**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC JANSEN, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| INTERNATIONAL FLAVORS & FRAGRANCES INC., ANDREAS FIBIG, and RICHARD A. O'LEARY, | |
| Defendants. | **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Marc Jansen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by International Flavors & Fragrances Inc. ("IFF" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by IFF; and (c) review of other publicly available information concerning IFF.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired IFF securities between May 7, 2018 and August 5, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     IFF purports to be an "innovator of sensory experiences" by creating products that consumers taste, smell, or touch.  IFF acquired Frutarom Industries Ltd. ("Frutarom") in October 2018 for $7.1 billion.  After the acquisition, the Company's product portfolio includes natural colors, antioxidants for food preservation, nutraceuticals, ingredients for infant formula and proteins for elderly nutrition, and expanded core product lines with savory solutions aimed at the meat and fish industry, citrus and other natural flavors, specialty ingredients, and new cosmetic actives.

3.     On August 5, 2019, after the market closed, the Company disclosed that Frutarom had "made improper payments to representatives of a number of customers" in Russia and Ukraine and that "key members of Frutarom's senior management at the time were aware of such payments."  The Company also reduced its 2019 financial guidance for sales to a range of $5.15 billion to $5.25 billion, from a range of $5.2 billion to $5.3 billion, and for adjusted earnings per share to a range of $4.85 to $5.05, from $4.90 to $5.10.

4.     On this news, the Company's share price fell $22.56 per share, or nearly 16%, to close at $118.91 per share on August 6, 2019, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Frutarom had bribed customers in Russia and Ukraine; (2) that senior management at Frutarom were aware of such improper payments; (3) that, as a result, Frutarom's financial results were materially overstated; (4) that, as a result of the improper payments, the Company was reasonably likely to face regulatory scrutiny; (5) that the Company had not completed adequate due diligence before acquiring Frutarom; (6) that, as a result of the foregoing, the Company was unlikely to achieve purported synergies from the acquisition; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Marc Jansen, as set forth in the accompanying certification, incorporated by reference herein, purchased IFF securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant IFF is incorporated under the laws of New York with its principal executive offices located in New York, New York.  IFF's shares trades on the New York Stock Exchange ("NYSE") exchange under the symbol "IFF."

13.     Defendant Andreas Fibig ("Fibig") was the President and Chief Executive Officer of the Company at all relevant times.

14.     Defendant Richard A. O'Leary ("O'Leary") was the Chief Financial Officer of the Company at all relevant times.

15.     Defendants Fibig and O'Leary, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     IFF purports to be an "innovator of sensory experiences" by creating products that consumers taste, smell, or touch. IFF acquired Frutarom Industries Ltd. ("Frutarom") in October 2018.   After the acquisition, the Company's product portfolio includes natural colors, antioxidants for food preservation, nutraceuticals, ingredients for infant formula and proteins for elderly nutrition, and expanded core product lines with savory solutions aimed at the meat and fish industry, citrus and other natural flavors, specialty ingredients, and new cosmetic actives.

### Materially False and Misleading
### Statements Issued During the Class Period

17.     The Class Period begins on May 7, 2018. On that day, the Company announced its definitive agreement to acquire Frutarom for $7.1 billion. The Company stated in a press release, in relevant part:

**Driving Enhanced Financial Performance**

- **Accelerates Profitable Growth:** On a pro forma basis, the combined company would be expected to have approximately $5.3 billion of revenue in 2018. Following the completion of the transaction, IFF is expected to benefit from enhanced top line growth rates and a strong EBITDA margin.

- **Provides Significant Synergy Potential:** IFF and Frutarom expect to realize approximately $145 million of run-rate cost synergies by the third full year after closing, with approximately 25% achieved in the first full year. Synergies are expected to come from procurement, footprint optimization and streamlining overhead expenses. In addition, cross-selling opportunities and integrated solutions are expected to provide revenue synergies, creating further value to shareholders over time.

- **Drives Strong Earnings and Cash Flow Accretion:** The transaction is expected to be neutral to adjusted cash earnings per share in the first full year and double-digit accretive to adjusted cash earnings per share in the second full year. The combined company is also expected to generate enhanced cash flow to meet operating, financing and strategic needs.

- **Maintains Dividend**: IFF expects to maintain its quarterly dividend consistent with prior guidance.

18.     On September 6, 2018, the Company announced "strong progress" on the

Frutarom combination. In an press release, the Company stated, in relevant part:

> "We have made significant progress planning for the integration of our two companies, and our accelerated timeline to close this transaction in early October, pending all remaining antitrust approvals, is a true testament to the hard work and integration planning efforts underway. On this strong foundation, we believe that we will unlock significant long-term value for our shareholders."

> **Combination will enrich IFF's portfolio with a stronger product offering, greater exposure to fast-growing customers and broader access in attractive adjacencies**

>> Creates a differentiated portfolio with an increased focus on naturals and health and wellness as well as more comprehensive solutions

>> Enhances IFF's exposure to the fast-growing small- and mid-sized customers, including private label

>> Provides opportunities to expand into attractive and fast-growing categories, such as savory solutions, natural colors, natural food protection and health ingredients

> **Expects to accelerate financial growth rates as a combined company**

>> Increases average sales growth targets to 5-7%, on a currency neutral and pro-forma basis, for 2019 to 2021 period

>> Updates average currency neutral adjusted cash EPS growth to 10% or greater for 2019 to 2021 period

>> Anticipates cost synergies of $145 million by rationalizing procurement, optimizing global footprint and streamlining overhead expenses by the third full year after the completion of the merger

>> Prioritizes repayment of debt and anticipates to be less than 3X net debt to EBITDA in 18-24 months to retain investment grade rating

19.     On October 4, 2018, the Company completed its acquisition of Frutarom.

20.     On November 5, 2018, the Company announced its third quarter 2018 financial results, reporting net sales of $908 million and operating profit of $159 million.

21.     On February 13, 2019, the Company announced its fourth quarter and full year 2018 financial results. It also provided 2019 guidance, expecting between $5.2 and $5.3 billion in sales and between $4.90 and $5.10 in adjusted earnings per share. The press release stated, in relevant part:

**Management Commentary**

"2018 was a pivotal year in the long and successful history of IFF," said Andreas Fibig, IFF Chairman and CEO. "As an organization, we delivered on all our key financial metrics and completed our acquisition of Frutarom – the largest in our industry to date – all while successfully navigating a challenging and dynamic market environment.

"We achieved strong advancements in both top and bottom line results in 2018. Highlights include our record-setting sales of approximately $4.0 billion – including sales related to Frutarom, as well as mid-single digit growth in both Taste and Scent – and strong adjusted EPS ex amortization of $6.28.

\* \* \*

**Full Year 2018 Consolidated Financial Results**

- Reported net sales for the full year totaled $4.0 billion, an increase of 17% from $3.4 billion in 2017 driven by mid-single digit growth in both Taste and Scent and the contribution of sales related to Frutarom. For the year, pricing contributed approximately 2 percentage points to growth for both Taste and Scent.

22.     On February 26, 2019, the Company filed its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results. Regarding risks impacting the business, the Company stated, in relevant part:

**We may not realize the benefits anticipated from the Frutarom acquisition, which could adversely affect our business.**

Part of our growth strategy has included growth through acquisitions within the fragrance, flavors, natural ingredient industries and adjacencies. The Frutarom acquisition was our most significant acquisition and brings a significantly different customer base and new adjacent product categories to our business. Our expectations about the benefits of this acquisition are based on projections and assumptions about our combined businesses which depend on (i) our ability to maintain the current Frutarom business, (ii) our ability to achieve the anticipated synergies and (iii) our ability to cross-sell the combined company's products. We may encounter significant challenges achieving these anticipated benefits, including the following:

- potential disruption of, or reduced growth in, our historical core businesses, due to diversion of management attention from our historical core business and uncertainty with our current customer and supplier relationships;

- challenges arising from the expansion of our product offerings into adjacencies with which we have limited experience, including functional foods and nutraceuticals;

- coordinating and integrating research and development teams across technologies and products to enhance product development while reducing costs;

- consolidating and integrating corporate, information technology, finance and administrative infrastructures, and integrating and harmonizing business systems, which may be more difficult than anticipated due to the significant number of acquisitions completed by Frutarom over the past few years;

- coordinating sales and marketing efforts to effectively position our capabilities and the direction of product development;

- difficulties in achieving anticipated cost savings, synergies, business opportunities, cross-selling opportunities and growth prospects from combining Frutarom's business with our business;

- the increased scale, regulatory compliance costs and complexity of our operations;

- retaining key employees, suppliers and other partners;

- retaining and efficiently managing Frutarom's significantly expanded and decentralized customer base;

- difficulties in anticipating and responding to actions that may be taken by competitors in response to the transaction; and

- the assumption of and exposure to unknown or contingent liabilities of Frutarom.

In addition, our anticipated benefits of the acquisition of Frutarom contemplate significant cost-saving synergies, which we expect to arise principally from facility consolidation and rationalization of supply chain relationships. Even if we are able to successfully integrate the operations of Frutarom with ours, we may not realize the full benefits of the acquisition if we are unable to identify and implement the anticipated cost savings or if the actions taken to implement such cost-savings have unintended consequences on our other business operations.

If we do not successfully manage these issues and the other challenges inherent in integrating Frutarom, we may not achieve the anticipated benefits of the acquisition, we could incur unanticipated expenses and charges and our operating results could be materially and adversely affected.

**The Frutarom acquisition resulted, and may continue to result, in significant charges or other liabilities that could adversely affect the financial results of the combined company.**

Our financial results, following the acquisition of Frutarom, were adversely affected by cash expenses and non-cash accounting charges incurred in connection with the acquisition. We expect these types of charges to continue as a result of the integration of the business and operations of Frutarom. As a result of the acquisition, we assumed all of Frutarom's liabilities, including unknown and contingent liabilities. Due to the nature of the transaction and the characteristics of Frutarom, our ability to conduct extensive due diligence was limited and we may subsequently identify additional obligations, including those that Frutarom assumed in its prior acquisitions, during the measurement period. Prior to our acquisition, Frutarom completed 47 acquisitions since 2011, including 22 since the beginning of 2016. Our ability to accurately identify and assess the magnitude of the liabilities assumed by Frutarom in these acquisitions was limited by, among other things, the information available to us and Frutarom and the limited operating experience that Frutarom has with these acquired entities. If we are not able to completely assess the scope of these liabilities or if these liabilities are neither probable nor estimable at this time, our future financial results could be adversely affected by unanticipated reserves or charges, unexpected litigation or regulatory exposure, unfavorable accounting charges, unexpected increases in taxes due, a loss of anticipated tax benefits or other adverse effects on our business, operating results or financial condition.

23.     Regarding internal control over financial reporting, the 2018 10-K stated, in relevant part:

**_Changes in Internal Control Over Financial Reporting._**

On October 4, 2018, we completed the acquisition of Frutarom and are in the process of incorporating Frutarom into our internal control over financial reporting structure and our evaluation of internal control over financial reporting and related disclosure controls and procedures. Our Chief Executive Officer and Chief Financial Officer have concluded that, other than working to incorporate Frutarom as mentioned above, there have not been any changes in our internal control over financial reporting during the fourth quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

24.     On May 6, 2019, the Company announced its first quarter 2019 financial results.

It also confirmed its financial guidance for 2019. The press release stated, in relevant part:

"We are executing well against our integration roadmap. For those businesses where we have aligned our go-to-market approach with IFF – North America Taste and IBR – growth is very strong, increasing double-digits. We are also seeing great progress from procurement synergies and are well underway in terms of our manufacturing optimization plan. For 2019, we are confident that we will achieve our $30 to $35 million cost savings goal as our current run-rate savings are already in excess of this target.

"Looking forward, we expect sales growth and profitability to improve in the second half of the year. We remain focused on executing our strategy and integrating successfully, and by doing so, we have reiterated our full year financial guidance."

**First Quarter 2019 Consolidated Financial Results**

- Reported net sales for the first quarter totaled $1.3 billion, an increase of 39% from
  $931.0 million in 2018, including the contribution of sales related to Frutarom. On a combined basis, currency neutral sales improved 3%, excluding the contribution of acquisitions and divested businesses, with growth across all segments.

25.     The same day, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2019, affirming the previously reported financial results.

26.     On June 5, 2019, the Company affirmed its 2019 and long-term guidance, stating in relevant part:

**Financial Guidance**

The Company reconfirms its long-term financial targets for 2019-2021: 5-7% currency neutral sales growth, and 10%+ currency neutral EPS growth, excluding amortization. The company reconfirms its objective to reach <3x Net Debt / EBITDA between 18-24 months and >12% total shareholder return by 2021. For the full year 2019, the Company also reconfirms its guidance of $5.2B - $5.3B in sales, $4.90 - $5.10 in adjusted EPS, and $6.30 - $6.50 in EPS excluding amortization.

27.     The above statements identified in ¶¶17-26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Frutarom had bribed customers in Russia and Ukraine; (2) that senior management at Frutarom were aware of such improper payments; (3) that, as a result, Frutarom's financial results were materially overstated; (4) that, as a result of the improper payments, the Company was reasonably likely to face regulatory scrutiny; (5) that the Company had not completed adequate due diligence before acquiring Frutarom; (6) that, as a result of the foregoing, the Company was unlikely to achieve purported synergies from the acquisition; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and

prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

28.     On August 5, 2019, after the market closed, the Company disclosed that Frutarom had "made improper payments to representatives of a number of customers" in Russia and Ukraine and that "key members of Frutarom's senior management at the time were aware of such payments." The Company also reduced its 2019 financial guidance for sales to a range of $5.15 billion to $5.25 billion, from a range of $5.2 billion to $5.3 billion, and for adjusted earnings per share to a range of $4.85 to $5.05, from $4.90 to $5.10. The Company stated in a press release, in relevant part:

> During the integration of Frutarom, IFF was made aware of allegations that two Frutarom businesses operating principally in Russia and Ukraine made improper payments to representatives of a number of customers. IFF promptly commenced investigations of such allegations with the assistance of outside legal and accounting firms. IFF's investigations are not yet complete, but preliminary results indicate that improper payments were made and that key members of Frutarom's senior management at the time were aware of such payments. IFF has not uncovered any evidence suggesting that such payments had any connection to the United States.

> Based on the results of the investigations to date, IFF believes that such improper customer payments are no longer being made and the estimated affected sales represented less than 1% of IFF's and Frutarom's combined net sales for 2018. IFF does not believe the impact from these matters is or will be material to IFF's results of operations or financial condition.

> IFF is committed to the highest standards of ethics and compliance and has strict compliance policies in place that are regularly reviewed and updated. Consistent with such policies, IFF has taken or will take appropriate remedial actions with respect to the matters described above. Although the investigations are continuing, based on the results to date and other compliance-related integration activities IFF is not currently aware of similar instances of misconduct.

29.     On this news, the Company's share price fell $22.56 per share, or nearly 16%, to close at $118.91 per share on August 6, 2019, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired IFF securities between May 7, 2018 and August 5, 2019,

inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IFF's common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of IFF common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by IFF or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of IFF; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

36.     The market for IFF's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, IFF's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired IFF's securities relying upon the integrity of the market price of the Company's securities and market information relating to IFF, and have been damaged thereby.

37.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of IFF's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about IFF's business, operations, and prospects as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about IFF's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects,

thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

39.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

40.     During the Class Period, Plaintiff and the Class purchased IFF's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding IFF, their control over, and/or receipt and/or modification of IFF's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IFF, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

42.     The market for IFF's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

disclose, IFF's securities traded at artificially inflated prices during the Class Period. On June 11, 2019, the Company's share price closed at a Class Period high of $152.15 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of IFF's securities and market information relating to IFF, and have been damaged thereby.

43. During the Class Period, the artificial inflation of IFF's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about IFF's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of IFF and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

44. At all relevant times, the market for IFF's securities was an efficient market for the following reasons, among others:

(a) IFF shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, IFF filed periodic public reports with the SEC and/or the NYSE;

(c) IFF regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) IFF was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

45.     As a result of the foregoing, the market for IFF's securities promptly digested current information regarding IFF from all publicly available sources and reflected such information in IFF's share price. Under these circumstances, all purchasers of IFF's securities during the Class Period suffered similar injury through their purchase of IFF's securities at artificially inflated prices and a presumption of reliance applies.

46.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of IFF who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

48.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase IFF's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

50.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for IFF's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about IFF's financial well-being and prospects, as specified herein.

52.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IFF's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about IFF and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

53.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IFF's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of IFF's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired IFF's securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that IFF was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their IFF securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     Individual Defendants acted as controlling persons of IFF within the meaning of

Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, IFF and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 12, 2019                    By:  */s/ Lesley F. Portnoy*
                                          **GLANCY PRONGAY & MURRAY LLP**
                                          Lesley F. Portnoy (LP-1941)
                                          230 Park Ave., Suite 530
                                          New York, NY 10169
                                          Telephone: (212) 682-5340
                                          Facsimile: (212) 884-0988
                                          Email: lportnoy@glancylaw.com

                                                   -and-

                                          Lionel Z. Glancy
                                          Robert V. Prongay
                                          Charles H. Linehan
                                          Pavithra Rajesh
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone: (310) 201-9150
                                          Facsimile: (310) 201-9160
                                          Email: info@glancylaw.com

                                          *Attorneys for Plaintiff Marc Jansen*

# SWORN CERTIFICATION OF PLAINTIFF

## INTERNATIONAL FLAVORS & FRAGRANCES INC. SECURITIES LITIGATION

I, Marc Jansen, certify that:

1.      I have reviewed the Complaint and authorize its filing and/or the filing of a Lead
Plaintiff motion on my behalf.

2.      I am duly authorized to institute legal action International Flavors & Fragrances
Inc. and other defendants.

3.      I did not purchase International Flavors & Fragrances Inc. securities that are the
subject of this action at the direction of plaintiff's counsel or in order to
participate in any private action arising under this title.

4.      I am willing to serve as a representative party on behalf of a class and will testify
at deposition and trial, if necessary.

5.      My transactions in International Flavors & Fragrances Inc. securities during the
Class Period set forth in the Complaint are as follows:

        (See attached transactions)

6.      I have not sought to serve, nor served, as a representative party on behalf of a
class under this title during the last three years, except for the following:

7.      I will not accept any payment for serving as a representative party, except to
receive my pro rata share of any recovery or as ordered or approved by the court,
including the award to a representative plaintiff of reasonable costs and expenses
(including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

8/9/2019
_____                    _____
       Date                                                    Marc Jansen

**Marc Jansen's Transactions in International Flavors &
Fragrances Inc. (IFF)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 5/23/2018 | Bought | 40 | $125.0000 |