## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MENORA MIVTACHIM INSURANCE LTD, MENORA MIVTACHIM PENSIONS AND GEMEL LTD, MENORA MIVTACHIM AND THE FEDERATION OF ENGINEERS PROVIDENT FUND MANAGEMENT LTD, CLAL INSURANCE COMPANY LTD, CLAL PENSION AND PROVIDENT LTD, and ATUDOT PENSION FUND FOR EMPLOYEES AND INDEPENDENT WORKERS, | Case No. 19-cv-07536 (NRB)  **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Lead Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| INTERNATIONAL FLAVORS & FRAGRANCES INC., FRUTAROM INDUSTRIES LTD, ANDREAS FIBIG, RICHARD A. O'LEARY, ORI YEHUDAI, ARI ROSENTHAL, ALON GRANOT, GUY GILL, and AMOS ANATOT, | |
| Defendants. | |

1

Lead Plaintiffs Menora Mivtachim Insurance Ltd.; Menora Mivtachim Pensions and Gemel Ltd.; Menora Mivtachim and the Federation of Engineers Provident Fund Management Ltd., collectively ("Menora"); Clal Insurance Company Ltd.; Clal Pension and Provident Ltd.; Atudot Pension Fund for Employees and Independent Workers, collectively ("CLAL") (altogether, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.   Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by International Flavors & Fragrances Inc. ("IFF") and Frutarom Industries Limited ("Frutarom") with the United States Securities and Exchange Commission ("SEC") and the Israeli Securities Authority ("ISA"); (b) review and analysis of press releases and media reports issued by and disseminated by IFF and Frutarom; (c) review of other publicly available information concerning IFF and Frutarom; and (d) interviews with confidential witnesses with direct knowledge of the allegations made herein.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of all persons and entities that purchased or otherwise acquired IFF securities on the New York Stock Exchange ("NYSE") between May 7, 2018 and August 12, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").   Plaintiffs also bring this action as a class action on behalf of all persons and entities who purchased or otherwise acquired IFF securities on the Tel Aviv Stock Exchange ("TASE") between October 9, 2018 and August 12, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Israeli securities laws.

1

2.     Frutarom Industries Ltd. ("Frutarom") describes itself as "a global company established in Israel," which itself and through its subsidiaries "develops, produces and markets flavors and fine ingredients used in the manufacturing of food, beverages, flavors and fragrances, pharma/nutraceuticals, cosmetics and personal care products."  Frutarom focuses on local sourced and organic ingredients, small and midsized customers, with a heavy concentration of development and sales in Emerging Markets.[1]

3.     IFF purports to be an "innovator of sensory experiences" by creating products that consumers taste, smell, or touch.  IFF focuses on large institutional global customers.  IFF was the third largest flavors and sensory company, when in October 2017 it set its sights on Frutarom, seeking to become the second largest company in that industry.

4.      The anticipated merger of these two industry leaders was announced with great fanfare on May 7, 2018.  The merger negotiations were led by Defendants Fibig and O'Leary from IFF and Defendant Yehudai, with support from Defendants Granot and Gill, from Frutarom.

5.     Both companies, together and separately marketed this merger, and presented the long history of financial success of each company to paint a picture as a future leader in the flavors industry.  IFF repeatedly touted Frutarom's success, especially in the Emerging Markets, where sales from Frutarom Russia were in the hundreds of millions of dollars.  Explaining IFF's interest in the merger, Defendant Fibig stated that "They [Frutarom] do around about 40% to 45% of their business in merging markets as well. And here, as you can see in terms of the

---

[1] Emerging markets are those that are striving to become advanced economies through increased production, development of regulatory bodies and exchanges, and increasingly sophisticated markets. During the relevant time, Frutarom and IFF included Russia and Ukraine in their Emerging Markets division.  Both entities were laser-focused on Emerging Markets.  For example, in 2017 Frutarom reported sales from its emerging market division of US$ 585,619,000, out of total sales of US$ 1,362,396,000, approximately 43% of total sales. As of June 2018, 57% of Frutarom's employees worked in the Emerging Markets division.

financials, very, very strong growth in terms of sales and profitability over the last decade, driven by strong organic growth last three years, the average around about 6% . . . in the mid- and long-term that's probably the biggest value creation opportunity you will see . . . ."

6.      IFF and Frutarom presented an impressive combined company, with $5.3 billion in sales from IFF and $1.6 billion in sales from Frutarom. In this merger context, IFF shareholders understood that the statements made concerning Frutarom impacted the price of IFF's securities, which traded in an efficient market.  Indeed, analysts covering IFF before and after the merger looked at and discussed Frutarom in setting price targets for IFF.

7.      IFF acquired Frutarom in October 2018 for $7.1 billion, creating the second largest company in the fragrance and flavors industry.  This $7 billion transaction was one of the largest acquisitions in Israel's history.   The turnover and profitability of Frutarom, as well as the growth dynamics, were the major factors influencing both the merger itself and the price paid by IFF for Frutarom.

8.      The merger was presented to investors as a compelling transaction because it combined two companies that had focused on different markets and in different regions.  IFF had focused on large corporate clients, such as PepsiCo, Coca-Cola and Estee Lauder, in developed countries, whereas Frutarom had focused on organic and natural flavors and colors, which marketed products to the small and midsized customers with an Emerging Markets focus.  One country in particular that had captured IFF's attention was Russia, which represented 30% of Emerging Market revenues at Frutarom.  Following the acquisition of PTI in 2013, "Frutarom became the leading manufacturer in Russia and the countries of the region of unique savory solutions and with one of the largest and most leading R&D, sales and marketing and distribution platforms in its field.

9.      The merger would serve large multinational clients as well as small clients, in both developed nations and in Emerging Markets.

10.     But the deal was built on a foundation of material misstatements and omissions made by Frutarom and repeated by IFF regarding the source of Frutarom's success in the Emerging Markets.  In truth, the growth and strength of the Emerging Markets sector was based on a long-running bribery scheme at Frutarom, designed to capture and retain customers and bribe customs and certification officials to facilitate the movement of goods.  Unbeknownst to investors, an audacious fraud had been ongoing from at least 2002 at Frutarom, involving bribing Frutarom customers to capture their business in Russia and Ukraine, as well as bribing government officials at ports of entry for the delivery of goods.  The bribery scheme affected 30-50% of Frutarom's customers in Ukraine and Russia, and was known to and directed by the most senior executives at Frutarom, including Defendants Yehudai, Gill, Granot and Rosenthal. According to confidential witnesses with firsthand knowledge of the bribery scheme, the bribes were set at approximately 3-10% of relevant sales.

11.     During the Class Period, IFF touted Frutarom's success in Russia and other Emerging Markets, ignoring the massive bribery scheme, despite acknowledging that Russia was a hotbed for bribery and corruption.

12.     The merger was completed in October 2018.  Frutarom was delisted and became an operating unit (in a form of a wholly-owned subsidiary) of IFF, retaining the very employees who had supported and engaged in the rampant bribery scheme in Russia and Ukraine.  The corrupt Frutarom executives continued to work at Frutarom after the merger, bringing with them their knowledge of the rampant bribery scheme.  Worse, IFF acquiesced in Frutarom's decision to dole out tens of millions of dollars in "bonuses" to Frutarom's corrupt executives, despite the

fact that the bonuses were an exception to Frutarom's compensation policy.  The largest bonus proposed was for Defendant Yehudai for $20 million and did not secure a majority vote at the shareholders meeting on August 6, 2018.   Yet, on October 2, 2018, days before the completion of the merger, the Board of Directors and Compensation Committee approved the bonus, overriding the shareholders' vote.

13.     IFF acknowledged but did not publicly disclose the scheme when, as part of the merger negotiations, it made Frutarom pledge that it would cease bribery activities at the company.

14.     On February 13, 2019, after the market closed, IFF announced disappointing fourth quarter and full-year results for 2018, and revenue guidance for 2019 that came in below consensus expectations.  The decrease in earnings was due in part to IFF beginning to restrict the bribery scheme.  On this news, IFF's share price plummeted $12.56 per share, or nearly 8.65%, to close at $132.66 per share on February 14, 2019, on unusually heavy trading volume, wiping out hundreds of millions of dollars in market capitalization.  There was a similar drop on the shares traded on the TASE.

15.     On August 5, 2019, after the market closed, IFF shocked investors when it announced that, after an internal investigation, it found that Frutarom "made improper payments to representatives of a number of customers" in Russia and Ukraine and that "key members of Frutarom's senior management at the time were aware of such payments."  These executives included Defendants Yehudai, Gill, Rosenthal and Granot.  Given that the company could no longer rely on the scheme to boost sales in its Emerging Markets division, it also reduced its 2019 financial guidance for sales to a range of $5.15 billion to $5.25 billion, from a range of $5.2 billion to $5.3 billion.  On this news, the Company's share price plummeted $22.56 per share, or

nearly 16%, to close at $118.91 per share on August 6, 2019, on unusually heavy trading volume, eviscerating hundreds of millions of dollars in market capitalization.  There was a similar decline in the price of the shares traded on the TASE.  Before the market opened on August 13, 2019, news outlets reported that IFF submitted the results of its internal investigation regarding Frutarom to the DoJ.  The same day a number of class actions were filed against IFF.  On this news, on August 13, 2019, IFF's share price fell 1.14% from $120.08 to $118.71.  On the next day, IFF's share price fell 4.81% from $118.71 to $113.00 on August 14, 2019, on unusually heavy trading volume. IFF's shares continued to decline another 2.12% on August 15, closing at $110.61.  There were similar drops on the shares traded on the TASE.

16.     On October 29, 2019, IFF and Frutarom commenced an action in Israel to claw back the outsized bonus paid to Defendant Yehudai.  The complaint charged Yehudai with fraud and identified material misstatements and omissions made by Frutarom/Yehudai in public filings.  Those misstatements are the same or substantially similar to the false representations Plaintiffs allege in this complaint, so their viability under the law cannot be seriously contested by Defendants.   IFF and Frutarom alleged that "during the internal investigation it was revealed that Frutarom's activities, at least in Russia and Ukraine, were tainted by unlawful and/or improper activity of payments to customer representatives (existing and/or potential) in order to make and/or others to purchase the company's products for and/or by the Customers . . . the improper activities and improper payments were made under the direction and/or approval and/or involvement of Ori Yehudai, and for the very least he was aware of these payments and did not prevent them . . . The bonus was approved on the basis of misleading misrepresentations and other violations and wrongdoings."

17.     Specifically, IFF and Frutarom alleged that:

Over the years, prior to the merger deal, Frutarom reported successful operations, including in Russia and Ukraine. For example, in Frutarom's financial reports for 2016-2014, Frutarom reported that the share of revenues from operations in Russia amounted to $150 million per year, out of total annual revenue of about $1 billion. As part of the aforementioned financial statements, the senior executives of Frutarom, including defendant 1 (Yehudai), made a false statement that the financial statements adequately reflect Frutarom's operating results and cash flow, and that any defect and/or fraud in which the company or any of its senior employees is involved in, is disclosed.

In addition, as part of the financial reports, Frutarom periodically reported the effectiveness of control, supervision and the integrity of the Company's operations.

18.    IFF and Frutarom also alleged there were false statements within the merger agreement, since the "merger agreement also included a statement and representation that Frutarom complied with all applicable laws."  Citing the agreement, which was filed with the SEC by IFF pursuant to Form S-4, IFF and Frutarom represented that "Since December 31, 2015, the Company and its Subsidiaries have been and are in compliance with (i) all applicable Laws."  The merger agreement "included Ori Yehudai's attestation that the statements and representations in the merger agreement were true and accurate (hereinafter: "Yehudai's False Statement")."

19.    IFF and Frutarom alleged that "The improper payments were made unlawfully and with bad faith (at the very least with negligence) and at the very least constituted 'civil bribery.' These payments contravene the proper ways of operations of a publicly traded company, contradict the company's code of ethics and are obviously false statements."

20.    Plaintiffs in this matter agree with IFF and Frutarom's admissions that these statements were materially false and misleading.

21.    Here, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that:

(1) Frutarom was bribing customers' employees and customs and certification officials in Russia and Ukraine; (2) senior management at Frutarom directed and were aware of such improper payments; (3) as a result, Frutarom's financial results and the combined statements by Frutarom and IFF regarding IFF and/or Frutarom's financial metrics and the potential for future sales and revenues were misleading and overstated; and (4) as a result of the improper payments, IFF was reasonably likely to face regulatory scrutiny and financial liability, loss of business, and reputational losses.   Moreover, Defendants made numerous materially false and misleading statements during the Class Period, including representations that "Frutarom does not give or receive, either directly nor indirectly, bribes or other improper advantages for business or financial gain."

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of IFF's securities, Plaintiffs and Class members have suffered significant losses and damages.  Any misdeed by Frutarom becomes the financial responsibility of IFF, which in the merger agreement explicitly assumed Frutarom's known and unknown liabilities, including, but not limited to, Russia and Ukraine.  The Merger Agreement provided that "upon the completion of the merger, IFF will be liable for some or all of Frutarom's liabilities, including unknown and contingent liabilities that Frutarom assumed in connection with their prior acquisitions that IFF may have failed to or been unable to identify in the course of performing due diligence."

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and under the Israel Securities Law, 1968.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Moreover, IFF's principal executive offices are located in this District.

26.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

27.     Plaintiffs Menora and Clal, as set forth in their previously filed certifications, purchased IFF securities during the Class Period on both the NYSE and TASE, and suffered damages as a result of the misleading statements and/or material omissions alleged herein.

28.     Defendant IFF is incorporated under the laws of New York with its principal executive offices located in New York, New York.  IFF's shares trade on the NYSE under the symbol "IFF" and also trade on the TASE.  In October 2018, IFF acquired Frutarom, which became a wholly owned subsidiary of IFF.

29.     Defendant Frutarom is a wholly owned subsidiary of IFF.

30.     Defendant Andreas Fibig ("Fibig") was the President and Chief Executive Officer of IFF at all relevant times.

31.     Defendant Richard A. O'Leary ("O'Leary") was the Chief Financial Officer of IFF at all relevant times.

32.     Defendant Ori Yehudai ("Yehudai") was President and Chief Executive Officer of Frutarom before the merger and remained a consultant for IFF after the merger.

33.     Defendant Guy Gill ("Gill") was Vice President of Finance at Frutarom before the merger and was Senior VP of Finance at Frutarom after the merger until October 2019.  After the merger, Gill reported to Anatot, who was part of the Executive Leadership team at IFF.  Gill also reported to O'Leary, the CFO of IFF.

34.     Defendant Ari Rosenthal ("Rosenthal") was General Manager Israel and Emerging Markets at Frutarom and remained in that position at Frutarom after the merger until August 2019.  After the merger, Rosenthal reported to a top executive at IFF.

35.     Defendant Alon Granot ("Granot") was Chief Financial Officer at Frutarom and remained at Frutarom under IFF after the merger.

36.     Defendant Amos Anatot ("Anatot") served as Frutarom's Executive Vice President of Global supply Chain & Operations.  After the merger, Anatot became President of Frutarom and became a member of the Executive Leadership team at IFF.

37.     The defendants referenced in ¶¶30-36 above are referred to collectively as the "Individual Defendants."

38.     The defendants referenced in ¶¶28-36 above are referred to collectively as "Defendants" or "Scheme Defendants."

39.     The Individual Defendants, because of their positions with the companies, possessed the power and authority to control the contents of, among other things, Defendants' Frutarom and/or IFF's reports to the SEC, the London Stock Exchange, the Israeli stock

exchange, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of Defendants Frutarom and/or IFF's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Moreover, because of their positions and access to material non-public information available to them, the Individual Defendants knew or should have known that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

40.     The Individual Defendants approved, reviewed, ratified, furnished information and language for inclusion, and knowingly or recklessly disregarded and/or tolerated Frutarom and IFF's false representations.

41.     Defendants Gill and Rosenthal were responsible for preparing the financials of Frutarom, which IFF in turn used and reported publicly.

42.     Each of the Individual Defendants, at Frutarom and/or IFF:

a.   directly participated in the management of Frutarom and/or IFF;

b.   was directly involved in the day-to-day operations and decision making of Frutarom/IFF at the highest levels;

c.   was privy to confidential proprietary information concerning Frutarom and/or IFF and its business and operations;

d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of Frutarom and/or IFF's internal controls;

f.  knew or recklessly disregarded the fact that the false and misleading statements were being issued concerning Frutarom and/or IFF and the positive effect on IFF shares;

g.  approved or ratified these statements in violation of the federal securities laws; and

h.  at least four of the Individual Defendants have explicitly authorized payment of bribes, designed and supervised the bribery system and were instrumental in its integration into Frutarom's operations.

43.  Defendant Anatot led the integration between Frutarom and IFF.  According to Defendant Fibig, Anatot "has a robust knowledge of the day-to-day operations at Frutarom and is actively involved in all business aspects . . . [Anatot is] very engaged to ensure the successful completion and integration of" the two companies.

44.  Due to their senior level and positions within the companies, the scienter of the Individual Defendants is imputed to IFF and Frutarom.

### SUBSTANTIVE ALLEGATIONS
### Fraud at Frutarom
#### a.  The Bribery Scheme

45.  Beginning at least as early as 2002 and through 2018, bribing government officials and customer representatives was business as usual at Frutarom in Russia and Ukraine. The bribes to customers were well-documented in an excel chart (the "Bribes Chart") and the bribes to customs officials and local certification officials were documented in an excel chart called "cash report" (the "Cash Bribes Chart").  Both charts were compiled by Frutarom

managers in Russia and Ukraine, and were regularly distributed to Defendants Yehudai, Granot, Rosenthal and Gill, as well as to internal auditor Yoav Barak and to several other people from the financial department and Emerging Markets division.  The bribes recipients and percentages were approved by Gill and Rosenthal.

46.    Confidential Witness 1 ("CW-1")[2] (defined below) said that in Frutarom's Profit and Loss ("P&L") report sent to Israel each month, there was a row called "Other salary expenses" listing the amounts of bribes paid as they were documented on the Bribes Chart and the Cash Bribes Chart.  CW-1 said if anyone reviewed the P&L, it was impossible to miss the bribes.

47.    According to CW-1, the Bribes Chart contained a list of customers, sales, customer payments, bribes amount in local currency and in US dollars, names of sales managers responsible for the delivery of bribes, names of customer officials receiving the bribes, and their positions.  CW-1 said the bribes were usually paid to employees of big and important customers and explained that all the bribes were documented in periodic reports at Frutarom.

48.    CW-1 was the CFO at Frutarom Ukraine and Frutarom Russia.  He was head of the finance department in Ukraine between 2007 and 2014 and head of the finance department in Russia between 2008 and 2014.  CW-1 was the "de facto" General Manager of Frutarom Russia.  During his time at Frutarom, CW-1 had control over all reported finances for Russia and Ukraine.  CW-1 reported to CW-2 until 2010, when he began reporting to Defendant Rosenthal.  In 2012, he started reporting to Defendant Gill as well, when Gill became Vice President of Finance.

---

[2] Confidential witnesses ("CWs") are identified herein by number (CW-1, CW-2, etc.).  All CWs are described in the masculine to protect their identities.

49.     CW-1 managed two departments, logistics and accounting.  CW-1 was located first in Kiev, Ukraine until 2009, when he moved to Frutarom's office in Moscow, Russia.  CW-1 was the second in command at Frutarom Russia and Frutarom Ukraine, under CW-2.  CW-1 visited Israel approximately five to seven times during his tenure at Frutarom.  His last visit was in June 2014.

50.     Confidential Witness 2 ("CW-2") was the General Manager and CEO at Frutarom Ukraine between 2006 and 2013 and at Frutarom Russia between 2008 and 2014.  He managed all business and finances at these subsidiaries, subject to the instructions of Frutarom executives in Israel.  When CW-2 began his employment at Frutarom Ukraine, he reported to Mr. Yair Ben Zvi, who was Vice President for Emerging Markets at Frutarom.  Mr. Ben Zvi reported to CEO of Frutarom's flavors sector Kobi Levi, and Levi reported to CEO Yehudai.  In March 2008, Mr. Amit Raz was appointed VP for Emerging Markets and CW-2 reported directly to him.  In 2009, Defendant Rosenthal replaced Mr. Raz and thereafter CW-2 reported directly to Rosenthal.  CW-2 had regular interactions with Defendant Yehudai in Israel, on the telephone and by email.

51.     In Ukraine and Russia, there were two "Vice" General Managers who reported to CW-2: the Vice General Manager for commercial products and sales, and the CFO (CW-1).

52.     Frutarom rented apartments in Ukraine and Russia for CW-2, and he commuted back to Israel every other weekend until February 2008 when he commuted back to Israel every weekend.  Frutarom Russia's main office was in Moscow, and there were field offices in St. Petersburg, Saratov, Krasnodar and Yekaterinburg.  Frutarom's Ukraine office was in Kiev. CW-2 worked out of both the Moscow and Kiev offices.

53.     Frutarom Ukraine was a relatively small operation when CW-2 joined it, but it grew significantly after he joined.  There were two heads of sales, Sergey Shilko and Sergey Chuikov.  Frutarom Ukraine sales represented roughly 30% of Frutarom Russia sales.

54.     When CW-2 became head of Frutarom Russia, it was likewise a relatively small operation, but it grew dramatically throughout the years.  By 2017, Frutarom Russia reported over US$ 160 million in sales.

55.     Defendant Yehudai visited Frutarom Russia several times over the years.  CW-2 corresponded with Yehudai often and met with him in Israel several times between 2006 and 2008.  After 2008, there was a period where Yehudai wanted CW-2 to report to him almost 2-3 times a month, with meetings in his office in Herzelia, Israel.   They discussed all the business in Russia and Ukraine.  After 2009, CW-2 mainly communicated with Yehudai through Defendant Rosenthal.  Rosenthal told CW-2 that the bribes were discussed with Yehudai.  Yehudai visited Russia in January 2010 and CW-2 took him to different meetings over 3 days.  Yehudai also visited Moscow in 2011 when CW-2 and Yehudai had meetings regarding the potential acquisition of plants.  CW-2 met him again in December 2013.  There were also several email communications involving both CW-2 and Yehudai.

56.     CW-1 was responsible for updating and circulating the Bribes Chart.  The chart included the name of the client, the volume of the sales to that client, the total amount paid by the client, the bribery percentage that was agreed upon, the actual payment made to the individual receiving the bribe in local currency and US dollars, the name of the sales manager responsible for payment of the bribe to the recipient, and the recipient's name and position with the client.  CW-1 was also responsible for updating and circulating the Cash Bribes Chart.  It listed the customs house where the official was bribed and the amount.

57.     CW-1 sent the Bribes Chart by email to CW-2, and to Defendants Rosenthal and Gill monthly, quarterly, and annually.  CW-2 sent the Bribes Chart to Defendant Granot, cc'ing Yehudai.  They would discuss the Bribes Chart via email and by telephone.  CW-1 sent the Cash Bribes Chart to CW-2, Ari Rosenthal, and Guy Gill (and in different period of times Avital Shtark, Idan Goren, Amit Raz, and Avner Avissara).  The Charts were also sent together in emails monthly to these individuals.

58.     Periodically, CW-1 would prepare ad hoc reports that analyzed the effectiveness of the bribe payments or real margin.  Those reports were sent by email to the requesting officials in Israel and were saved on CW-1's desktop.

59.     According to CW-1 and CW-2, the sales teams at Frutarom Russia and Ukraine were in charge of negotiating the amount of each bribe with the "decision-makers" at the customer.  The bribes were typically based on a percentage of sales.  Frutarom would generally pay the "decision makers" 3-10% of the customer's sales, and on some occasions as much as 20%.

60.     Although the bribery negotiations were led by the sales representatives at Frutarom, the amounts of bribes were approved by CW-2, Rosenthal or Gill.   According to CW-1 and CW-2, if the bribe was new or an increase in percentage from prior amounts, they would need to ask Defendants Rosenthal and Gill for approval.  The cash bribes to customs and certification officials were also approved by CW-2 as part of the monthly budget.

61.     CW-2 would approve the bribe amounts by telephone, and CW-1 entered them into the Bribes Chart, which was sent to Rosenthal and Gill for review and approval.  CW-1 explained that Rosenthal and Gill would receive the requests and approve the bribes for each new customer via email, and they monitored monthly, quarterly, and annually the Bribes Chart.

Defendants Granot and Yehudai didn't approve each new bribe, however they approved policy decisions about the payment of bribes.

62.     Defendants Rosenthal and Gill reviewed the Bribes Chart and the Cash Bribes Chart monthly.   On a few occasions, CW-1 was asked by Frutarom managers to enter more details in the Bribes Chart.   Management's main goal was to reach 40% to 70% margins on sales, and the bribery was included and calculated in the price of sales.   CW-1 stated that the bribery was discussed orally, often using the word "bribe" or "otkat" (the last between Russian-speaking employees).[3]   CW-2 also said that some emails used the word "otkat" to discuss the bribes as well.   CW-2 stated that e-mails including Yehudai and Granot discussed policy issues and used words such as "illegal" and "money laundering."

63.     Once a bribe was approved and listed on the Bribes Chart, the amount would be added to the amount of money to be transferred from Israel to the Russian or Ukrainian accounts. There were two ways money was transferred to Russia and Ukraine.   Initially, CW-2 physically obtained the cash in the financial department in Israel and carried the cash on planes from Israel to Russia or Ukraine, but within a few years Frutarom added the bribe money to CW-1's salary paid to his bank account, which he would then withdraw in cash and distribute to sales managers.

64.     CW-2 explained that from 2006 to 2008, he visited Frutarom Haifa every two weeks to collect envelopes stuffed with cash (in U.S. dollars) that he would bring back to Russia and Ukraine to pay the bribes.   On September 12, 2006, CW-2 started work at Frutarom in Israel. On September 15, 2006, CW-2 received cash from Tali in the accounting department and was told he needed to bring the cash to Kiev for distribution.   He flew to Ukraine with Mr. Ben Zvi

---

[3] "Otkat is a colloquial term used to describe a form of corruption in Russia. It literally means 'rolling back' and is the equivalent of the English term 'kickback.' Otkat is the diversion of part of the money allocated for a purchase to the person responsible for the purchase, for example to an employee of a state administration or a company." http://www.in-formality.com/wiki/index.php?title=Otkat_(Russia)

and Mr. Sheigaut (Business Development Emerging Markets) for this first trip.   He gave the envelope of cash to Kati in the accounting department in Frutarom Ukraine.  Mrs. Mayinya, head of sweet flavors department in Frutarom Ukraine, first explained the process of delivering cash in Ukraine on CW-2's first trip.

65.     For the next two years, CW-2 traveled back and forth between Israel and Ukraine or Israel and Russia, carrying cash.  The cash was in U.S. dollars to be used for all operative costs, including salaries that were paid in cash at that time and bribes to customer employees. He learned later that the bribes had started years before, in the 1990s at Frutarom, and this was the normal way to get and retain customers in the region.

66.     In 2008, the cash transfer process was changed.  CW-1 received a monthly bonus to his salary, paid to his bank account, from which he would withdraw cash in local currency and distribute it to sales managers who doled out the bribes.  CW-1 would forecast the amount needed for bribes and would seek approval for the total amounts from CW-2, Rosenthal and Gill, providing them the calculation per customer.  Upon approval, CW-1 gave the sales managers envelopes with cash.  The sales managers gave the envelopes with cash to the client's decision-maker to generate continued and increased business with the customer.  The amounts varied monthly, and the bribe payments would be noted on the Bribes Chart by CW-1.  Angela Karpova, Svetlana Lobova, and Vitaly Isayev were some of the sales managers who received the cash to be paid out as bribes.  According to CW-2, Defendants Gill and Granot gave the instruction to proceed with the transfer of money in this manner, with Yehudai's approval.  CW-2 did not participate in this money transfer through his paycheck because his salary was paid to his bank account in Israel and was subject to inspection by the Israeli authorities.

67.     Before CW-2 left Frutarom Russia, management decided to use straw companies to launder money and pay bribes.  For example, Frutarom Russia received invoices from the straw company for services such as marketing, a service that was not actually provided, and would pay for the service and receive the cash back.  The cash from this system was then used to bribe the individual employees of the customers.

68.     According to CW-1, Frutarom Ukraine paid bribes to 15-20 customers out of the active 40-50 customers, while Frutarom Russia bribed 20-25 customers out of the active 40-50 customers.  CW-1 and CW-2 said the percentage of business impacted by the bribery in Russia and Ukraine was roughly 30-50% of the total sales volume.  If the bribes were not paid, Frutarom Russia and Frutarom Ukraine could lose 30-50% of their sales in Russia and Ukraine.

69.     For example, Frutarom reported that Q1 2018 overall sales were US$ 384.8 million.  Sales from the Emerging Markets encompassed approximately US$ 165.464 million or 43% of Frutarom's total sales, and Russia had been averaging over the previous three years 31% of the Emerging Markets.  Therefore, the bribery in Russia affected 13.3% of Frutarom's overall sales in that quarter alone.  Frutarom reported that the Q2 2018 overall sales were US$ 401.3 million.  Sales from the Emerging Markets encompassed approximately $180.585 million or 45% of Frutarom's total sales, and Russia had been averaging over the previous three years 31% of the Emerging Markets.  Therefore, the bribery in Russia affected 13.95% of Frutarom's overall sales in that quarter alone.

70.     The form of bribery used by Frutarom in Russia and Ukraine was locally called Otkat ("roll-back").  According to CW-2, the Otkat bribery process was formalized at some companies.  In the soft drink and meats industries, for example, a potential client would invite 10 companies similar to Frutarom, usually before summer to present new flavors.  The chief

technologist from the customer would test the offers.  The chief technologist (or head of procurement, or another manager of the customer) would next invite the sales managers to a restaurant, which was a sign the customer approved the product but needed to negotiate the price. After the decision-maker and sales manager reached an agreement about the price of the product, a discussion regarding a payment to the employee would follow.  Sometimes, in order to increase the percentage of bribes, an inflated invoice would be agreed upon.  Frutarom would then invoice the payment, including the fraudulent increase. The customer buying the Frutarom product would pay the entire payment price, including the price increase corresponding to the bribe percentage.  Frutarom sales managers would then transfer the additional charge back to the individual employee in cash or deposit it to a trusted bank account under the name of a relative.

### b. Examples of Bribed Customers

71.     Throughout his time at Frutarom Ukraine and Russia, CW-1 was the individual who handled the cash and distributed it to field offices and to salespeople.

72.     CW-1 stated that he took part in evaluating a company named Protein Technologies Ingredients ("PTI") that Frutarom was planning to purchase.   He was involved in the review of the reporting at the last stage of the evaluation.  CW-1 identified a similar scheme at PTI while performing his due diligence, noting that PTI had a lot of the same customers as Frutarom Russia and estimating it affected up to 50-60% of the sales in the savory business and 30-40% in the flavors business.  This fact was discussed with Defendant Rosenthal.  In 2014, Frutarom purchased PTI.  CW-2, who was also aware of the bribery at PTI, indicated that he believed the bribes increased dramatically after the acquisition.   Frutarom's first quarter Directors Report for 2017 stated that Frutarom's "four acquisitions [were] carried out in 2013 and 2014 (JannDeRee in South Africa, PTI in Russia, Aroma in Guatemala, Montana Food in

Peru and Chile)."  The "acquisition of approximately 75% of Vantodio's capital [owner of PTI] was completed in November 2013 in exchange for a cash payment of US$ 50.3 million."  In 2017, Frutarom exercised its option to purchase the remaining 25% for $40 million from Vantodio.

73.     Some of the other customers that CW-1 remembered receiving bribes were: Vitmark, NGK, Globino, Taran, and Novg Product.  CW-1 noted that Vitmark was a relatively large customer of Frutarom.  The sales manager in charge was Ludmilla Mahinya, who interacted with Vitmark's Chief of Technology, a woman named Anna.  Anna personally received $5,000-$10,000 per quarter as a percentage of sales to Vitmark.  Anna would approve the purchase of goods by Vitmark from Frutarom Ukraine.  Vitmark's annual sales were approximately $500,000.  After Ludmilla's resignation in 2008, Sergey Shilko, Sergey Chuikov, and Natalya Daschenko replaced her as the courier of the bribes.  The bribes were based on a percentage of sales to the customer.

74.     CW-2 also noted that Vitmark and Biola were two customers in Ukraine who were bribed.  Vitmark officials received approximately $3,000-$4,000 a month in the beginning but as sales grew, they received approximately $10,000 a month.

75.     CW-2 stated that a meat manufacturer named Cherkizovsky was one of the biggest clients in the meat industry, and its chief of technology was bribed by Frutarom Russia. Angela Karpova was the head of the Frutarom meat department in Moscow and her husband Sergey Karpov was a chief technologist in Cherkizovski.  Frutarom bribed Cherkizovski for years.

76.     CW-2 and CW-1 named another two big clients in the meat industry, Mitek and Darya, whose employees were also bribed by Frutarom.  Another client with bribed employees

was Dubki, whose chief technologist received from Frutarom $30,000-$40,000 per quarter. The bribe amounts were approved by Gill and Rosenthal, according to CW-2. Mitek was another client with bribed employees, whose CEO Sergey Kopyt received 3% of the sales in bribes. Alkon was yet another client whose employees were bribed by Frutarom's sales manager Svetlana Lobova.

77.     CW-1 and CW-2 stated that Frutarom also bribed customers' employees in Kazakhstan, China and Turkey. CW-1 and CW-2 both noted that Defendant Rosenthal also mentioned bribery in Kazakhstan, China and Turkey. CW-1 said he discussed the bribery in Kazakhstan and Turkey when Rosenthal visited Russia or Ukraine. CW-2 said that bribery in Kazakhstan and China came up in conversations with Rosenthal.

### c.  Bribery of Customs Officials

78.     Another form of bribery at Frutarom involved the shipment or receipt of goods. CW-1 noted that this primarily applied to goods imported into Ukraine or Russia. Logistics head Alexander Vovk in Russia transferred the cash payments to the forwarder company that paid cash bribes to the customs officials. CW-2 said they paid $200-$300 in bribes per container. If the bribes were not paid, the shipments would be blocked. CW-1 explained that bribing customs officials in Ukraine and in Russia was a "must" because the customs officials would not sign the release documents if they were not bribed.[4] CW-2 noted that this was especially the case with deliveries to the Odessa port, but it affected airports as well. CW-1 explained that Frutarom needed also to bribe customs officials at the airports when the shipments contained samples without the required import certificates. To have the goods imported, CW-2 had to pay directly to the customs official approximately $100-500. CW-1 noted that these payments and bribes affected all products at Frutarom that were imported to the region. All sales

---

[4] For example, Frutarom was importing Flavors and Seasonings to Ukraine for sale.

were affected because of the need to import supplies.  In other words, every product sold and shipped to Russia and Ukraine triggered a bribe to customs officials.

79.    CW-1 would provide the cash and it would be entered in the "Cash Bribes Chart." CW-2 noted that the payments to customs officials were explicitly discussed at Frutarom as part of "policy discussions," both orally and in writing.  Defendants Granot, Rosenthal, Gill and Yehudai were aware of these payments, approved it as a matter of policy, and received the cash report.  CW-2 said that the bribes were constantly discussed at Frutarom with the executives, as a part of routine procedure.  The only concern that was raised was how to prevent the bribes from being embezzled by sales managers.  These issues were discussed with Yehudai, Granot, Gill, Rosenthal, and internal auditor Yoav Barak.  Yoav Barak suggested adding the names and positions of bribes recipients to the Bribes Chart and periodic reports, in order to prevent cash bribes being embezzled by sales managers. CW-1 and CW-2 heard that bribes had been embezzled at Frutarom.

80.    CW-2 also stated that the Russian Authorities Standards Institutes and quality assurance officials were also bribed and that these payments were documented in the Cash Bribes Chart.  In order to sell flavors and seasoning in Russia, they needed to pass local certification (certifying the fitness of the products) with the Russian Authorities, hence the need to bribe the officials there.  Frutarom would pay between $100-$300 USD per product certificate in Moscow or Kiev.  Sometimes they would pay bribes to employees of local certifying agencies if the payments were cheaper than in Moscow and Kiev.

81.    Throughout the years, CW-1 and CW-2 explained that the Internal Audit department at Frutarom was also aware of the bribery scheme.  Yoav Barak, Frutarom's internal auditor, received the Bribes Chart, as did several other people in the Finance Department.  Barak

reviewed the P&L, which listed the bribes.  CW-1 was informed that Mr. Barak discussed the bribery scheme also during a meeting of the Board of Directors at Frutarom, relating to the 2013 financial results.  Defendant Yehudai was at the meeting.  After this meeting, there were no changes made to the bribery scheme.

### d.  The Bribery Scheme Continued Throughout 2018

82.  When CW-1 and CW-2 left Frutarom, they explained that the bribery was in full swing.  A former sales manager who had been a part of the bribery, Svetlana Lobova, was appointed General Manager at Frutarom Russia.  The bribes continued at least through 2018.

83.  CW-1 maintained contact with Alexander Buriy, CFO for Frutarom Russia between December 2014 and August 2019, who confirmed that the bribery continued through 2018.  CW-1 also observed that he heard representatives of Frutarom customers commenting that everything proceeded "as usual" in 2018, meaning the bribery scheme had continued unabated.

### The Merger Negotiations

84.  Frutarom held a strong market share in the Emerging Markets sector, particularly in Russia and Ukraine.  On or around 1999, Frutarom opened sales offices in Ukraine and Russia.  By 2017, Frutarom reported that it had become "the leading manufacturer in Russia."

85.  In 2015, Frutarom's sales in Emerging markets accounted for over US$ 384 million.  Of that amount, sales in Russia were US$ 143 million (or 37%).  Sales in Russia continued to increase.  In 2017, Russian sales accounted for over US$ 160 million (or 27%).  A large part of these sales were procured though fraudulent means, such as bribing custom officials and Frutarom customers, facts hidden from investors.  Defendants Yehudai, Gill, Granot and Rosenthal were directly involved in the scheme.

86.     Frutarom's success in Emerging Markets like Russia and Ukraine was a magnet for IFF.  Indeed, one of the primary reasons for the merger was Frutarom's footprint in Eastern Europe.  "Frutarom is very strong in geography where I believe IFF historically were not very strong. I will give example. Central and East Europe, very strong growth for Frutarom, but not [a place where] IFF invested before."

87.     In October 2017, IFF began exploring a potential acquisition of Frutarom. "Between late October 2017 and the signing of the merger agreement, it was reported that the IFF board and the transaction committee met regularly to review the potential acquisition of Frutarom and other potential strategic alternatives."

88.     On a February 6, 2018 phone call between Defendant Fibig and Defendant O'Leary, which included Mr. Soutendijk and BofA Merrill Lynch, Merrill Lynch indicated that Frutarom was in discussions with other parties, and "emphasized [that it was]  Frutarom's desire for the due diligence process prior to the signing of any definitive documentation *to be completed as expeditiously as possible*."

89.     Between March 24 and April 3, 2018, IFF conducted due diligence on Frutarom, holding meetings where Defendants Fibig and Yehudai discussed "Frutarom's business and key drivers of future growth" and "outstanding diligence questions of IFF in connection with its valuation of Frutarom."

90.      Reportedly, on April 24, April 25 and April 29, 2018, representatives of IFF and Frutarom met in person and by video conference to discuss confirmatory due diligence across a variety of functional areas, including finance and accounting, tax, human resources, legal and compliance, regulatory and business due diligence.

91.     Negotiations continued and, eventually, with the unanimous approval of each of the IFF board and the Frutarom board, "the merger agreement was executed on May 3, 2018.  On May 7, 2018, Frutarom and IFF issued a joint press release announcing the entry into the merger agreement.  Frutarom would maintain its previous go-to-market strategy.

92.     On October 4, 2018, IFF completed the merger with Frutarom.  Frutarom was delisted from TASE, and Frutarom's shares were cashed out and converted to IFF shares.  The scheming Frutarom executives joined IFF and were lauded by IFF for their "talents."  Yehudai served as a "strategic advisor" supporting Defendant Fibig.

93.     On October 9, 2018, IFF's shares started trading on the TASE (in addition to being traded on the NYSE for years) and Frutarom's shares were delisted from TASE and the London Stock Exchange.

94.     Analysts noted that IFF was focused on "gaining share in emerging markets and '[n]otably, sales from these emerging markets accounted for around 48% of the Company's 2017 sales'" with the completed merger.

**IFF and Its Executives Turned a Blind Eye to Frutarom's Bribery Scheme**

95.     Intent on acquiring Frutarom at all costs, IFF and its executives wiped Frutarom's bribery scheme under the rug.  Significantly, their due diligence of Frutarom deviated drastically from IFF's due diligence operating standard procedure.  The due diligence was completed in just 11 short days instead of the typical one-year plus period required by a company of Frutarom's size.

96.     Plaintiffs' counsel interviewed a former employee of IFF, who worked at IFF's New York City Headquarters between 2014 and 2018 in Executive Compensation and, among other things, prepared board meeting materials and annually-required SEC disclosures, and was involved in performing due diligence—CW-3.  He did not work on the IFF due diligence

because by January 2018 it had not begun, but he noted that in the past the due diligence process was comprehensive, describing work within the legal department, using outside counsel and forming a steering committee comprising representatives from its Legal, Business, Finance and Human Resources departments, in addition to its CFO, outside counsel, bankers and other consultants.  IFF is bifurcated based on its two main product divisions – Flavors and Fragrances – and representatives from the relevant division would typically serve on the due diligence steering committee.

97.     Based on his knowledge of IFF's typical due diligence process and the large size of the Frutarom acquisition, CW-3 estimated that IFF would have to spend a year conducting due diligence prior to finalizing the Frutarom acquisition.  However, IFF did not conduct a comprehensive due diligence process, devoting only a handful of days to the process.

98.     Due diligence started March 24, 2018, when "Mr. Fibig, Mr. Yehudai and representatives of each of IFF and Frutarom participated in a management discussion to address key diligence questions raised by IFF with respect to Frutarom's business and key drivers of future growth."

99.     Between March 24 and April 3 (11 days) IFF conducted due diligence, with Defendants Fibig and Yehudai meeting with representatives of IFF to discuss Frutarom's business and key drivers of future growth and outstanding diligence questions of IFF in connection with its valuation of Frutarom.

100.     IFF and Frutarom reported three more days of due diligence discussions.  "On April 24, April 25 and April 29, 2018, representatives of IFF and Frutarom met in person and by video conference to discuss confirmatory due diligence across a variety of functional areas,

including finance and accounting, tax, human resources, legal and compliance, regulatory and business due diligence."

101.   Therefore, the due diligence related to one of the largest mergers in the industry, involving a company with extensive business in bribery-prone countries was completed in just 11 days.   Not only did Frutarom derive a significant number of its sales from Russia and other emerging markets where bribery abounded, but Frutarom had been on an acquisition binge, completing 44 acquisitions in 2016-2017 alone, compounding the need for extensive due diligence.

102.   Moreover, Russia is known for corruption and bribery.   In directly speaking to U.S. Companies doing business in Russia, the State Department warned:   "It is important for U.S. companies, irrespective of size, to assess the business climate in the relevant market in which they will be operating or investing and to have effective compliance programs or measures to prevent and detect corruption, including foreign bribery. U.S. individuals and firms operating or investing in Russia should take time to become familiar with the relevant anticorruption laws of both Russia and the United States in order to comply fully with them. They should also seek, when appropriate, the advice of legal counsel."   (Department of State, 2017 Investment Climate Statements: Russia, https://www.state.gov/reports/2017-investment-climate-statements/russia/).

103.   Transparency International, which rates different countries on their Corruption Perception Index and was listed in the State Department report, lists Russia as 29/100 – with 100 being very clean and 1 being highly corrupt.   In 2016, Russia and Ukraine were ranked 131/176 with a score of 29, while the US was ranked 18/176 with a score of 74. (https://www.transparency.org/news/feature/corruption_perceptions_index_2016).     In   2017, Russia was ranked 135/180 with a score of 29, Ukraine 130/180 with a score of 30, and the US

16/180 with a score of 75. (https://www.transparency.org/news/feature/corruption_perceptions_index_2017). In 2018, Russia was ranked 138/180 with a score of 28, Ukraine 120/180 with a score of 32, and the US 22/180 with a score of 71. (https://www.transparency.org/cpi2018).

104. "Corruption significantly impedes businesses operating or planning to invest in Russia. High-level and petty corruption are common, especially in the judicial system and public procurement. The business environment suffers from inconsistent application of laws and a lack of transparency and accountability in the public administration. Russia's regulatory inefficiency substantially increases the cost of doing business and has a negative effect on market competition." (GAN, Business Anti-corruption portal, https://www.ganintegrity.com/portal/country-profiles/russia/ (Feb. 2017))

105. "Corruption is widespread in Russia and poses an increasingly heavy burden to any development. This impression is shared not only by independent experts (including international expert opinion as measured by various country rankings) and polls of foreign as well as domestic businesspeople but also by top state representatives, including the president, who regularly cites corruption as a key problem. This situation can be explained by the near complete lack of functioning integrity mechanisms. State auditors are often competent but lack enforcement powers. Rules to hold politicians or bureaucrats accountable are underdeveloped and seldom enforced in practice." (BTI Transformation Index, BTI 2016 | Russia Country Report, https://www.bti-project.org/en/reports/country-reports/detail/itc/rus/ity/2016/itr/pse/)

106. Ukraine has also been reported to be marred by bribery and corruption, affecting all aspects of businesses and transactions within the country. "A combination of rampant corruption, market volatility and political instability in Ukraine represents major business risks

for foreign investors. Bribery and facilitation payments are widespread among Ukrainian public officials, severely complicating business registration and trade procedures for international companies." (GAN, Business Anti-corruption portal, https://www.ganintegrity.com/portal/country-profiles/ukraine/ (August 2017)).   Further noting that customs is an area susceptible to bribery, it was reported that "Ukraine's customs administration is susceptible to corruption. Corrupt activities at the border represent the single most problematic factor for trade, and burdensome tariffs and demanding customs procedures increase business costs." (GAN, Business Anti-corruption portal, https://www.ganintegrity.com/portal/country-profiles/ukraine/ (August 2017)).  The Department of State noted that "[t]he biggest obstacle to Ukraine's success is endemic corruption, with reformers facing off against powerful vested interests to bring increased transparency and accountability to Ukraine's business environment." (2017 Investment Climate Statement, Department of State, https://www.state.gov/reports/2017-investment-climate-statements/ukraine/ (June 29, 2017)).

107.    These red flags should not have been ignored by IFF.  Frutarom was reporting large sales numbers within Emerging Markets, and Russia was responsible for more than 30% of those sales numbers.  Sales from Russia represented 27%, 30%, 37% of all sales in the emerging countries in 2017, 2016 and 2015, respectively.  Sales in Russia amounted to US$ 160.4 million, US$ 150.4 million and US$ 142.8 million in 2017, 2016 and 2015, respectively.

108.    Turning a blind eye to Frutarom's procurement activities in Russia and Ukraine was particularly egregious in light of the fact that IFF specifically identified and acknowledged that bribes were a way of doing business in those countries.  IFF explicitly recognized that "We operate or may pursue opportunities in some jurisdictions, such as China, India, Brazil, Russia and Africa, which pose potentially elevated risks of fraud or corruption or increased risk of

internal control issues.  In certain jurisdictions, compliance with anti-bribery laws may conflict with local customs and practices. . . .  In addition, Frutarom grew through rapid acquisition and, as part of our integration efforts, we will be seeking to implement our anti-corruption and similar policies throughout a number of those acquired companies, many of which were not previously subject to these U.S. laws."

109.    News articles reported that IFF was familiar with the under the radar payment system before the merger closed, during the due diligence process.  IFF had been aware of the matter 'for many months,' according to a person with knowledge interviewed by Calcalist. (Ganon & Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice, CTech (Aug. 13, 2019)).

110.    According to CW-1, former employee Alexander Buriy, CFO for Frutarom Russia between December 2014 and August 2019, said that Defendant Rosenthal told him that IFF knew in 2018, during the due diligence process related to the merger, about the bribery at Frutarom and that in 2018 Defendant Rosenthal travelled to Russia to orally order that bribes stop being paid in  Ukraine and Russia.  Buriy reported that IFF asked Frutarom management to sign an obligation that they wouldn't be involved in bribery and would halt all such improper activity.  Frutarom management signed the attestation.  PTI, which was part of Frutarom, refused to sign the document, and there were no consequences to PTI.

111.    CW-1 noted it would have been easy for IFF to identify the fraud during due diligence and that, in fact, it "was almost not possible to hide during the due diligence process." CW-2 similarly explained that it was easy for IFF to find the bribery scheme via the monthly reports.

**The Frutarom Corrupt Executives Were Rewarded Handsomely, With IFF's Support**

112.     On June 28, 2018, the Compensation Committee at Frutarom recommended a $20 million bonus to Defendant Yehudai "for managerial continuity and the continued growth of the surviving company, as well as an easy and smooth implementation of the merger."   The Committee also announced a recommendation for $2 million bonus to be shared by Defendants Granot, Anatot and Gill as part of a retention plan, "in light of the involvement of the officers in many of the tasks entailed by the merger, and the need to accompany the merger process, both before and after its completion; tasks that are of great importance for the success of the merger and the surviving company's post-merger continued activity and success."

113.     With IFF's approval, Defendants Anatot and Gill were also given extra bonuses due to their work "both to the completion of the merger and to the full integration of the company during the merger."  Both Frutarom executives remained at Frutarom under IFF to help with the integration of the companies

**Materially False and Misleading
Statements Issued During the Class Period**

114.     The Class Period begins on May 7, 2018. On that day, IFF and Frutarom announced their definitive agreement to acquire Frutarom for $7.1 billion in a joint press release. From this day forward, Frutarom and IFF's statements were intertwined, by either joint presentations and statements or incorporation of Frutarom's statements into IFF's statements. They presented a united campaign for their merger, incorporating their financial statements into their projections and statements of why this merger was so important and would be so profitable for their shareholders.

115.     Analysts covering IFF before and after the merger looked at and discussed Frutarom in analyzing IFF and setting its price targets.  For example, a J.P. Morgan analyst

report issued on May 8, 2018 analyzing IFF noted that "Frutarom reported 2017 sales of $1.36b, which split into "natural" sweet and savory taste solutions (75%), ingredients (18%), and trade & marketing (7%). Nearly 80% of sales are to the EMEA region, 14% to the Americas region, and 6% to the A/P region." Another J.P. Morgan analyst report issued on November 13, 2018 analyzing IFF observed that "The estimated sales of Frutarom for 3Q:18 disclosed by IFF was something of a jolt. Frutarom had been reporting good sequential and y/y revenue growth for some time. Net sales for 3Q:18 for Frutarom are between $360-365m, which compares to $401.3m for 2Q:18 and $358.8m for 3Q:17." On May 2, 2019, Deutsche Bank issued an analyst report on IFF stating that "The most important metric for IFF will be local currency growth for its base business and like-for-like growth for FRUT. We also expect secondary focus on pricing, gross margins, and cash flow guide. We are forecasting +3% like-for-like (Street: +2.7%) growth in both Frutarom and the legacy IFF business (noting a tough 7% comp)." On May 19, 2019, JP Morgan issued a report analyzing IFF, noting that "IFF's year-ahead share price performance is likely to depend, in our opinion, on whether the growth rate of the company accelerates due to the Frutarom acquisition. Frutarom organic sales growth was about flat in 3Q:18, and it improved to ~3% growth in 4Q:18, and ~3% in 1Q:19. IFF thinks Frutarom's normal rate of sales growth is 5-7%."

116.    During the Class Period, Defendants made numerous materially false and misleading statements and concealed material information from investors. For example, Defendants failed to disclose to investors that: (1) Frutarom was bribing customers and customs officials in Russia and Ukraine; (2) senior management at Frutarom directed and were aware of such improper payments; (3) as a result, Frutarom's financial results and the combined statements by Frutarom and IFF regarding IFF and/or Frutarom's financial metrics and the

potential for future sales and revenues were misleading and overstated; and (4) as a result of the improper payments, IFF was reasonably likely to face regulatory scrutiny and financial liability. Defendants made numerous materially false and misleading statements during the Class Period, including representations that "Since December 31, 2015, the Company [Frutarom] and its Subsidiaries have been and are in compliance with (i) all applicable Laws," that "since December 31, 2014, none of the Company [Frutarom], its Subsidiaries, any of its or their directors or officers, nor, to the Knowledge of the Company, any other employees, agents or other Persons while acting for or on behalf of the Company or any of its Subsidiaries, has violated the FCPA . . . or any other applicable Law relating to anti-corruption or anti-bribery," and that "Frutarom does not give or receive, either directly nor indirectly, bribes or other improper advantages for business or financial gain."

### The May 7, 2018 Statements

117.    On May 7, 2018, IFF and Frutarom issued a joint Press Release titled "IFF to Combine with Frutarom to Create a Global Leader in Taste, Scent and Nutrition."  The Press Release noted that Defendant Yehudai will serve as a strategic advisor supporting Defendant Fibig.  IFF and Frutarom also jointly produced an infographic, and jointly participated in a conference call to discuss the merger.  All materials were posted on IFF's official website.  The announcement was an integrated, joint message to the market from IFF and Frutarom.

118.    The Press Release stated that "Frutarom has a strong track record of growth, with expected sales of above $1.6 billion in 2018, and their previously announced target of $2.25 billion in sales in 2020."  It represented that the proposed merger "broadens complementary and growing customer," with "Frutarom significantly enhanc[ing] IFF's exposure to the fast-growing small- and mid-sized customers, including private label.  Approximately 70% of Frutarom's

sales are to these two customer groups."  The Press Release announced that "on a pro forma basis, the combined company would be expected to have approximately $5.3 billion of revenue in 2018."

119.    The statements in the preceding paragraph were false and misleading when made because, for example, Frutarom's sales and revenues were based in material part on the success of the Emerging Markets sector, which included in material part rampant bribery in Russia and Ukraine.

120.    IFF and Frutarom jointly prepared an Investor Presentation, which reported Frutarom's reported earnings, including 16x the growth between 2000 and 2017, 30x growth in EBITDA and sales in the billions in 2016 and 2017, *i.e.*, $1.1 billion in 2016 and $1.3 billion in 2017.  Based on the total estimated sales for IFF and Frutarom in 2018, they estimated sales for a combined company to be $5.3 billion ($1.6 billion from Frutarom and $3.7 billion from IFF).

121.    The reported sales numbers in the preceding paragraph where false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.  The combined sales of the two companies were based on sales generated by Frutarom from Russia and Ukraine, which in turn were possible only though the bribery scheme.  The growth numbers were fueled in significant part by the scheme.

### The May 28, 2018 Statements

122.    On or around May 28, 2018, Frutarom published its Directors' Report of the Company's State of Affairs for the Period Ended March 31, 2018 ("March 2018 Report").  The March 2018 Report disclosed that the Board of Directors and management of Frutarom are

responsible for the preparation and presentation of the interim financial information.  The March 2018 Report was approved by Yehudai and Granot. The March 2018 Report included the Directors' Declarations: the Declaration of the President and CEO Ori Yehudai, and the Declaration of the Executive Vice President and CFO Alon Granot.

123.    The March 2018 Report stated that Frutarom's total sales (including sales from Emerging Markets) in the first quarter of 2018 amounted to $US 384.8 million, a 27.2% increase from the parallel period.  These sales numbers included in material part sales from Frutarom Russia. The March 2018 Report stated that some of the 27.2% increase reflected "currency adjusted growth of 7.6% in pro-forma terms compared with the parallel period."  The March 2018 Report also reported a gross profit of $US 155.7 million for the first quarter of 2018.

124.    The reported sales and profit numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

125.    The March 2018 Report included the Quarterly Report Regarding Effectiveness of Internal Audit on Financial Reporting and on Disclosure under Regulation 38C(A).  It explained that "[t]he management of Frutarom Industries Ltd. (the "Company"), supervised by the Company's Board of Directors is responsible for prescribing and conducting proper internal control on the Company's reporting and disclosure" and stated that "for this matter, the members of management are 1) Ori Yehudai, President and CEO; 2) Alon Granot, Executive Vice President and CFO; 3) Amos Anatot, Executive Vice President Global Supply Chain and Operations; 4) Sharon Ganot, Global Vice President, Human Resources; 5) Guy Gill, Vice President Finance; and 6) Flora Lewin, Global Chief information officer."  The March 2018

Report further explained that "Internal control on financial reporting and disclosure includes controls and procedures which are conducted in the Company, which are planned by the Company's President and CEO and the highest ranking financial officer and under their supervision, or by whoever fills these positions in practice, under the supervision of the Company's Board of Directors. These controls and procedures are meant to provide a reasonable level of certainty regarding the reliability of the financial reporting and the preparation of the financial reports in accordance with the provision of the law, ensuring that the information the Company is required to disclose in the reports it publishes under the provisions of the law is gathered, processed, summarized and reported on the date and the manner prescribed by law."

126.     The March 2018 Report elaborated that "Internal control includes, among other things, controls and procedures designed to ensure that the information the Company, as stated, is required to disclose is gathered and delivered to the Company's management including to the President and CEO, and to the highest ranking financial officer or to whoever fills these positions in practice, in order to allow timely decision making with regards to the disclosure requirement."

127.     The March 2018 Report further explained that Yehudai and Granot each "(a) set controls and procedures, or ensured the existence and set up of controls and procedures under [their] supervision, designated to ensure that material information relating to the Company, including its consolidated companies as defined in the Securities Regulations (Annual Financial Reports), 5770-2010, is brought to [their] attention by others in the Company and the consolidated companies, particularly during the preparation of the Reports; and (b) set controls and procedures, or ensured the enactment and performance of controls and procedures under [their] supervision, designed reasonably ensure the reliability of the financial reporting and the

preparation of the financial reports in accordance with the provisions of law, including in accordance with accepted accounting principles."

128.    The March 2018 Report stated that "No events or issues were brought to the attention of the Board of Directors and the Company's management which could change the assessment of effectiveness of the internal audit, as contained in the Last Annual Report Regarding Effectiveness."  In the Last Annual Report, Frutarom's management and the Board of Directors vouched for the effectiveness of the Internal Audit on Financial Reporting and on Disclosure attached to the Period Report ending on December 31, 2017.  The March 2018 Report stated that "as of the date of the report, based on the assessment of effectiveness of internal control in the Last Annual Report Regarding Effectiveness and based on information brought to the attention of Management and the Board of Directors as stated above the internal audit is effective."

129.    The statements in the preceding paragraph were materially false and misleading when made because, for example, they describe controls that were non-existent, or utterly ineffective, and were not providing the protection presented since the controls were managed by the individuals who were directly engaged in the bribery scheme.   The controls were ineffective because they permitted the bribery scheme to occur unabated.  Internal Audit was integrated into administration of the bribery scheme and was used as a tool to ensure its efficiency, including prevention of embezzlement of bribery funds by low-level employees.

130.    The Directors' Report included Declarations by Defendants Yehudai and Granot, each vouching that they have "reviewed the Quarterly Report of Frutarom Industries Ltd. (the "Company") for the first quarter of 2018 (the "Reports") and  "[t]o my knowledge, the Reports do not include any false representations of any material fact and do not omit representation of

any material fact required in order to ensure that the representations contained in these, in light of the circumstances under which such representations were included, are not misleading in relation to the period of the Reports."

131. Defendants Yehudai and Granot's Declarations further stated that "I have disclosed to the Company's auditors, the Board of Directors and the Audit Committee of the Company's Board of Directors, based on my most updated assessment of the internal control on financial reporting and disclosure:

> a. All the material deficiencies and weaknesses in prescribing and implementing the internal control on the financial reporting and on the disclosure, if any, which may reasonably adversely affect the ability of the Company to gather, process or report on financial information in a manner which could raise concerns regarding the reliability of the financial reporting and the preparation of the financial reports in accordance to the provisions of the law; and

> b. Any fraud, material or not material, which involves the president and CEO or anyone directly reporting to him or other employees who hold significant positions in the internal control on the financial reporting and on disclosure.

132. The statements in the two preceding paragraphs were materially false and misleading when made because, for example, the Directors' Report did, in fact, include false representations of material fact, omitting the material fact that Frutarom Russia and Frutarom Ukraine were engaged in a brazen bribery scheme designed to obtain and retain customers in an effort to boost sales. Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme. Moreover, Yehudai failed to disclose all fraud involving the CEO, as the bribery scheme occurred under his and other Frutarom executives' direction at all relevant times.

133. Defendants Yehudai and Granot's Declarations further stated that "No events or issues occurring during the period between the periodic report for 2017 and the date of this Report which could change the Board of Directors' and management's conclusion regarding

effectiveness of the internal report on the Company's financial statement and on the disclosure have been brought to my attention."

134.     The statements in the preceding paragraph were false and misleading when made because, for example, Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme and to prevent the issuance of false and misleading statements to the market.

### The June 19, 2018 Statements

135.     On June 19, 2018, IFF filed a Form S-4 Registration Statement with the SEC, detailing the proposed merger with Frutarom.  The Registration Statement was signed by, among others, Defendant Fibig. The Registration Statement contained the Merger Agreement signed by Defendant O'Leary on behalf of IFF and Defendant Yehudai on behalf of Frutarom.  The S-4 included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements.  Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

136.     The S-4 presented selected historical consolidated financial data for Frutarom as of and for the fiscal years ended December 31, 2017, 2016, 2015, 2014 and 2013, and as of and for the quarters ended March 31, 2018 and 2017:

| (amounts in thousands, except per share amounts or unless indicated otherwise) | Quarter Ended March 31, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2017[a] | 2016[b] | 2015[c] | 2014[d] | 2013[e] |
| **Statement of Income Data:** | | | | | | | |
| Sales | $ 384,805 | $ 302,531 | $ 1,362,396 | $ 1,147,041 | $ 872,796 | $ 819,547 | $ 673,693 |
| Gross profit | 155,738 | 115,714 | 525,125 | 437,553 | 338,059 | 320,552 | 256,796 |

The consolidated statements of financial position were approved, among others, by Yehudai and Granot.  The S-4 reported that "Frutarom sales in 2017 increased by 18.8% to $1,362.4 million compared to $1,147.0 million in 2016.  The increase in Frutarom's overall sales reflected increased sales in Flavors Activity, Specialty Fine Ingredients Activity and Trade & Marketing Activity, and was primarily due to the acquisitions completed after 2016 as well as organic growth and positive currency effects and positive impact of changes to the exchange rates of currencies in which Frutarom operates against the U.S. dollar."  "Frutarom's sales in 2016 increased by 31.4% to $1,147.0 million compared to $872.8 million in 2015.  The increase in Frutarom's overall sales was primarily due to organic growth and acquisitions . . . "

137.   The statements in the previous paragraph about the sales and gross profits at Frutarom were materially false and misleading when made because, for example, the reported growth and sales numbers were not just "[p]rimarily due to organic growth and acquisitions in Flavors Activity, Specialty Fine Ingredients Activity and Trade & Marketing Activity," but were also based on fraudulent payments, involving bribes to customers' employees and governmental officials, a scheme that was concealed from the market.

138.   The S-4 also reported the following pro-forma condensed combined sales and profits:

**Unaudited Pro Forma Condensed Combined Statement of Operations**
**For the Quarter Ended March 31, 2018**
**(In USD thousands, except shares and per-share data)**

| | Historical | | Purchase Accounting Adjustments | Notes | Other Pro Forma Adjustments | Notes | Total |
|---|---|---|---|---|---|---|---|
| | IFF (US GAAP) | FRUTAROM (US GAAP) | | | | | |
| *Revenue:* | | | | | | | |
| Net sales | 930,928 | 384,805 | — | | — | | 1,315,733 |
| | | | | | | | |
| *Gross profit* | 405,809 | 155,738 | — | | — | | 561,547 |

**Unaudited Pro Forma Condensed Combined Statement of Operations**

**For the Year Ended December 31, 2017**
**(In USD thousands, except shares and per-share data)**

| | IFF (US GAAP) | FRUTAROM (US GAAP) | Purchase Accounting Adjustments | Notes | Other Pro Forma Adjustments | Notes | Total |
|---|---|---|---|---|---|---|---|
| | Historical | | | | | | |
| *Revenue:* | | | | | | | |
| Net sales | $3,398,719 | $ 1,362,396 | $    — | | $    — | | $4,761,115 |
| *Gross profit* | 1,479,001 | 525,125 | — | | (6,538) | | 1,997,588 |

139.    The reported combined net sales and gross profit figures were false and misleading when made because they included sales and gross profits of Frutarom.  These figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine (and several other countries).  Russia in particular generated significant sales and revenues for Frutarom.

140.    The S-4 also reported the following with respect to Frutarom's sales in Emerging Markets, including Russia:

| | Year ended December 31 | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | U.S. dollars in thousands | | |
| Emerging Market* | 585,619 | 470,247 | 384,804 |
| West Europe** | 494,149 | 424,292 | 281,745 |
| USA and North America*** | 195,280 | 173,216 | 136,633 |
| Other | 87,348 | 79,286 | 69,614 |
| Total consolidated sales | 1,362,396 | 1,147,041 | 872,796 |

*    Sales in Russia amounted to $160,363 thousand, $150,370 thousand and $142,885 thousand in 2017, 2016 and 2015, respectively.

141.    The reported sales numbers for the Emerging Markets and Russia were false and misleading when made because they were generated in substantial part on the bribery scheme initiated and directed by Frutarom's executives.

142.    The S-4 confirmed the effectiveness of Frutarom's internal controls related to financial reporting:

The Company [Frutarom] and its Subsidiaries maintain a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements for external purposes in conformity with IFRS. The Company has evaluated the effectiveness of the Company's internal control over financial reporting and, to the extent required by applicable Law, presented in any applicable Company Reporting Document or any amendment thereto its conclusions about the effectiveness of the internal control over financial reporting as of the end of the period covered by such report or amendment based on such evaluation.

143.   The statements in the previous paragraph were materially false and misleading when made because, for example, Frutarom did not "maintain a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of the Company's financial reporting" when it permitted the bribery scheme to flourish for years on end and it permitted the publication of false and misleading financial statements, including reported sales and profits, that were based in material part on the success of the bribery scheme.

144.   The S-4 further represented that "Since December 31, 2015, the Company [Frutarom] and its Subsidiaries have been and are in compliance with (i) all applicable Laws . . ."

145.   The statement in the preceding paragraph was materially false and misleading when made because, for example, Frutarom and its Subsidiaries had not been in compliance with "all applicable Laws" because Frutarom in Israel and its subsidiaries in Russia and Ukraine were engaged in a rampant bribery scheme involving bribing customers and customs officials in an effort to boost sales.

146.   The S-4 further assured the market that "since December 31, 2014, none of the Company [Frutarom], its Subsidiaries, any of its or their directors or officers, nor, to the Knowledge of the Company, any other employees, agents or other Persons while acting for or on behalf of the Company or any of its Subsidiaries, has violated the FCPA, the U.K. Bribery Act 2010, the OECD Convention on Combating Bribery of Foreign Public Officials in International

Business Transactions or any other applicable Law relating to anti-corruption or anti-bribery (collectively, the "**Anti-Corruption Laws**")."[5]

147.   The statements in the preceding paragraph were materially false and misleading when made because, for example, Frutarom subsidiaries in Russia and Ukraine were engaged in a rampant bribery scheme involving bribing customers' employees and customs officials in an effort to boost sales.

148.   The S-4 stated that since December 31, 2015, Frutarom has filed, "all forms, reports, schedules, statements, exhibits and other documents (including exhibits, financial statement and schedules thereto and all other information incorporated therein and amendments and supplements thereto) required by it to be filed (or furnished)" with ISA, TASE and LSE, certifying that "each Company Reporting Document filed did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."

149.   The statements in the preceding paragraph were materially false and misleading when made because Frutarom's filings did in fact contain untrue statements of material facts, omitting the material fact that Frutarom was engaged in a brazen bribery scheme in Russia and Ukraine designed to obtain and retain customers in an effort to boost sales.   Moreover, contrary to its representations, Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme.

---

[5] The FCPA's anti-bribery provision makes it a crime to "corruptly" offer any kind of payment to a foreign official "in order to assist . . . in obtaining or retaining business." 15 U.S.C. § 78dd-2. The FCPA also requires companies to keep books and records that accurately reflect financial transactions, and to maintain effective internal controls.

150.    Further, the S-4 stated that Frutarom's financial statements "fairly present in all material respects the financial position, the shareholders' equity, the results of operations and cash flows of the Company and its consolidated Subsidiaries as of the times and for the periods referred to therein (except as may be indicated in the notes thereto and subject, in the case of unaudited interim financial statements, to normal and recurring year-end adjustments)."

151.    The statements in the preceding paragraph were false and misleading when made because, for example, they did not "fairly present in all material respects" the sales and profits of Frutarom, but in truth they failed to disclose the material fact that Frutarom was engaged in a brazen bribery scheme in Russia and Ukraine to obtain and retain customers in an effort to boost sales.  Russia in particular generated significant sales and revenues for Frutarom as a result of the bribery scheme.

152.    The S-4 further represented that "None of the information (a) supplied or to be supplied by or on behalf of the Company [Frutarom] or any of its Subsidiaries for inclusion or incorporation by reference in the Form S-4 to be filed with the SEC by Parent in connection with the registration under the Securities Act of the shares of Parent Common Stock to be issued in the Merger (as amended or supplemented from time to time, the "Form S-4") will, at the time the Form S-4, or any amendment or supplement to it, is filed with the SEC, or at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein, in light of the circumstances under which they are made, not misleading . . . ."

153.    The statements in the preceding paragraph were materially false and misleading when made because, for example, the information supplied included false representations of material fact, omitting the material fact that Frutarom was engaged in a brazen bribery scheme in

Russia and Ukraine designed to obtain and retain customers in an effort to boost sales. Moreover, Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme, a fact concealed from investors, who were assured otherwise.

### The June 21, 2018 Statements

154.    On June 21, 2018, IFF and Frutarom jointly presented at a Global Town Hall. The presentation highlighted "profitable internal growth and 12 acquisitions made in 2017 Frutarom Revenues Run-Rate exceeds $1.5 billion." It also projected $2.25 billion in revenues in 2020, and a combined Frutarom and IFF 2018 pro-forma sales of $5.3 billion.

155.    The statements in the preceding paragraph highlighting internal growth and acquisitions leading to Frutarom revenues of $1.5 billion in 2017, and the projected revenues and pro-forma sales were materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine. Russia in particular generated significant sales and revenues for Frutarom.

### The July 2, 2018 Statements

156.    On July 2, 2018, IFF filed with the SEC Amendment No. 1 to Form S-4, which attached Exhibit 99.1, "Immediate report with respect to an invitation to a special general meeting of the shareholders of the Company [Frutarom]." The amendment to S-4 included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements. Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

157.    Exhibit 99.1 disclosed the following with respect to the contemplated $20 million bonus to be paid to Yehudai, which was agreed to by IFF (this bonus was an exception to Frutarom's compensation policy):

> Mr. Yehudai has been employed by the Company since 1986 and began serving as president and chief executive officer of the Company in 1996. During the past three decades, the Company, under Mr. Yehudai's management, has undergone a journey of accelerated growth in profits during which it has increased its income from approximately US$ 10 million in 1990 to an expected amount of more than US$ 1.6 billion in 2018, with significant ongoing growth in profit and profitability. The average rate of growth of the income and profits of the Company since 2000 has been assessed to represent an annual growth of approximately 20% on average. The growth journey of the Company has been based on the successful implementation of a strategy combining internal growth in profits at a rate double the growth of the markets in which the Company operates together with strategic acquisitions. All of these factors have led to consistent improvement in the results of operations and value that the Company creates for shareholders, which can be observed in the doubling of sales and profits of the Company, on average, every four years since 2000.
>
> In addition, Mr. Yehudai has been involved in the formulation of the terms of the Merger, in the management, navigation and direction of the Company's discussions with the Purchaser, in the management of the various work teams within the Company and outside of it, and has contributed greatly to the resolution of complex issues and dedicated many hours of his time to the Transaction.

158.    The statements in the preceding paragraph touting Yehudai's contributions to Frutarom and to the merger as reasons justifying a $20 million bonus were materially false and misleading when made because, for example, they omitted that Yehudai for years had directed and engaged in a brazen scheme to bribe customers and customs officials in an effort to boost Frutarom's sales.  Moreover, in 2018, at the time of the merger, the bribery scheme was on-going and Yehudai had agreed with IFF to join IFF after the merger.  As a result of Yehudai's fraudulent scheme, it was foreseeable and highly likely that Frutarom and/or IFF would face regulatory scrutiny and litigation that would subject Frutarom and/or IFF to severe penalties and fines, along with reputational damage.  Information about management integrity is material to

investors.   Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.

159.   Exhibit 99.1 disclosed the following with respect to the contemplated $2 million bonuses to other key officers of Frutarom, bonuses which were agreed to by IFF (these bonuses were an exception to Frutarom's compensation policy):

> Following are additional details with respect to the Officers: (a) Mr. Alon Shmuel Granot has been employed at the Company since 2001 and serves as executive vice president and chief financial officer of the Company. By virtue of his role, he is responsible for the financial arrangements of the Company. His role involves a great deal of broad responsibility over financing and management of the Company's funds, risk management, information systems, due diligence activities, mergers and acquisitions as well as many other matters; (b) Mr. Amos Anatot has been employed at the Company since 2010 and serves as executive vice president and vice president of operations and global supply chain. By virtue of his role, he is responsible for supply chain layouts, as well as operation and procurement at the Company. His role involves a great deal of broad responsibility over integration of different sections of the Company as well as many other matters; (c) Mr. Guy Gill has been employed by the Company since 2006 and serves as vice president of finance. By virtue of his role, he is responsible for the financial divisions at the Company. His role involves a great deal of broad responsibility over filing of financial reports, monitoring and handling of the Company's budget, insurance, taxation, administrative enforcement at the Company as well as many other matters.

> In addition, the Officers have been and will be involved in many tasks involved with the Merger and overseeing the process both before the completion of the Merger and thereafter. These are tasks of great importance to the success of the Merger and the continued activity and success of the Surviving Company after completion of the Merger. Beyond their ordinary role at the Company, they have dedicated, and will continue to dedicate, many hours of their time continuously and intensively. In addition, the said retention plan and its terms will, in the future, incentivize them to continue their activities in the Company after the completion of the Merger, so as to enable the Surviving Company to enjoy continuous professional and skilled management, an easier and smoother implementation of the Merger, the continued growth of the Surviving Company and so forth. For these reasons and the reasons set forth in Section 3.5 below, the compensation committee has recommended, and the board of directors of the Company recommends, that the retention plan as set forth below be approved.

160.    The statements in the preceding paragraph touting Granot, Gill and Anatot's contributions to Frutarom and to the merger as reasons justifying a multi-million dollar bonus were materially false and misleading when made because, for example, they omitted that Granot and Gill had engaged for years in a brazen scheme to bribe customers and customs officials in an effort to boost Frutarom's sales and that Anatot knew or at a minimum acted with recklessness in not disclosing the scheme to investors.  Moreover, in 2018, at the time of the merger, the bribery scheme was on-going and Granot, Gill and Anatot were tasked with ensuring the success of the merger and the continued sales and financial activities of Frutarom under IFF.  As a result of the fraudulent scheme, it was foreseeable and highly likely that Frutarom and/or IFF would face regulatory scrutiny and litigation that would subject Frutarom and/or IFF to severe penalties and fines, along with reputational damage.  Information about management integrity is material to investors.  Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.

### The August 8, 2018 Statements

161.    On August 8, 2018, IFF held its Q2 2018 Earnings Call, accompanied by a presentation titled "IFF Q2 2018 Earnings Conference Call."  Defendants Fibig and O'Leary led the call and the presentation, which reported robust sales growth at 6% and expected 2018 pro-forma sales of $5.3 billion.

162.    The reported sales growth and pro-forma sales numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

### The August 22, 2018 Statements

163.    On August 22, 2018, Frutarom published its Directors' Report of the Company's State of Affairs for the Period Ended June 30, 2018 ("June 2018 Report"). The June 2018 Report disclosed that the Board of Directors and management of Frutarom are responsible for the preparation and presentation of the interim financial information. The June 2018 Report was approved by Ori Yehudai and Alon Granot. The June 2018 Report included the Directors' Declarations: the Declaration of the President and CEO Ori Yehudai, and the Declaration of the Executive Vice President and CFO Alon Granot. The June 2018 Report made similar disclosures to the ones reflected in connection with the March 2018 Report above about the role of Yehudai and Granot in the preparation and presentation of the June 2018 Report.

164.    The June 2018 Report stated that Frutarom's sales in the second quarter of 2018 amounted to $US 401.3 million, a 16.8% increase from the same period a year ago. These sales numbers included in substantial part sales by Frutarom in Russia. The June 2018 Report stated that some of the increase  reflected "currency adjusted growth of 4.5% in pro-forma terms compared with the parallel period." The June 2018 Report also reported a gross profit of $US 159.7 for the second quarter of 2018.

165.    The reported sales and profit numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine. Russia in particular generated significant sales and revenues for Frutarom.

166.    The June 2018 Report stated that "No events or issues were brought to the attention of the Board of Directors and the Company's management which could change the assessment of effectiveness of the internal audit, as contained in the Last Annual Report

Regarding Effectiveness." In the Last Annual Report, Frutarom's management and the Board of Directors vouched for the effectiveness of the Internal Audit on Financial Reporting and on Disclosure attached to the Period Report ending on December 31, 2017. The June 2018 Report stated that "as of the date of the report, based on the assessment of effectiveness of internal control in the Last Annual Report Regarding Effectiveness and based on information brought to the attention of Management and the Board of Directors as stated above the internal audit is effective."

167.   The statements in the preceding paragraph were materially false and misleading when made because, for example, they describe controls that were non-existent, or utterly ineffective, and were not providing the protection presented since the controls were managed by the individuals who were directly engaged in the bribery scheme. The controls were ineffective because they permitted the bribery scheme to occur unabated. Indeed, the Board of Directors, which was headed by Yehudai, was obviously aware of issues that could impact the Company's internal controls assessment because he directed and oversaw the Company's bribery scheme.

168.   The June 2018 Report highlighted Defendant Yehudai's supposed contributions to Frutarom's success as well as his role in the merger transaction, which purportedly justified "a one-time bonus" "in an amount of US$ 20 million, as an exception to the compensation policy of the company:"

> "a one-time bonus to the president and chief executive officer of the company, Mr. Ori Yehudai, in an amount of US$ 20 million, as an exception to the compensation policy of the company, in view of his crucial contribution to both the company's performance and success and to the merger transaction, for leading the company to rapid profitable growth and a significant increase in its revenues over the years, as well as a material ongoing increase in its profits and profitability, successfully implementing a strategy combining profitable internal growth, double the growth rates than those of the markets in which the Company operates, together with strategic acquisitions. Mr. Yehudai was involved in working out the terms and conditions of the merger transaction; in managing,

navigating and directing the Company's negotiations with the Purchasing Company, managing multiple work teams - both the company's teams as well as external teams - contributing substantially to the resolution of complex issues and devoting long hours to all matters relating to this transaction. In addition, for a transaction of this scale to succeed, including the intricately complex management of the activity since the transaction was signed until the closing date, and including the implementation of the merger after its completion, Mr. Yehudai's involvement is important and it is necessary for the completion of the merger, and later on, after its completion, for managerial continuity and the continued growth of the surviving company, as well as an easy and smooth implementation of the merger."

169.    The statements in the preceding paragraph touting Yehudai's contributions to Frutarom and to the merger as reasons justifying a $20 million bonus were materially false and misleading when made because, for example, they omitted that Yehudai for years had engaged in a brazen scheme to bribe customers and customs officials in an effort to boost Frutarom's sales. Moreover, in 2018, at the time of the merger, the bribery scheme was on-going and Yehudai had agreed with IFF to join IFF after the merger.  As a result of Yehudai's fraudulent scheme, it was foreseeable and highly likely that Frutarom and/or IFF would face regulatory scrutiny and litigation that would subject Frutarom and/or IFF to severe penalties and fines, along with reputational damage.  Information about management integrity is material to investors.  Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.

170.    In similar vein, the 2018 Report highlighted Defendants Granot and Gill's purported contributions to Frutarom's success and their involvement and contributions related to the merger, which supposedly justified "the adoption of a retention plan and payments thereunder in a total amount of US$ 2,000,000 to be paid to" each of these officers:

"the adoption of a retention plan and payments thereunder in a total amount of US$ 2,000,000 to be paid to three (3) officers of the Company as follows: (a) executive vice president and chief financial officer of the Company, Mr. Alon Shmuel Granot; (b) executive vice president and vice president of operations and

global supply chain, Mr. Amos Anatot; and (c) vice president of finance, Mr. Guy Gill, in two installments subject to the completion of the Merger and the rest of the conditions set forth in the merger agreement, to be shared between them in accordance with the discretion of the president and chief executive officer in consultation with IFF. The retention plan was suggested in light of the involvement of the officers in many of the tasks entailed by the merger, and the need to accompany the merger process, both before and after its completion; tasks that are of great importance for the success of the merger and the surviving company's post-merger continued activity and success. The purpose of the retention plan is to provide an incentive to company employees and officeholders who have a key role in the company, and who have substantially contributed, and continue to contribute, to the company, devoting all their energy and time, both to the completion of the merger and to the full integration of the company during the merger, as well as its continued functioning after the completion of the merger, allowing for professional and experienced managerial continuity in the surviving company, a smoother and easier implementation of the merger, and continued growth of the surviving company."

171.    The statements in the preceding paragraph touting Granot's, Gill's and Anatot's contributions to Frutarom and to the merger as reasons justifying a multi-million dollar bonus were materially false and misleading when made because, for example, they omitted that Granot and Gill for years had engaged in a brazen scheme to bribe customers and customs officials in an effort to boost Frutarom's sales, and that Anatot knew or at a minimum acted with recklessness in not disclosing the scheme to investors.  Moreover, in 2018, at the time of the merger, the bribery scheme was on-going and Granot, Gill, and Anatot were tasked with ensuring the success of the merger and the continued sales and financial activities of Frutarom under IFF.  As a result of the fraudulent scheme, it was foreseeable and highly likely that Frutarom and/or IFF would face regulatory scrutiny and litigation that would subject Frutarom and/or IFF to severe penalties and fines, along with reputational damage.  Information about management integrity is material to investors.  Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.

172.    The Directors' Report included Declarations by Defendants Yehudai and Granot, each vouching that they have "reviewed the Quarterly Report of Frutarom Industries Ltd. (the "Company") for the second quarter of 2018 (the "Reports") and  "[t]o my knowledge, the Reports do not include any false representations of any material fact and do not omit representation of any material fact required in order to ensure that the representations contained in these, in light of the circumstances under which such representations were included, are not misleading in relation to the period of the Reports."

173.    Defendants Yehudai and Granot's Declarations further stated that "I have disclosed to the Company's auditors, the Board of Directors and the Audit Committee of the Company's Board of Directors, based on my most updated assessment of the internal control on financial reporting and disclosure:

> All the material deficiencies and weaknesses in prescribing and implementing the internal control on the financial reporting and on the disclosure, if any, which may reasonably adversely affect the ability of the Company to gather, process or report on financial information in a manner which could raise concerns regarding the reliability of the financial reporting and the preparation of the financial reports in accordance to the provisions of the law; and

> Any fraud, material or not material, which involves the president and CEO or anyone directly reporting to him or other employees who hold significant positions in the internal control on the financial reporting and on the disclosure.

174.    The statements in the two preceding paragraphs were materially false and misleading when made because, for example, the Directors' Report did, in fact, include false representations of material fact, omitting the material fact that Frutarom was engaged in a brazen bribery scheme in Russia and Ukraine designed to obtain and retain customers in an effort to boost sales.   Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme.  Moreover, Yehudai failed to disclose all fraud involving the CEO, as the bribery scheme occurred under his and other Frutarom executives' direction at all relevant times.

175.    Defendants Yehudai and Granot's Declarations further stated that "No events or issues occurring during the period between the date of the last Quarterly Report (the report for the period ended March 31, 2018) and the date of this Report which could change the Board of Directors' and management's conclusion regarding effectiveness of the internal report on the Company's financial statement and on the disclosure have been brought to my attention."

176.    The statements in the preceding paragraph were false and misleading when made because, for example, Frutarom did not have in place effective internal controls to root out and prevent this fraudulent scheme and to prevent the issuance of false and misleading statements to the market.  The controls were ineffective because they permitted the bribery scheme to occur unabated.  Indeed, the Board of Directors, which was headed by Yehudai, was obviously aware of issues that could impact the Company's internal controls assessment because he directed and oversaw the Company's bribery scheme.

### The September 6, 2018 Statements

177.    On September 6, 2018, IFF filed with the SEC a Form 8-K for the period ending September 6, 2018, reporting "IFF to Share Strong Progress on Frutarom Combination at Barclays Global Consumer Staples Conference."   The Form 8-K included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements. Moreover, the Frutarom executives approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

178.    Defendants Fibig and O'Leary made the following representations about the merger:

> IFF and Frutarom combination creates a global leader in natural taste, scent and nutrition with expected 2018 pro-forma sales of $5.3 billion (IFF $3.7 billion and Frutarom $1.6 billion)

Accelerating financial performance, with sales growing 5 to 7% and adjusted cash EPS 10%+ between 2019 and 2021

179.    The statements in the preceding paragraph touting $5.3 billion combined sales including $1.6 billion from Frutarom's sales, and total sales growing 5%-7% were materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

180.    Also on September 6, 2018, Defendants Fibig and O'Leary participated at a Barclays Global Consumer Staples Conference, which was accompanied by a presentation. At the conference, Fibig and O'Leary reported on Frutarom's first quarter 2018 performance, touting "record revenues & profitability margin," with "constant currency growth on a pro-forma basis of 6.0%."  Fibig emphasized the following about Frutarom's growth: "you can see in terms of the financials, very, very strong growth in terms of sales and profitability over the last decade, driven by strong organic growth last three years, the average around about 6%, and good growth driven by some very targeted M&A, as I said, over the last decade."  Fibig and O'Leary further highlighted that the IFF and Frutarom transaction was a "compelling combination" that would "accelerate financial results, with sales +5 to +7%" and expected 2018 pro-forma sales of $5.3 billion.

181.    The reported sales growth and pro-forma sales numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

**The October 4, 2018 Statements**

182.    On October 4, 2018, IFF issued a Press Release announcing the completion of its acquisition of Frutarom.  The Press Release stated that "The Company expects to generate an average sales growth of 5-7%, and 10% adjusted cash EPS growth, on a currency neutral and pro-forma basis, over the 2019 to 2021 period."  The projected sales growth included projected sales growth for Frutarom, and the Frutarom executives controlled the contents of such statements as they pertained to Frutarom.  Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

183.    The statement in the preceding paragraph 5%-7% sales growth was materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

**Statements Made Between May 7, 2018 and October 4, 2018**

184.    Based on review of Frutarom's historical official website, at least each month between May 7, 2018 and October 4, 2018, Frutarom made the following representations on its official website:

> Frutarom does not give or receive, either directly nor indirectly, bribes or other improper advantages for business or financial gain.

185.    The statements made in the preceding paragraph were false and misleading when made because Frutarom did give or receive, directly, bribes to customers and custom officials.

**The November 6, 2018 Statements**

186.    On November 6, 2018, IFF held its Q3 2018 Earnings Call, accompanied by a presentation titled "IFF Q3 2018 Earnings Conference Call."  Participants included Defendants

Fibig, O'Leary, and Anatot.   Defendant O'Leary provided the following "commentary on Frutarom's estimated results for Q3 2018: For the third quarter, net sales are expected to be between $360 million and $365 million . . . On a year-to-date basis, sales are expected to be approximately $1.15 billion, an increase of about 15%."  O'Leary also announced that "Looking at the full year 2018, inclusive of Frutarom's fourth quarter estimated results . . . we expect our sales to be between $3.95 billion and $4.05 billion for the full year with similar contributions to Q3 in our legacy IFF business as well as sequential improvements in Frutarom's sales performance versus a growth they achieved in Q3."  Defendant Fibig reported that the combined Frutarom and IFF entities are "targeting sales growth, an average of 5% to 7%" between 2019 and 2021, and that IFF expects Frutarom to be 32% of IFF's entire business.   The Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

187.   The reported sales and growth numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

## February 13, 2019 Statements

188.   On February 13, 2019, IFF issued a Press Release announcing its fourth quarter and full year 2018 financial results.  The Press Release included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements.  Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

189.    The Press Release reported net sales for the full year 2018 of $4.0 billion, an increase of 17% from $3.4 billion in 2017, driven by mid-single digit growth in both Taste and Scent and the contribution of sales related to Frutarom.  It also reported fourth quarter 2018 sales of $1.2 billion, which included sales related to Frutarom.  IFF further reported $359.6 million sales from the Frutarom Business Unit.   "On a combined basis, full year 2018 sales were approximately $5.1 billion, including $4 billion achieved in 2018, plus an estimated $1.1 billion related to Frutarom's first nine months of 2018, less an estimated $45 million of plan divestitures."  Defendant Fibig highlighted "record-setting sales of approximately $4.0 billion – including sales related to Frutarom."  The Press Release further disclosed that "Combined sales growth for 2019 is expected to be approximately 5% to 7% . . . ."

190.    The statements in the preceding paragraph touting net sales for full year 2018 of $4.0 billion, fourth quarter 2018 sales of $1.2 billion, including $359.6 million sales from Frutarom, combined full year sales of $5.1 billion, an estimated $1.1 billion sales from Frutarom, and combined sales growth for 2019 of 5%-7%, were materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine.   Russia in particular generated significant sales and revenues for Frutarom.

**February 26, 2019 Statements**

191.    On February 26, 2019, IFF filed its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"), noting that "With the acquisition of Frutarom, which was principally focused on serving small and mid-sized companies globally, we have significantly increased our exposure to these faster-growing customers. Based on our 2018 combined sales, approximately 35% of our customers are global consumer products companies

while approximately 65% of our customers are small and mid-sized companies.  The Form 10-K included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements.  Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

192.    The 2018 10-K reported that "The 2018 combined sales of IFF and Frutarom, which combines the full year 2018 sales of both Frutarom and IFF, was approximately $5.1 billion which, management believes, makes us the second largest company in the taste, scent and nutrition industry."

193.    The statements in the preceding paragraph touting 2018 combined sales of IFF and Frutarom of $5.1 billion were materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

194.    Regarding internal control over financial reporting, the 2018 10-K stated, in relevant part:

> **_Changes in Internal Control Over Financial Reporting._**
>
> On October 4, 2018, we completed the acquisition of Frutarom and are in the process of incorporating Frutarom into our internal control over financial reporting structure and our evaluation of internal control over financial reporting and related disclosure controls and procedures. Our Chief Executive Officer and Chief Financial Officer have concluded that, other than working to incorporate Frutarom as mentioned above, there have not been any changes in our internal control over financial reporting during the fourth quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting . . .
>
> Based on this assessment, management determined that, as of December 28, 2018, our internal control over financial reporting was effective.

195.    The statements in the preceding paragraph vouching that IFF's internal control over financial reporting was effective were false and misleading when made because IFF did not have in place effective internal controls preventing the fraudulent sales of Frutarom in Russia and Ukraine to be entered into IFF's financial reports, on which investors relied to their detriment.

196.    The 2018 10-K contained Sarbanes Oxley Certifications by Fibig and O'Leary, certifying that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Fibig and O'Leary also certified that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report . . .

> The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions) . . . Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

197.    The statements in the preceding paragraph were materially false and misleading when made because IFF's annual report did not, in fact, fairly present, in all material respects, the financial condition and results of operations of IFF, and did, in fact, contain untrue statements of material fact, omitting the material fact that Frutarom was engaged in a brazen bribery scheme in Russia and Ukraine designed to obtain and retain customers in an effort to boost sales.   The sales derived from this illicit scheme were included in the total sales figures reported by IFF to investors, on which investors relied.   Moreover, contrary to its representations, IFF did not have in place effective internal controls preventing the fraudulent

sales of Frutarom in Russia and Ukraine to be entered into IFF's financial reports, on which investors relied to their detriment.

**The May 6, 2019 Statements**

198.    On May 6, 2019, IFF filed its quarterly report on Form 10-Q for the period ended March 31, 2019, which contained signed certifications pursuant to SOX by Defendants Fibig and O'Leary, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  The Form 10-Q included representations pertaining to Frutarom, and the Frutarom executives controlled the contents of those statements.  Moreover, the Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

199.    The 10-Q reported net sales of $1.3 billion and gross profit of US$ 531 million, including contribution of sales related to Frutarom.   The 10-Q reported that "Frutarom sales in 2019 were US$ 364 million."

200.    The statement in the preceding paragraph reporting net sales of $1.3 billion, gross profit of $531 million, and Frutarom sales of $364 million was materially false and misleading when made because these figures were based in material part on the success of the Emerging Markets sector, which included rampant bribery by Frutarom in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.

201.    The attestations by Fibig and O'Leary attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud were also materially false and misleading when made because the quarterly report and did, in fact, contain untrue statements of material

fact, omitting the material fact that Frutarom was engaged in a brazen bribery scheme in Russia and Ukraine designed to obtain and retain customers in an effort to boost sales.   The sales derived from this illicit scheme were included in the total sales figures reported by IFF to investors, on which investors relied.   Moreover, contrary to its representations, IFF did not have in place effective internal controls preventing the fraudulent sales of Frutarom in Russia and Ukraine to be entered into IFF's financial reports, on which investors relied to their detriment.

### The May 7, 2019 Statements

202.   On May 7, 2019, IFF held its Q1 2019 Earnings Call, accompanied by a presentation titled "IFF Q1 2019 Earnings Conference Call."   Defendants Fibig and O'Leary led the call and the presentation, which reported "record-setting quarterly sales of approximately $1.3 billion, a 39% increase over last year," with "double-digit sales & adjusted operating profit growth, including Frutaronm," sales from Frutarom of $364 million,  and reconfirmed projected between $5.2 billion and $5.3 billion in sales in 2019, representing 5%-7% increase in growth.  It also highlighted Frutarom Q1 2018 sales of US$ 402 million and explained that the lower Frutarom sales for Q1 2019 were due to "some weakness in parts of our Russia business . . . ." The Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

203.   The reported sales growth and pro-forma sales numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom. Defendants also failed to disclose that the weakness in sales from Russia was due to the clamp down on the bribery scheme which IFF demanded when it negotiated the merger.

**The June 5, 2019 Statements**

204.     On June 5, 2019, IFF held an Investor Day presentation with analysts. Defendants Fibig, O'Leary and Anatot attended the presentation, which again projected $5.2 billion to $5.3 billion in sales, and an average growth rate of 5%-7%.  O'Leary mentioned the "pressures" he has seen from the "Savory business primarily in PTI in Russia."  The Frutarom executives including Gill, Rosenthal, and Anatot approved, reviewed, ratified, furnished information and language for inclusion with respect to these statements.

205.     The reported sales growth and projected sales numbers in the preceding paragraph were false and misleading when made because, for example, they were based in material part on the success of the Emerging Markets sector, which included rampant bribery in Russia and Ukraine.  Russia in particular generated significant sales and revenues for Frutarom.  Defendants also failed to disclose that the weakness in sales from Russia was due to the clamp down on the bribery scheme which IFF demanded when it negotiated the merger.

206.     During the presentation, analyst Silke Kueck from JP Morgan asked the following question:

> I was wondering whether you can talk about what you know about Frutarom now that you didn't know before you purchased it? Both positives and negatives.

> Defendant Fibig replied "They're all nice guys."

207.     Defendant Fibig's response in the preceding paragraph was false and misleading as it failed to disclose that the "nice guys" at Frutarom had been engaged in a long-running bribery scheme in an effort to boost sales.

208.     The following exchange occurred between an Unidentified Participant and Defendants O'Leary and Fibig:

Q: Do you know what the historic clean, organic growth of Frutarom was? Given that we know there are accounting differences between the two companies?

O'Leary:  Based on the work -- I mean we focused on the last three years, I would say it's between 5% and 6%.

Q:  What was it in 2018? Because we know that the second half was a little bit challenged?

O'Leary:  It would have been I would say probably 3% or 4%.

Q:  And then lastly on the 5% to 6%, what was the proportion of volume and price?

O'Leary:  Primarily volume.

Q:  Unidentified Participant

O'Leary:  Volume, okay.

Fibig:  Just one thing, in terms of volume and price, despite the Scent business, everything else is almost all volume, just for our businesses.

Q:  Unidentified Participant: So the question was on Frutarom. So the 5%, 6% was mainly volume, right? Historically?

Fibig:  Yes.

Q:  And then last question, have you identified any other major accounting differences between the two companies?

A:  O'Leary:  No, I mean the primary differences, IFRS to US GAAP, but I mean we've done an extensive amount of work. But no, nothing significant. We have slightly different useful lives for example on certain categories of equipment, but nothing significant.

209.    The answers in the preceding paragraph were false and misleading when made because Defendants failed to disclose that Frutarom's growth was not "organic," but was instead the result of a long-running bribery scheme designed to boost sales.  Additionally, O'Leary's answer that there was "nothing significant" between IFF and Frutarom's "accounting" was similarly false and misleading because Frutarom's reported sales were fraudulently obtained through bribery of customers' employees and customs officials.  Moreover, the "accounting" of

Frutarom was inherently flawed, as it included illicit payments of bribes as legitimate business expenses.

## **THE TRUTH EMERGES**

210.     On February 13, 2019, after the market closed, IFF announced poor fourth quarter and full-year results for 2018, and revenue guidance for 2019 that came in below consensus expectations.   The decrease in earnings was due in part to IFF beginning to restrict the bribery scheme.   Analysts noted that "the main focus for the market was Frutarom, which improved after a poor Q3 yet continued to underperform vs targets."   (BNP Paribas, "Q418 results and 15 questions for management," February 18, 2019).   The Company also "eliminated specific commentary with respect to sub-segments and geographies, which will make it even more challenging to decipher underlying business trends going forward." (Barclays, "4Q18 First Impressions," February 13, 2019).   On this news, IFF's share price plummeted $12.56 per share, or nearly 8.65%, to close at $132.66 per share on February 14, 2019, on unusually heavy trading volume, wiping out hundreds of millions of dollars in market capitalization.   There was a similar drop on the shares traded on the TASE.

211.     On August 5, 2019, after the market closed, IFF shocked the market when it acknowledged that Frutarom had "made improper payments to representatives of a number of customers" in Russia and Ukraine and that "key members of Frutarom's senior management at the time were aware of such payments."

212.     The key members included the Frutarom executives, Defendants Yehudai, Gill, Granot, and Rosenthal.

213.     According to IFF's preliminary investigation, the improper actions were performed in two ways: bribery of customs officials in Russia and Ukraine, and kickbacks,

meaning bribes paid to distributors, of which the named executives allegedly took a cut. Frutarom's management transferred funds out of its marketing budget to local employees in Russia and Ukraine, who then used them to pay local entities.

214.    IFF also reduced its 2019 financial guidance for sales to a range of $5.15 billion to $5.25 billion, from a range of $5.2 billion to $5.3 billion.

215.    On this news, IFF's share price plunged $22.56 per share, or nearly 16%, to close at $118.91 per share on August 6, 2019, on unusually heavy trading volume.  There was a similar drop on the shares traded on the TASE.

216.    On August 7, 2019, Deutsche Bank issued an analyst report on IFF, observing the following: "Key takeaways from IFF's 2Q19 results: While IFF results and guide-down were disappointing, what really un-nerved the market today was disclosure around Frutarom management making bribery payments to customers in Russia and Ukraine (prior to IFF's acquisition). To a large extent, we believe this explains the sales shortfall at Frutarom's savory solutions business in Russia since the acquisition."

217.    Before the market opened on August 13, 2019, news outlets reported that IFF submitted the results of its internal investigation regarding Frutarom to the DoJ.  The same day a number of class actions were filed against IFF.

218.    On this news, on August 13, 2019, IFF's share price fell 1.14% from $120.08 to $118.71.  On the next day, IFF's share price fell 4.81% from $118.71 to $113.00 on August 14, 2019, on unusually heavy trading volume. IFF's shares continued to decline another 2.12% on August 15, closing at $110.61.  There were similar drops on the shares traded on the TASE.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

219.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a)       Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)       the omissions and misrepresentations were material;

c)        the Company's stock traded in an efficient market;

d)       the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

e)       Plaintiffs and other members of the Class purchased IFF securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

220.     At all relevant times, the markets for IFF securities were efficient for the following reasons, among others:

a)       as a regulated issuer, IFF filed periodic public reports with the SEC;

b)       IFF regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c)       IFF was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d)      IFF's common stock was actively traded in efficient markets, namely the NYSE and TASE.

221.    As a result of the foregoing, the market for IFF securities promptly digested current information regarding IFF from publicly available sources and reflected such information in the prices of IFF's securities.  Under these circumstances, all purchasers of IFF securities during the Class Period suffered similar injury through their purchase of IFF securities at artificially inflated prices and the presumption of reliance applies.

222.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to IFF and/or Frutarom, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

### CLASS ACTION ALLEGATIONS

223.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired IFF securities on the NYSE between May 7, 2018 and August 12, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Frutarom and/or IFF, and the directors and officers of Frutarom and/or IFF and their families and affiliates at all relevant times.

224.    Plaintiffs also bring claims on behalf of all persons and entities who purchased or otherwise acquired IFF securities on TASE between October 9, 2018 and August 12, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any

subsidiary or affiliate of Frutarom and/or IFF, and the directors and officers of Frutarom and/or IFF and their families and affiliates at all relevant times.

225.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of May 6, 2018, there were 78.9 million IFF shares outstanding.

226.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

a)    Whether the Exchange Act was violated by Defendants;

b)    Whether Defendants omitted and/or misrepresented material facts;

c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e)    Whether the prices of IFF securities were artificially inflated; and

f)    The extent of damage sustained by Class members and the appropriate measure of damages.

227.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

228.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in securities class action litigation.  Plaintiffs have no interests that conflict with those of the Class.

229.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION

230.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

231.     Throughout the Class Period, the price of IFF's securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

232.     During the Class Period, Plaintiffs and the Class purchased IFF securities at artificially inflated prices because of Defendants' materially false and misleading representations and were damaged thereby.   The price of IFF's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

233.     Defendants' failure to disclose the fraudulent activity and/or failure to provide complete and accurate information artificially inflated the value of Frutarom and IFF's securities and/or maintained those securities at an artificially high level, and the revelation and/or materialization of this information and/or the risks concealed by Defendants' fraud resulted in substantial losses to the Class members.

## NO SAFE HARBOR

234.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein relate, for example, to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management at Frutarom and/or IFF, who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

235. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

236. During the Class Period, Defendants disseminated or approved the false statements above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations or omissions and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

237. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

      a)     Employed devices, schemes, and artifices to defraud;

b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of IFF securities during the Class Period.

238.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IFF securities.  Plaintiffs and the Class would not have purchased IFF securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

239.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of IFF securities during the Class Period.

## SECOND CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Frutarom, IFF and the Scheme Defendants

240.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

241.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Count, nor prove in this case, that each of the Scheme Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

242.     During the Class Period, the Scheme Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of IFF securities; and (iii) cause Plaintiffs to purchase IFF securities at artificially inflated prices.

243.     In furtherance of this unlawful plan, scheme and course of conduct, the Scheme Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of IFF securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

244.     The Scheme Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included encouraging and enabling the fraudulent activities in Russia and Ukraine.  This conduct resulted, for example, in Frutarom and IFF dramatically overstating the success of the Emerging Markets segment and making false statements to the market about the financial success and the reasons underlying the success.

245.     Plaintiffs and the Class reasonably relied upon the integrity of the market in which the IFF securities traded.

246.     During the Class Period, Plaintiffs and the Class were unaware of the Scheme Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of the Scheme Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased IFF securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

247.     As a direct and proximate result of the Scheme Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of IFF securities during the Class Period.

248.     By reason of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of IFF securities during the Class Period.

## THIRD CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

249.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

250.     The Individual Defendants acted as controlling persons of Frutarom and/or IFF within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions and their power to control public statements about Frutarom and/or IFF, the Individual Defendants had the power and ability to control the actions of Frutarom and/or IFF and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

251.     The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

## FOURTH CLAIM

### For Violation of the Israel Securities Law, 1968
### (Brought by the TASE Plaintiffs Against All Defendants for
### Purchases Made on the TASE)

252.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

253.    Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets.  For dual-listed firms incorporated in Israel like Frutarom, and dual-listed firms like IFF incorporated elsewhere but approved for such treatment by the Israeli Securities Agency ("ISA"), Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing.  *See* Israeli Securities Law, 1968 ("Securities Law"), §§ 1, 35T, 35DD, 35EEE.  According to IFF's registration form, "The Company's securities will be listed for trading in accordance with the provisions of Chapter 5'3 of the (Israeli) Securities Law, 1968. Therefore, the Company's reports will be in English and its content will be in accordance with its reporting format abroad.  Also, the law applicable to the company in relation to its reporting obligations is in accordance with US law."

254.    Accordingly, to construe the propriety of Frutarom and IFF's disclosures to investors, Israel applies U.S. laws and regulations, including the anti-fraud provisions of the U.S. securities laws, to enforce disclosure obligations for dual-listed stocks. *See* Securities Law, §§35T, 35 DD, 35EE; *Damti v. Mannkind Corporation*, Civil Appeal Petition 17/8737 (Israeli Supreme Court, Oct. 16, 2018); *Verifone Holdings, Inc. v. Stern, Class Action* 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc., Class Action* 3912-01-08, decision rendered Aug. 25, 2011, subsequent to and in light of *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010)).  According to Israeli case law, liability for violations thereof is

pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act applies to the claims arising from misstatements made by IFF and Frutarom on the TASE.

255.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of IFF common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase IFF securities at inflated prices in reliance on Defendants' false and misleading statements made knowingly or with deliberate recklessness by Defendants; and (d) caused them losses when the truth was revealed.

256.    During the Class Period, in violation of Section 20(a) of the Exchange Act, the Individual Defendants had control over IFF and/or Frutarom and made the material false and misleading statements and omissions on behalf of IFF and/or Frutarom within the meaning of Section 20(a) of the Exchange Act, causing damages to Plaintiffs and other Class members.  By virtue of their controlling shareholder status, executive positions, board membership, and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the companies, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the companies' internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements

were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

257.    Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from Plaintiffs' purchases of common shares on the TASE, the following provisions and causes of action apply to those claims:

a.    Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000 promulgated under the Securities Law – IFF and Frutarom breached their reporting obligations under the "foreign law" - namely, U.S. law - defined in § 1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."  Specifically, IFF and Frutarom failed to submit and publicize reports, notices, and other documents of the adverse information contained herein as required under U.S. law, in a timely fashion as required under U.S. law or earlier, on issues required under U.S. law.  IFF and Frutarom thereby caused damage to Plaintiffs.

b.    § 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970 thereunder – IFF and Frutarom failed to submit immediate reports in a timely fashion as required under Regulation 30. According to Regulation 36(a): "An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price of

the corporation's securities."  Moreover, even if IFF and Frutarom may have delayed timely reporting pursuant to Regulation 36(b), once they became aware of rumors and other public information, they breached their obligation under Regulation 36(d) to submit an immediate report and refer therein to the correctness of the information that has already been made public.  IFF and Frutarom thereby caused damage to Plaintiffs.

c.  §§ 31-32A, 34, 38B-38C of the Securities Law - Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and a controlling shareholder thereof with regard to a misleading item that was in a report, notice or document that the corporation filed pursuant to this Law - to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter, for damage caused to them by the inclusion of a misleading item in those disclosures.  A "misleading item" is defined in § 1 of the Securities Law as "including anything that is likely to mislead a reasonable investor, and any matter the omission of which is likely to mislead a reasonable investor."  Specifically, § 32A(c) denies the safe harbor protection for "forward looking information" under this Section from "a party that knew that the forward-looking information would not be realized."  Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for forward-looking information."  Defendants are liable to Plaintiffs under these provisions.

d.  Par, 44A1 – misleading item in any report, prospectus, announcement etc, both positive or failure to include necessary information.

e.  § 52K of the Securities Law - This general civil liability provision imposes liability

on an issuer, the directors of the issuer, its general manager, and on a controlling shareholder of the issuer for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this Law or of regulations hereunder.  Defendants are liable to Plaintiffs under this provision.

f.   §§ 35-36 of the Torts Ordinance [New Version] - These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission.  Defendants are liable for damage caused to Plaintiffs by the former's misrepresentations and omissions as detailed in the above paragraphs.

g.   § 63 of the Torts Ordinance [New Version] - This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this Ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, the breach caused damage to that person of the kind or nature of damage meant by the statute, unless that statute was meant to exclude such remedy. Defendants are liable for damage caused to Plaintiffs by the former's failures to comply with their duties under the Securities Law as detailed in the above paragraphs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  March 16, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Emma Gilmore (*pro hac vice application forthcoming)*
Heather Volik (*pro hac vice application forthcoming*)

600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: egilmore@pomlaw.com
Email: hvolik@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Samuel H. Rudman
David A. Rosenfeld
Philip Merenda
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Additional Counsel for Plaintiffs*

**Elbert, Nazaretsky, Rakov & Co.
Law Offices & Notary**
Maxim Rakov
4 Maskit str. Herzliya Israel

*Legal Consultant for Plaintiffs*