UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
MENORA MIVTACHIM INSURANCE LTD.,
MENORA MIVTACHIM PENSIONS AND GEMEL
LTD., MENORA MIVTACHIM AND THE
FEDERATION OF ENGINEERS PROVIDENT FUND
MANAGEMENT LTD., CLAL INSURANCE COMPANY
LTD., CLAL PENSION AND PROVIDENT LTD.,
and ATUDOT PENSION FUND FOR EMPLOYEES
AND INDEPENDENT WORKERS,

                 Lead Plaintiffs,

        - against -

INTERNATIONAL FLAVORS & FRAGRANCES INC.,
FRUTAROM INDUSTRIES LTD., ANDREAS FIBIG,
RICHARD A. O'LEARY, ORI YEHUDAI, ARI
ROSENTHAL, ALON GRANOT, GUY GILL, and
AMOS ANATOT,

              Defendants.
--------------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 7536 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    This federal securities class action is brought by a putative class of investors who acquired International Flavors & Fragrances, Inc. ("IFF") securities between May 7, 2018 and August 12, 2019 (the "Class Period").

    In October 2018, IFF, an American company that sells flavoring and fragrance products around the world, acquired Frutarom Industries Ltd. ("Frutarom"), an Israeli company operating in the same sector. Plaintiffs allege that since the early 2000s, and possibly before that, Frutarom employed

a kickback scheme with customers in Russia and Ukraine and bribed officials in the same countries to generate business.

In light of these tactics, plaintiffs allege that IFF, Frutarom, and various executives of those companies made materially false or misleading statements or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).  Plaintiffs further claim that by disseminating misleading statements, defendants employed a scheme to defraud and engaged in a course of business that operated as a fraud in violation of Section 10(b) and Rule 10b-5(a) and (c).  Plaintiffs also bring derivative claims against the individual executives for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Finally, plaintiffs assert claims against all defendants under the Israeli Securities Law of 1968 based on the same facts.

This opinion addresses defendants' motions to dismiss plaintiffs' Amended Class Action Complaint ("Am. Compl.") under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  (ECF Nos. 94, 95, 103.)[1]

---

[1]     Certain defendants also move to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

For the reasons discussed below, defendants' Rule 12(b)(6) motions are granted.

**FACTUAL BACKGROUND**[2]

**A.    IFF**

IFF is a company incorporated and headquartered in New York that, true to its name, creates and sells flavoring and fragrance products.  (Am. Compl. ¶¶ 3, 28.)  Prior to its acquisition of Frutarom, IFF sold its products to customers in approximately 162 countries and amassed annual net sales totaling nearly $3.4 billion.  IFF, Registration Statement (Form S-4) at 6, 18 (June 19, 2018) (Ex. 3 to Decl. of Thomas S. Kessler (ECF No. 99-3)).

During the Class Period, IFF securities were traded on the New York Stock Exchange ("NYSE") and, after October 9, 2018, the Tel-Aviv Stock Exchange ("TASE") as well.  (Am. Compl. ¶ 93.)  At all times relevant to this action, defendant Andreas Fibig served as IFF's President and Chief Executive Officer and defendant Richard A. O'Leary served as IFF's Chief Financial Officer.  (Id. ¶¶ 30-31.)

---

[2]    The following allegations are largely drawn from the Amended Complaint.  (ECF No. 50.)  The Court also considers any "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission ("SEC")], and documents possessed by or known to the plaintiffs and upon which they relied" in bringing this action.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

**B.    Frutarom**

Frutarom is an Israeli company that also develops and sells flavoring and fragrance products. (Id. ¶ 2.)  Prior to its acquisition by IFF, Frutarom sold products to over 30,000 customers spread across more than 150 countries.  IFF, Registration Statement (Form S-4) at 7 (June 19, 2018).  Frutarom's securities traded on TASE and the London Stock Exchange until it was acquired by IFF and became a wholly owned subsidiary.  (Am. Compl. ¶¶ 12, 92.)

At all relevant times prior to IFF's acquisition of Frutarom, defendant Ori Yehudai served as Frutarom's President and Chief Executive Officer, defendant Amos Anatot served as Frutarom's President of Global Supply Chain and Operations, defendant Alon Granot served as Frutarom's Chief Financial Officer, defendant Ari Rosenthal served as Frutarom's General Manager of Israel and Emerging Markets, and defendant Guy Gill served as Frutarom's Vice President of Finance.  (Am. Compl. ¶¶ 32-36.)  After the merger, Anatot joined IFF's Executive Leadership team and also became President of Frutarom.  (Id. ¶ 36.)  The rest of the individual defendants did not join IFF's management team.  Instead, Yehudai became a consultant for IFF, Granot remained at IFF in an unspecified role, Rosenthal remained in his position as General Manager of Israel and Emerging Markets

for Frutarom until August 2019, and Gill served as Frutarom's Senior Vice President of Finance until October 2019. (Id. ¶¶ 32-35.)

### C. Frutarom's Sales in Russia and Ukraine

Russia and Ukraine were two of the approximately 150 countries where Frutarom sold its products. (See id. ¶ 10.) In 1999, Frutarom opened its sales offices in Russia and Ukraine. (Id. ¶ 84.) By 2008, Frutarom's operations in those countries were still relatively small. (Id. ¶ 53.) However, in 2013, Frutarom eventually grew to become "the leading manufacturer in Russia and the countries of the region" following its acquisition of PTI, a company that operated in Russia. (Id. ¶ 8.) Between 2016 and 2018, Frutarom's sales in Russia represented on average 31% of its sales in Emerging Markets countries,[3] which in turn represented up to 45% of Frutarom's total sales. (Id. ¶ 69.) By 2017, the year before the merger, Frutarom's sales in Russia exceeded $160 million (id. ¶ 85), while its global sales surpassed $1.3 billion, IFF, Registration Statement (Form S-4) at 20 (June 19, 2018).[4]

---

[3]    "Emerging Markets" were defined by IFF as "all markets except North America, Japan, Australia, and Western, Southern and Northern Europe," IFF, Registration Statement (Form S-4) at 7 (June 19, 2018), and similarly defined by Frutarom as including "Asia, Central and South America, Central and Eastern Europe and Africa," id. at 59.

[4]    While the Amended Complaint does not allege any specific sales figures for Ukraine, it does allege that "Frutarom Ukraine sales represented roughly 30% of Frutarom Russia sales." (Am. Compl. ¶ 53.)

As discussed in detail below, some of Frutarom's sales in Russia and Ukraine were aided by a kickback payment scheme that Frutarom arranged with customer representatives and payments Frutarom made to customs and licensing officials in Russia and Ukraine.  (See Am. Compl. ¶ 10.)

### 1. Kickback Payments to Customers in Russia and Ukraine Before 2015

Beginning in at least 2002, and possibly as far back as the 1990s, Frutarom arranged for kickback payments, also known as "otkat" in Russian, to flow to customer representatives in Russia and Ukraine to generate business in those countries.  (Id. ¶¶ 10, 45-77; id. at 17 n.3.)

According to Confidential Witness 1 ("CW-1"), who served as the Chief Financial Officer of Frutarom Russia and Frutarom Ukraine between 2007 and 2014 (id. ¶ 48), Frutarom directed these kickback payments to approximately 35 to 45 of its customers in the region, which impacted about 30% to 50% of Frutarom's sales in Russia and Ukraine.  (Id. ¶ 68.)  The Amended Complaint, however, provides no time period for these estimates.

Confidential Witness 2 ("CW-2"), who held roles as the General Manager and Chief Executive Officer at Frutarom Ukraine and Frutarom Russia between 2006 and 2014 (id. ¶ 50),

offered similar estimates, again for an unspecified time period (id. ¶ 68).

According to both CW-1 and CW-2, during the time they were employed at Frutarom, the sales teams at Frutarom Russia and Ukraine were tasked with negotiating the payment amount with the customer representatives, with the typical kickback falling between 3% and 10% of the sales to the customer. (Id. ¶ 59.) Frutarom's goal at that time was to reach 40% to 70% margins on its sales, with these kickback payments included in the calculation. (Id. ¶ 62.) Whenever new payments were negotiated or existing payments were increased, the payment amount would have to be approved by CW-2, Rosenthal, or Gill. (Id. ¶¶ 60-61.) And, while they did not approve each new individual payment, Yehudai and Granot approved the general policy decision to make these payments, which Yehudai also discussed internally with Rosenthal. (Id. ¶¶ 55, 61.) According to CW-2, Yehudai and Granot were also privy to emails that used the words "illegal" and "money laundering" in the context of discussing "policy issues" related to the payments. (Id. ¶ 62.)

While CW-1 and CW-2 were employed at Frutarom, the customer payments were documented internally in a few ways. First, CW-1 maintained a spreadsheet that listed the name of the customer, sales related to that customer, payments made

by the customer, the name and position of the customer
representative who received the kickback payments, the amount
of the kickback payments Frutarom paid to the customer
representative, and the Frutarom sales manager responsible
for the customer.  (Id. ¶¶ 45, 47, 56.)  CW-1 circulated the
chart on a regular basis to CW-2, Yehudai, Granot, Rosenthal,
and Gill.  (Id. ¶¶ 45, 57.)

Additionally, Frutarom's monthly profit and loss report
contained a category labeled "Other salary expenses," which
reflected the total amount of the customer kickback payments
Frutarom made in Russia and Ukraine that month.  (Id. ¶ 46.)

Finally, CW-1 periodically prepared "ad hoc" reports
that analyzed the effectiveness of each customer kickback
payment to determine the real margin on Frutarom's sales,
which he would distribute to Frutarom officials when
requested.  (Id. ¶ 58.)

As described by CW-2, one example of how the kickback
scheme worked during his time at Frutarom would be for
Frutarom and a client representative to agree to a kickback
payment amount at the same time that Frutarom secured the
client as a purchaser.  (Id. ¶ 70.)  The customer
representative and Frutarom would next agree on a contract
that would include the agreed-upon payment to the
representative as part of the invoice price.  (Id.)  Frutarom

would then bill the client according to the invoice and reroute the kickback payment to the client representative in the form of cash or a bank deposit.  (Id.)

From 2006 to 2008, Frutarom facilitated these payments by arranging for CW-2 to obtain cash from Frutarom's finance department in Israel and transport the cash on a plane to Russia and Ukraine.  (Id. ¶¶ 63-65.)  In 2008, Frutarom switched to adding the payment amounts to CW-1's salary that was deposited in CW-1's bank account for him to withdraw and disburse.  (Id. ¶¶ 63, 66.)  CW-2 did not participate in this arrangement because his bank account was subject to inspection by Israeli authorities.  (Id.)  Finally, at some point before CW-1 and CW-2 left the company, Frutarom began using straw companies to facilitate the payments by paying invoices for phony services to these companies and then receiving cash back that could be used to fund the customer representative payment.  (Id. ¶ 67.)

### 2.  Payments to Customs and Licensing Officials in Russia and Ukraine Before 2015

Also beginning in 2002 or earlier, Frutarom arranged to pay customs and licensing officials in Russia and Ukraine to export products into those countries.  (Id. ¶¶ 45, 78-81.)

With respect to customs officials, according to CW-2, Frutarom arranged to have a forwarder company pay $200 to

$300 in cash bribes for each container Frutarom shipped into Russia or Ukraine. (Id. ¶ 78.) As relayed by CW-1 and CW-2, certain officials, especially in Ukraine's Odessa port, would not sign release documents for these containers unless they received these payments. (Id.) Frutarom also arranged for payments of approximately $100 to $500 to customs officials at airports in Russia and Ukraine to ship samples of their products that were unaccompanied by the requisite import certificates. (Id.) CW-1 stated that these payments affected every product Frutarom imported into the region, albeit during an unspecified time period. (Id.)

According to CW-2, Frutarom also arranged for cash payments between $100 and $300 to officials at the Russian Authorities Standards Institutes to acquire the necessary certifications to sell flavor and seasoning products in Russia. (Id. ¶ 80.)

Like the customer kickback payments, Frutarom's payments to officials during CW-1's and CW-2's tenures were approved by CW-2 (id. ¶ 60) and entered by CW-1 into a spreadsheet that listed the customs house receiving the payment and the amount of the payment (id. ¶ 79). This chart was also regularly distributed to defendants Yehudai, Granot, Rosenthal, and Gill, who approved of the payments as a matter of policy. (Id. ¶¶ 45, 57, 79.) The payments to officials

were reflected in Frutarom's monthly profit and loss reports as "Other salary expenses."  (<u>Id.</u> ¶ 46.)

Several members of Frutarom's audit team were aware of the payments as well.  (<u>Id.</u> ¶ 81.)  An auditor even suggested adding the names and positions of the customs officials to the spreadsheet tracking the payments to prevent the payments from being embezzled by Frutarom's regional sales managers, which was reportedly an issue Frutarom faced.  (<u>Id.</u> ¶ 79.) Further, CW-1 heard that Frutarom's auditors discussed these payments in connection with 2013 financial results at a Frutarom Board of Directors meeting attended by Yehudai and that no changes were made to the payment schemes following that meeting.  (<u>Id.</u> ¶ 81.)

### 3.   Allegations of Payment Schemes in Russia and Ukraine During the Class Period

Both CW-1 and CW-2 left Frutarom in 2014.  (<u>Id.</u> ¶¶ 48, 50.)  The role of General Manager of Frutarom Russia went to a sales manager who had been involved in the customer payment scheme (<u>id.</u> ¶ 82), while the role of Frutarom Russia Chief Financial Officer went to an individual named Alexander Buriy (<u>id.</u> ¶ 83).  Both CW-1 and CW-2 claim that Frutarom's payment schemes were "in full swing" when they left the company in 2014.  (<u>Id.</u> ¶ 82.)

According to CW-1, Buriy told him that the payment schemes continued through 2018. (Id. ¶ 83.)  Likewise, CW-1 also "observed that he heard from representatives of Frutarom customers that everything proceeded 'as usual' in 2018." (Id.)

CW-1 also heard from Buriy that Rosenthal told Buriy that IFF knew about Frutarom's payments in 2018 and that Rosenthal traveled to Russia to order that Frutarom stop the payments in Russia and Ukraine and sign an attestation that it would halt the improper activity. (Id. ¶ 110.)  PTI, one of Frutarom's subsidiaries operating in Russia, reportedly declined to sign the attestation and faced no repercussions. (Id.)

### D.   IFF's Due Diligence of Frutarom

Beginning in October 2017, IFF began exploring the possibility of acquiring Frutarom. (Id. ¶ 87.)  IFF conducted due diligence of Frutarom in March and April 2018. (Id. ¶¶ 89, 99-100.)  According to Confidential Witness 3 ("CW-3"), who worked on executive compensation matters at IFF and performed due diligence work on mergers other than the Frutarom acquisition, IFF completed its due diligence of Frutarom quicker than what he would have expected. (Id. ¶¶ 96-97.)  CW-3's expectation from working on other mergers for

IFF was that due diligence of Frutarom could potentially take up to a year.  (Id.)

Additionally, an anonymous source quoted in a news article published by Calcalist, an Israeli business periodical, stated that IFF learned of an "under the radar payment system" at Frutarom during its due diligence and had known about it for "many months" before completing its acquisition of Frutarom.  (Id. ¶ 109 (citing Tomer Ganon & Ran Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice, CTech by Calcalist (Aug. 13, 2019) (Ex. 9 to Decl. of Thomas S. Kessler).)  That same source added that "all the payments in question were made to private people," that "[t]here were no bribes or illegal commissions," and that "the money was used only to pay local distributors to promote products."  Ganon & Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice, supra.

E.   **IFF's Acquisition of Frutarom**

On May 3, 2018, the boards of directors of both IFF and Frutarom approved the merger agreement.  (Id. ¶ 91)

In announcing the anticipated acquisition of Frutarom to its shareholders in June 2018, IFF listed 19 reasons that weighed in favor of the transaction.  IFF, Registration Statement (Form S-4) at 71-72 (June 19, 2018).  Among those

reasons was "hav[ing] an enhanced geographic position in emerging markets," id., which would be buoyed by Frutarom's sales in those regions, including Russia and Ukraine (see Am. Compl. ¶ 5; id. at 2 n.1).

On October 4, 2018, IFF completed its $7.1 billion acquisition of Frutarom, the largest acquisition in IFF's history. (Id. ¶ 92; IFF, Registration Statement (Form S-4) at 31 (June 19, 2018).) After acquiring Frutarom, IFF became the second largest company in the flavoring and fragrances industry (Am. Compl. ¶ 7), with net sales of over $5.1 billion to approximately 38,000 customers located in nearly every nation across the world. IFF, Annual Report (Form 10-K) at 3, 32 (March 3, 2020).

Related to the transaction, Yehudai received a $20 million bonus, and Granot, Anatot, and Gill were given smaller bonuses, all of which were exceptions to Frutarom's compensation policies. (Am. Compl. ¶¶ 12, 112-13, 157, 159, 168.)

## F.   IFF's Internal Investigation and Revelation of Frutarom's "Improper Payments"

Following the merger, on February 13, 2019, IFF announced its Q4 2018 and full-year 2018 financial results that came in below analysts' expectations in part because of Frutarom's underperformance, which plaintiffs allege was due

to IFF clamping down on Frutarom's payment schemes in Russia and Ukraine.  (Id. ¶ 210.)  IFF's share price on NYSE dropped 8.65% based on the announcement of its financial results and its shares traded on TASE experienced a similar decline. (Id.)

During a May 7, 2019 Q1 2019 earnings call, IFF's CEO Fibig stated that IFF had "seen some weakness in parts of our Russia business" in explaining IFF's financial results for that quarter and its future growth projections.  (Id. ¶ 202.) Later, at IFF's June 5, 2019 investor day presentation, IFF's CFO O'Leary discussed "pressures" he had seen from the "Savory business primarily in PTI [(a Frutarom subsidiary)] in Russia" in the context of explaining the company's growth rate and projections.  (Id. ¶ 204).

Then, on August 5, 2019, IFF announced:

> During the integration of Frutarom, IFF was made aware of allegations that two Frutarom businesses operating principally in Russia and Ukraine made certain improper payments, including to representatives of a number of customers. IFF promptly commenced investigations of such allegations with the assistance of outside legal and accounting firms.  IFF's investigations are not yet complete, but preliminary results indicate that improper payments to representatives of customers were made and that key members of Frutarom's senior management at the time were aware of such payments.  IFF has not uncovered any evidence suggesting

> that such payments had any connection to
> the United States.
>
> Based on the results of the investigations
> to date, IFF believes that such improper
> customer payments are no longer being made
> and the estimated affected sales
> represented less than 1% of IFF's and
> Frutarom's combined net sales for 2018.
> IFF does not believe the impact from these
> matters is or will be material to IFF's
> results of operations or financial
> condition. The costs arising from these
> matters, however, could be material in a
> particular fiscal quarter.

IFF, Quarterly Report (Form 10-Q) at 49 (August 5, 2019); see
Am. Compl. ¶ 211. The "key members" referenced above were
Yehudai, Gill, Granot, and Rosenthal. (Am. Compl. ¶ 212.)
IFF also reduced its 2019 sales projections from between $5.2
billion and $5.3 billion to between $5.15 billion and $5.25
billion. (Id. ¶ 214.) IFF's share price on both NYSE and
TASE fell about 16%. (Id. ¶ 215.)

On August 13, 2019, news outlets reported that IFF had
submitted the results of its internal investigation to the
U.S. Department of Justice. (Id. ¶ 217.) IFF's share price
on both NYSE and TASE fell from $120.08 on August 13 to
$110.61 on August 15, a decrease of about 7.89%. (Id. ¶ 218.)
There are no allegations in the Amended Complaint or
disclosures in IFF's SEC filings showing that the Department
of Justice has filed any criminal charges or taken other

actions against the defendants after receiving IFF's submission.

In its March 3, 2020 Form 10-K annual report on 2019, IFF stated:

> IFF's investigation of allegations that improper payments to representatives of customers were made in Russia and Ukraine has been completed. Such allegations were substantiated, and IFF has confirmed that key members of Frutarom's senior management at the time were aware of such payments. IFF has taken appropriate remedial actions, including replacing senior management in relevant locations, and believes that such improper customer payments have stopped.
>
> IFF has confirmed in these investigations that total affected sales represented less than 1% of the Company's consolidated net sales for 2019. The impact of the reviews, including the costs associated with them, were not material to IFF's results of operations or financial condition. In addition, no evidence was uncovered suggesting that any of these compliance matters had any connection to the United States.

IFF, Annual Report (Form 10-K) at 29 (March 3, 2020).

### G.   IFF and Frutarom's Legal Action Against Defendant Yehudai Following IFF's Disclosure

In October 2019, following an extensive internal investigation, IFF and Frutarom filed a lawsuit against Yehudai in Israel for fraud in the context of the merger to recover the $20 million bonus paid to Yehudai. (Id. ¶ 16.)

IFF and Frutarom's complaint in the Israeli action alleges that:

- "during the internal investigation it was revealed that Frutarom's activities, at least in Russia and Ukraine, were tainted by unlawful and/or improper activity of payments to customer representatives (existing and/or potential) in order to make and/or others to purchase the company's products for and/or by the Customers";

- "the improper activities and improper payments were made under the direction and/or approval and/or involvement of Ori Yehudai, and for the very least he was aware of these payments and did not prevent them";

- "senior executives of Frutarom, including [Yehudai], made a false statement that the financial statements [from 2014-2016] adequately reflect[ed] Frutarom's operating results and cash flow, and that any defect and/or fraud in which the company or any of its senior employees is involved in, [was] disclosed";

- "[t]he bonus was approved on the basis of misleading misrepresentations and other violations and wrongdoings";

- "[t]he improper payments were made unlawfully and with bad faith (at the very least with negligence) and at the very least constituted 'civil bribery'";

- "[t]hese payments contravene the proper ways of operations of a publicly traded company, contradict the company's code of ethics and are obviously false statements"; and

- the IFF-Frutarom "merger agreement also included a statement and representation that Frutarom complied with all applicable laws," which was false or misleading. (Id. ¶¶ 16-19.)

According to IFF's most recent Annual Report, the lawsuit against Yehudai remains pending. IFF, Annual Report (Form 10-K) at 33 (Feb. 22, 2021).

## PROCEDURAL BACKGROUND

The initial class action complaint in this case was filed by Marc Jansen on August 12, 2019.  (ECF No. 1.)  After receiving a number of applications for appointments of lead plaintiff and lead counsel filed pursuant to the Private Securities Litigation Reform Act ("PSLRA"), see 15 U.S.C. § 78u-4(a)(3)(B), the Court appointed Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., Menora Mivtachim and the Federation of Engineers Provident Fund Management Ltd., Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees and Independent Workers as lead plaintiffs and Pomerantz LLP as lead counsel on December 26, 2019.  (ECF No. 46.)  Plaintiffs filed the Amended Class Action Complaint on March 16, 2020, which remains operative.  (ECF No. 50.)  Defendants filed the instant motions to dismiss the Amended Complaint on June 26, 2020.  (ECF Nos. 94, 95, 103.)

## LEGAL STANDARDS

### A.   Motions to Dismiss for Failure to State a Claim

To survive a motion to dismiss brought under Rule 12(b)(6) for failure to state a claim, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555–56 (2007)).  While the Court must accept
"all of the factual allegations in the complaint as true," it
is "not bound to accept as true a legal conclusion couched as
a factual allegation.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009) (quoting Twombly, 550 U.S. at 555).  In addition to
the allegations in the complaint, the Court may consider
"written instruments attached [to the complaint], statements
incorporated by reference [in the complaint], and public
disclosure documents filed with the SEC."  Gamm v. Sanderson
Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019) (citation
omitted).

### B.  Alleging Securities Fraud under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful to

> use or employ, in connection with the
> purchase or sale of any security
> registered on a national securities
> exchange . . . any manipulative or
> deceptive device or contrivance in
> contravention of such rules and
> regulations as the Commission may
> prescribe as necessary or appropriate in
> the public interest or for the protection
> of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder,
prohibits "in connection with the purchase or sale of any
security," (a) "employ[ing] any device, scheme, or artifice
to defraud," (b) "mak[ing] any untrue statement of a material
fact or . . . omit[ting] to state a material fact necessary

in order to make the statements made, in the light of the circumstances under which they were made, not misleading," and (c) "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.

To survive a motion to dismiss Section 10(b) and Rule 10b-5(b) claims of material misrepresentations or omissions, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Gamm, 944 F.3d at 463 (citation omitted).

"Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012). Thus, to "state a claim under Rule 10b-5(a) or (c), the plaintiff must allege that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." In re ForceField Energy Inc. Sec. Litig., No. 15

Civ. 3020, 2017 WL 1319802, at *7 (S.D.N.Y. Mar. 29, 2017)
(citing In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 491-
92 (S.D.N.Y. 2005)) (internal quotation marks omitted).

In making allegations of securities fraud in violation
of Section 10(b), plaintiffs must also satisfy the heightened
pleading requirements under the Federal Rule of Civil
Procedure 9(b) and the PSLRA.  15 U.S.C. § 78u-4(b); Fed. R.
Civ. P. 9(b); see ATSI Commc'ns, 493 F.3d at 99.

For claims based on misrepresentations and omissions,
Rule 9(b) requires plaintiffs to "(1) specify the statements
that the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made,
and (4) explain why the statements were fraudulent." Rombach
v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  The PSLRA further
requires plaintiffs to "specify each misleading statement;
. . . set forth the facts on which a belief that a statement
is misleading was formed; and . . . state with particularity
facts giving rise to a strong inference that the defendant
acted with the required state of mind." Anschutz Corp. v.
Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012) (citing
Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005))
(internal quotation marks and alterations omitted).  "[I]f an
allegation regarding the statement or omission is made on
information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Likewise, for scheme liability claims, this heightened pleading standard requires plaintiffs to "state with particularity what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (citations and internal quotation marks omitted).

## OUTLINE OF DISCUSSION

The outline of this Opinion follows. We begin by discussing in Section I two threshold pleading issues with the Amended Complaint: (1) its failure to allege with the requisite particularity that Frutarom's misconduct continued into the Class Period; and (2) its failure to establish that Frutarom's misconduct, even had it occurred in the Class Period, was unlawful. (Pages 24-38.) These threshold pleading failures alone are fatal to plaintiffs' claims.

In Section II, we consider each category of statements or omissions challenged by plaintiffs under the arguendo assumption that plaintiffs adequately alleged illegal customer kickback payments in the Class Period and discuss how the Amended Complaint nevertheless fails to plead

actionable misrepresentations of material fact.  (Pages 38-61.)

Next, Section III begins by examining plaintiffs' allegations of scienter for the IFF Defendants and explains why those allegations do not present a strong inference of those defendants' scienter.  Section III then analyzes why plaintiffs, who are a class of IFF shareholders that never purchased or sold Frutarom securities, lack standing under Section 10(b) to bring claims against the Frutarom Defendants for representations made about Frutarom prior to the IFF-Frutarom merger.  (Pages 61-86.)

Finally, in Sections IV through VI, the Court describes why plaintiffs' scheme liability claims fail for the same reason as their material misrepresentation and omission claims (pages 86-87), why plaintiffs do not state a control-person liability claim (page 87), and why the Court declines to exercise supplemental jurisdiction over plaintiffs' Israeli Securities Law of 1968 claims (pages 87-88).

## DISCUSSION

### I.  Whether Plaintiffs Adequately Plead Illegal Bribery Affecting Alleged Class Period Misrepresentations

Plaintiffs' Rule 10b-5 claims essentially assert that Frutarom's payments to customers and officials rendered the defendants' statements in the Class Period misleading.

Plaintiffs, however, fail to plead that the statements in the Class Period were misleading, i.e., contemporaneously false. That is because while the Amended Complaint makes detailed allegations of Frutarom's payments before the Class Period, it does not plead with the requisite particularity that those payments occurred during the Class Period.

Moreover, even had the Amended Complaint adequately alleged that Frutarom continued to make payments in the Class Period, it fails to establish that Frutarom's payments in Russia and Ukraine were illegal bribes or were otherwise unlawful. Both of these threshold pleading deficiencies are independently fatal to plaintiffs' claims.

### A.   Pleading Improper Conduct During the Class Period

When a securities fraud lawsuit "claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pled with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." Gamm, 944 F.3d at 465. For claims based on illegal payments, this means that a complaint must identify "the who, what, when, where, and how of the alleged improper transaction[s]." Schiro v. Cemex, S.A.B. de C.V., 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) (citation and internal quotation marks omitted). Of course, when plaintiffs "fail[]

to plead with particularity the existence of an underlying bribery scheme, they cannot plead that [defendant] committed fraud by failing to disclose the payment of bribes." <u>Id.</u> at 198-200; <u>see</u> <u>Menaldi</u>, 164 F. Supp. 3d at 578-79, 582.

Moreover, for a misstatement to be actionable, plaintiffs must plead its "<u>contemporaneous</u> falsity." <u>In re Lululemon Sec. Litig.</u>, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), <u>aff'd</u>, 604 F. App'x 62 (2d Cir. 2015) (summary order) (emphasis in original) (citations omitted). As applied here, for a statement or omission in the Class Period to be <u>contemporaneously</u> misleading, the Amended Complaint must allege with particularity that Frutarom engaged in illegal transactions during the Class Period. <u>See</u> <u>In re PetroChina Co. Ltd. Sec. Litig.</u>, 120 F. Supp. 3d 340, 358 (S.D.N.Y. 2015) ("Plaintiffs are required, nonetheless, to establish——at a bare minimum——that the underlying fraud took place during the time period covered by the purportedly false public statements . . . .") (emphasis omitted).[5]

---

[5] There are two types of alleged misrepresentations presented in the Amended Complaint that do not logically require illegal transactions to have occurred in the Class Period to be contemporaneously false: (1) Frutarom's financial statements published during the Class Period pertaining to years that pre-date the Class Period; and (2) statements in the Class Period describing the historical managerial performances of Frutarom's executives. (<u>See</u> Am. Compl. ¶¶ 120, 136, 157-60, 168-71, 180; <u>see also</u> Pls.' Opp. to Defs.' Mots. to Dismiss ("Opp.") at 22 (ECF No. 110).) However, as explained below, these statements are not actionable for separate reasons, including the threshold failure to plead the illegality of the subject transactions.

In an attempt to establish that Frutarom made payments to customers and officials in Russia and Ukraine during the Class Period, plaintiffs plead particularized facts about transactions from several years before the Class Period and then assert that the payments must have continued into the Class Period largely unchanged.  Such allegations cannot satisfy plaintiffs' particularized pleading burden, as they "are temporally and logically insufficient," especially when, as here, there are "scant" allegations to establish the details of a company's unlawful conduct during the Class Period.  Emps. Ret. Sys. of City of Providence v. Embraer S.A., No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at *4, *11 (S.D.N.Y. Mar. 30, 2018) (quoting Greebel v. FTP Software Inc., 194 F.3d 185, 202 (1st Cir. 1999) for the proposition that "[a]lleged [misconduct] occurring prior to the Class Period cannot meet the heightened pleading standards of the PSLRA in the absence of specific facts showing that the practice continued during the Class Period"); see Fogel v. Vega, 759 F. App'x 18, 24 (2d Cir. 2018) (summary order) (reasoning that a complaint fails to adequately plead a violation of Section 10(b) when it does not "make any allegations of the bribery continuing past [a date several years before the class period] that are not speculative").

We begin with plaintiffs' allegations of misconduct up
until 2014.  By relying on the information provided by CW-1
and CW-2, who were employed by Frutarom from 2006 to 2014 and
were directly involved in the alleged payment schemes,
plaintiffs have met the particularized pleading standard for
establishing Frutarom payments to customers and officials in
Russia and Ukraine well before the Class Period.
Specifically, for this time period, the Amended Complaint
identifies the individuals who directed and participated in
the payment schemes, the types of people who received the
payments (including specific examples), how the payments were
negotiated and calculated, how and where the payments were
documented, and how and where the payment schemes were carried
out.

By contrast, the Amended Complaint's allegations of
transactions after CW-1 and CW-2 left Frutarom in 2014 are
notable for their lack of detail, including who was involved
in, approved of, or knew about the transactions, who received
the payments, when and how often the payments were made, how
the payments were negotiated and structured, or even where
the payments were made.

Instead of providing these crucial details about
transactions that supposedly occurred in the Class Period,
plaintiffs simply allege that the "bribes continued at least

through 2018" (Am. Compl. ¶ 82) and argue that following the
departures of CW-1 and CW-2 from Frutarom in 2014, "[n]othing
had changed in 2015 that would have put a stop to [Frutarom's]
practice" (Opp. at 21).   In support of these conclusory
assertions, the Amended Complaint relies on:

> (1)  information  provided  by  two  confidential
> witnesses   who   lacked   firsthand   knowledge   of
> Frutarom's operations and simply relayed hearsay to
> plaintiffs' counsel;

> (2) factual allegations about Frutarom's managerial
> moves  and  financial  success  that  shed  no  light
> whatsoever  on  the  specifics  of  any  post-2014
> transactions;

> (3) an anonymously sourced news article that both
> fails   to   discuss   the   details   of   any   unlawful
> transaction and disavows that any of the payments
> constituted "bribes or illegal commissions"; and

> (4)  unproven  allegations  in  IFF  and  Frutarom's
> complaint against Yehudai in Israel.

As  analyzed  below,  these  allegations  cannot  fulfill
plaintiffs' particularized pleading burden.

### 1.  Statements Provided by Confidential Witnesses Without Firsthand Knowledge

To  start,  the  Amended  Complaint  cites  a  number  of
statements provided by CW-1 and CW-2, two former Frutarom
employees who  lacked  firsthand  knowledge of the payment
schemes after they left the company in 2014.  Specifically,
the Amended Complaint asserts:

> (1) that CW-1 and CW-2 claim that the payment schemes
> were   in   "full   swing"   when   they   left   Frutarom
> approximately four years before the Class Period;

> (2) that CW-1 heard from Buriy (Frutarom Russia's CFO from 2014 to 2019) that the bribes continued into 2018;
>
> (3) that Buriy told CW-1 that he heard from Rosenthal that IFF knew about the bribery in 2018 and asked Rosenthal to order that the bribes stop and have Frutarom sign a declaration to stop the payments; and
>
> (4) that CW-1 "observed that he heard representatives of Frutarom customers commenting that everything proceeded 'as usual' in 2018."

(Am. Compl. ¶¶ 82-83, 110.)

Even recognizing that plaintiffs in securities fraud cases may have to rely on confidential witnesses relaying hearsay to help establish their claims,[6] "courts generally have not credited the statements of [confidential witnesses]" in situations where (1) their "descriptions do not suggest that they were in a position to know the facts attributed to them," (2) the information attributed to them was "sourced secondhand" and lacked sufficient independent corroboration, or (3) the information that they offer is itself "insufficiently particular." Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., No. 19 Civ. 10067 (PAE), 2020 WL 4734989, at *11 (S.D.N.Y. Aug. 14, 2020) (listing cases).[7]

---

[6] See, e.g., City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc., 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020).

[7] See also, e.g., Francisco v. Abengoa, S.A., 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (noting that "courts have rejected confidential witness allegations where the confidential witnesses left the company before the class period" and discrediting allegations of information provided by a confidential witness that was insufficiently particular and sourced secondhand) (citations and internal quotation marks omitted); Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013), aff'd sub nom. Tabak v. Canadian Solar Inc.,

Here, the allegations of Frutarom's misconduct after 2014 attributed to CW-1 and CW-2 suffer from each of these weaknesses: the witnesses had left the company in 2014 and no longer had direct knowledge of Frutarom's alleged payment schemes after that point; the information they provided to class counsel was instead hearsay that was sourced second- or even thirdhand; and, as described in the Amended Complaint, the information they actually provided was vague on the details on any specific transaction in the Class Period.

At bottom, even if the Court were to overlook the unreliable hearsay nature of these allegations and credit the allegations sourced to these confidential witnesses, the Amended Complaint would still fail to meet the heightened pleading burden of describing the details of the transactions in the Class Period with particularity.

> **2.   Factual Allegations About Managerial Changes and Financial Performance**

Next, the Amended Complaint alleges that a sales manager who had been involved in the customer payment scheme under

---

549 F. App'x 24 (2d Cir. 2013) (summary order) ("[S]econd-hand information, obtained only through intermediaries, undermines the likelihood that [the confidential witness] had personal knowledge of the allegations.") (citations and internal quotation marks and alterations omitted); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (allegations concerning a confidential witness were "particularly uninformative because they . . . suggest that [the confidential witness] got his information . . . through intermediaries, thus undermining the likelihood that he had personal knowledge of his allegations").

CW-1 and CW-2's management took over as Frutarom Russia's General Manager after they left in 2014.  (Am. Compl. ¶ 82.) Plaintiffs also allege that Frutarom experienced financial success in Russia and Ukraine after 2014, eventually becoming the leading manufacturer in Russia in 2017.  (Id. ¶ 84.)

While these allegations contain no details at all about any illegal transaction during the Class Period, plaintiffs nevertheless invite the Court to conclude not only that the payment schemes continued into the Class Period but also that the details of the transaction remained unchanged since 2014. This speculation is simply a bridge too far.

### 3.   An Anonymously Sourced News Article

Plaintiffs further allege that there was a news report in 2019 citing information provided by an anonymous source that IFF discovered before the merger that Frutarom had an "under the radar payment system" in Russia and Ukraine.  (Am. Compl. ¶ 109 (citing Ganon & Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice, supra).)

Not only is the reporting silent on timing and details of any alleged transaction during the Class Period, plaintiffs' reliance on the article is curious, to say the least, given that the source asserts that none of the payments were "bribes or illegal commissions."  Ganon & Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice,

<u>supra</u>.   In short, the article does nothing to advance plaintiffs' argument.

### 4.   IFF and Frutarom's Complaint Against Yehudai in Israel

Finally, plaintiffs rely on unproven allegations in IFF and Frutarom's complaint against Yehudai in an Israeli lawsuit that Yehudai directed or approved improper or unlawful payments from Frutarom to customers in Russia and Ukraine and made false statements in connection with Frutarom's 2014 to 2016 financial reporting and the IFF-Frutarom merger agreement.  (Am. Compl. ¶¶ 16-19.)

As an initial matter, the prevailing view in this District is to disregard allegations that incorporate unproven allegations from complaints filed in other lawsuits.[8] But, even if the Court were to credit IFF and Frutarom's allegations against Yehudai that plaintiffs repeat in the Amended Complaint, those allegations still fail to recount

---

[8]     See, e.g., <u>In re CRM Holdings, Ltd. Sec. Litig.</u>, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f) . . . .  Thus, Plaintiffs may not rely on these sources as evidence of the alleged fraud.") (citations and internal quotation marks omitted); <u>see also</u> <u>In re Crude Oil Commodity Litig.</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) ("[P]laintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits, but instead must prove to the court that their complaint is backed by specific facts supporting a strong inference of fraud.") (citation and internal quotation marks omitted).

any of the details of a supposedly illegal transaction in the Class Period. They do not, for example, identify who received the supposedly improper payments, who carried out the payments, when those payments were tendered, where those payments were made, or how the payments were made.

Simply asserting that IFF and Frutarom made these allegations against Yehudai in a foreign lawsuit following an extensive internal investigation cannot satisfy plaintiffs' burden under Rule 9(b) and the PSLRA to present sufficient factual detail in the Amended Complaint about supposedly illegal transactions to state a claim for securities fraud premised on those transactions.[9]  See Gamm, 944 F.3d at 465.

---

[9]     While not quoted in their complaint, Plaintiffs' brief in opposition to Defendants' motions to dismiss points out that when IFF revealed the "improper payments" in SEC filings, it stated that "IFF believes that such improper customer payments are no longer being made and the estimated affected sales represented less than 1% of IFF's and Frutarom's combined net sales for 2018." IFF, Quarterly Report (Form 10-Q) at 49 (August 5, 2019). IFF also later stated that it "has confirmed . . . that total affected sales represented less than 1% of the Company's consolidated net sales for 2019." IFF, Annual Report (Form 10-K) at 29 (March 3, 2020). To the extent that plaintiffs ask the Court to fully credit these representations, plaintiffs must also accept that they establish the quantitative immateriality of the affected sales. In any event, as with the other allegations, these disclosures lack the necessary details as to timing and linkage, including whether the disclosures referred to specific transactions in the Class Period as opposed to the cumulative effects of transactions that occurred before the Class Period. Thus, plaintiffs cannot rely on these disclosures to establish that the challenged representations in the Class Period were rendered contemporaneously misleading because of any illegal transactions made during the Class Period.

B.    **Establishing the Illegality of Frutarom's Alleged Conduct**

Even had plaintiffs sufficiently pled the details of transactions in the Class Period, the Amended Complaint is independently defective because it fails to identify any laws that the alleged payments violated, allege the basic elements to establish a violation of those laws, or explain how the facts alleged meet those elements.  See Gamm, 944 F.3d at 463-65; Menaldi, 164 F. Supp. 3d at 579 (dismissing securities fraud claim based on nondisclosure of alleged FCPA violations because complaint lacked sufficient "factual allegations[] and a theory connecting those allegations to the elements of an FCPA claim"); In re Axis Capital Holdings Ltd., Sec. Litig., 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (If a complaint "fails to allege facts which would establish . . . an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally flawed.") (emphasis in original) (citations omitted).[10]

---

[10]    See also, e.g., In re Yukos Oil Co. Secs. Litig., No. 04 Civ. 5243, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) (dismissing securities fraud claim because "the Complaint fails to plead with particularity sufficient facts demonstrating that [defendant's] tax strategy violated Article 40 of the Russian Federation Tax Code"); In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (dismissing securities fraud claim because, while "Plaintiffs contend that [defendant] made material omissions in failing to disclose its violations of 18 U.S.C. Sections 215 and 1005," they "have failed to allege with particularity that [defendant] or its agents violated these statutes.") (citations omitted).

Rather than specifics, plaintiffs simply declare that the payments were "bribes" or were otherwise "improper" without identifying any law that any of the transactions violated. Simply labeling the payments as illegal does not necessarily make them so.

Even assuming, for the sake of argument, that the Amended Complaint identified the relevant laws by alleging that Frutarom falsely certified in the merger agreement that it complied with the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act of 2010, and the Organisation for Economic Co-operation and Development's ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention") (Am. Compl. ¶ 146), the Amended Complaint still does not explain how Frutarom's payments would violate those laws.[11]

To start, the FCPA would not apply to the misconduct here because Frutarom is an Israeli company that is not alleged to have had its securities registered under the

---

[11] While plaintiffs make a blanket statement in their opposition brief that "Israeli law[] prohibit[s] the bribing of public officials and other forms of bribery," and cite to Article 291A of Israel's Penal Law, that argument cannot stand in the place of well-pled and specific allegations in the Amended Complaint and, in any event, it still fails to explain how the transactions in the Amended Complaint satisfied each element necessary to violate an existing law. See O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.") (citations omitted).

Exchange Act nor to have carried out any part of its Russian and Ukrainian payment schemes in the United States. <u>See</u> 15 U.S.C. §§ 78dd-1-78dd-3; <u>United States v. Hoskins</u>, 902 F.3d 69, 71 (2d Cir. 2018) (explaining the FCPA's jurisdictional limits).

The OECD Convention does not itself sanction any conduct under the laws of any jurisdiction, as it is just a compact between certain nations to take steps to combat bribery. <u>See</u> OECD Convention § 4.1, https://www.oecd.org/daf/anti-bribery/ConvCombatBribery_ENG.pdf.

As for the U.K. Bribery Act (and any other foreign statutes), plaintiffs fail to offer any briefing, expert declarations, or other source of information cognizable under Fed. R. Civ. P. 44.1 that would permit the Court to evaluate the jurisdictional reach of those statutes, the scope and elements of the prohibited conduct, or whether plaintiffs have alleged facts that would establish a violation of those laws. Under Rule 44.1, it is "the party claiming foreign law applies" that "carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case." <u>Bigio v. Coca-Cola Co.</u>, No. 97 Civ. 2858 (BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010),

aff'd, 675 F.3d 163 (2d Cir. 2012) (citation omitted). Plaintiffs fail to meet those burdens here.

Ultimately, plaintiffs' failure to plead with particularity how the alleged conduct violated the law is equally fatal to their claims. See Schiro, 438 F. Supp. 3d at 198-200; Das v. Rio Tinto PLC, 332 F. Supp. 3d 786, 802-05 (S.D.N.Y. 2018); Menaldi, 164 F. Supp. 3d at 578-79; In re Axis Capital Holdings, 456 F. Supp. 2d at 585-86.

## II.  **Whether Plaintiffs Have Adequately Alleged Material Misrepresentations**

Even assuming the Amended Complaint adequately pleads that Frutarom carried out illegal transactions during the Class Period, which it does not, plaintiffs still fail to state a Rule 10b-5(b) claim because the Amended Complaint does not plead any actionable false statements or omissions of material fact.  For purposes of the discussion below, the Court will assume that Frutarom's customer kickback payments in Russia and Ukraine continued without change into the Class Period exactly as described in plaintiffs' pre-Class Period allegations.[12]

---

[12]  To the extent that the Court is proceeding under an arguendo assumption, it is limited to customer kickback payments continuing unchanged into the Class Period, not the alleged bribes of officials. That is because, while the allegations, articles, and securities filings that at least hint at post-2014 misconduct lack the necessary details to state a claim with particularity, they refer only to "bribes" to customers or just "bribes" generally; they do not expressly mention any bribes paid to government officials.  (See, e.g., Am. Compl. ¶ 83 (alleging that customer representatives commented that business continued "as usual");

The Amended Complaint identifies several dozen
statements made by defendants during the Class Period that
they claim to be false and misleading in light of Frutarom's
alleged payments in Russia and Ukraine. (See Am. Compl.
¶¶ 114-209.) Generally speaking, these representations fall
into the following six categories:

> (1) statements about Frutarom's financial performance
> covering periods between 2013 and 2019 (which includes
> IFF's financial performance post-merger) and
> projected revenues and growth;
>
> (2) statements explaining Frutarom's growth and
> financial performance;
>
> (3) statements about the effectiveness of Frutarom's
> internal controls related to financial reporting;
>
> (4) statements about Frutarom's management;
>
> (5) statements about Frutarom's legal compliance,
> including with anti-bribery laws, and
>
> (6) statements certifying the accuracy of other
> representations in the securities filings.

Plaintiffs attempt to tie Frutarom's alleged payments to
a representation made in each challenged statement and then
claim that the representation is misleading because
defendants omitted mention of the payments or their impact.

It is well established that omissions concerning
"corporate mismanagement or uncharged criminal conduct are

---

IFF, Annual Report (Form 10-K) at 29 (March 3, 2020) ("IFF's investigation
of allegations that improper payments to representatives of customers
were made in Russia and Ukraine has been completed," and that "[s]uch
allegations were substantiated"); Ganon & Abramson, IFF Submits Frutarom
Findings to U.S. Department of Justice, supra ("[A]ll the payments in
question were made to private people . . . the money was used only to pay
local distributors to promote products.").)

not actionable unless the non-disclosures render other statements by defendants misleading." <u>Fries v. N. Oil & Gas, Inc.</u>, 285 F. Supp. 3d 706, 718-19 (S.D.N.Y. 2018) (collecting cases). Moreover, defendants do not have a freestanding duty to disclose such information. <u>City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG</u>, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (citations and quotation marks omitted).

Rather, a company is only obligated to disclose misconduct in these situations when there is a "connection between the illegal conduct and the misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." <u>Menaldi</u>, 164 F. Supp. 3d at 581 (citation and internal quotation marks omitted). This connection between the challenged statement and the omitted misconduct "may not be too attenuated" and "must be pled with sufficient specificity." <u>In re Axis Capital Holdings</u>, 456 F. Supp. 2d at 588.[13]

---

[13]    <u>See also, e.g.</u>, <u>Ong v. Chipotle Mexican Grill, Inc.</u>, 294 F. Supp. 3d 199, 233 (S.D.N.Y. 2018) (finding no duty to disclose when the challenged "misstatement . . . is far too attenuated from the alleged omission"); <u>Cohen v. Kitov Pharm. Holdings, Ltd.</u>, No. 17 Civ. 0917 (LGS), 2018 WL 1406619, at *5 (S.D.N.Y. Mar. 20, 2018) (finding no duty to disclose when "the subject of the omissions and the subject of the statements are too attenuated"); <u>Menaldi</u>, 164 F. Supp. 3d at 582 ("[T]he connection between [defendant's] public statements and the alleged

And, even when there is a duty to disclose the alleged wrongdoing, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to render the omission materially misleading.  Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Here, as explained below, each category of statements is either not actionable as a matter of law, not closely enough linked to the alleged payment scheme to implicate defendants' duty to disclose, or not sufficiently material.

### A.    Accurate Historical Financial Statements and Growth Projections

We begin with plaintiffs' challenges to Frutarom's and IFF's publication of accurate historical financial statements and growth projections modeled on those accurate historical figures.  (See Am. Compl. ¶¶ 118-21, 123-24, 136-41, 150-51, 154-55, 161-62, 164-65, 178-83, 186-87, 189-90, 192-93, 199-200, 202-05.)

First, Plaintiffs claim that Frutarom's pre-merger financial statements dating back to 2013 and IFF's post-

---

criminal conduct is too tenuous to give rise to a duty to disclose criminal wrongdoing.").

merger financial statements through the end of the Class
Period are false because they reflected earnings, sales,
revenues, profits, and financial projections derived from
Frutarom's misconduct in Russia and Ukraine. The Amended
Complaint does not, however, allege that any of the financial
statements were themselves inaccurate, such as by reflecting
income that was never actually earned.

As has been clearly established in this Circuit,
"[a]ccurately reported financial statements . . . cannot
become actionable simply because companies do not
simultaneously disclose some wrongdoing that may have
contributed to the company's financial performance." Fogel,
759 F. App'x at 24 (citation omitted); see Speakes v. Taro
Pharm. Indus., Ltd., No. 16 Civ. 08318 (ALC), 2018 WL 4572987,
at *7 (S.D.N.Y. Sept. 24, 2018) ("[A]ccurately reported
income derived from illegal sources is non-actionable despite
a failure to disclose the illegality.") (citation omitted);
In re BHP Billiton Ltd. Sec. Litig., 276 F. Supp. 3d 65, 84
(S.D.N.Y. 2017) (quoting Boca Raton Firefighters & Police
Pension Fund v. Bahash, 506 Fed. App'x 32, 39 (2d Cir. 2012)
(summary order) for the proposition that "a violation of
federal securities law cannot be premised upon a company's
disclosure of accurate historical data").

The same is true of statements that merely describe the accurate financial data using more vivid language, such as the statement that Frutarom's Q2 2018 sales reflected "currency adjusted growth of 4.5% in pro-forma terms compared with the parallel period" (Am. Compl. ¶ 164).  See Marcu v. Cheetah Mobile Inc., No. 18 Civ. 11184 (JMF), 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020).

Next, plaintiffs contend that statements projecting IFF's and Frutarom's future revenues and growth were false and misleading.  If statements about accurate historical data are not actionable, it also stands to reason that projections of expected future financial performance modeled on accurate historical trends are similarly not actionable notwithstanding the existence of underlying misconduct. Moreover, these projections are separately insulated from liability under the PSLRA safe harbor protecting forward-looking statements of opinion, as the Amended Complaint does not plead that defendants genuinely believed that the projections were false when made, knew they had no reasonable basis for making the projections, or were aware of undisclosed facts undermining the accuracy of the projections.[14]  See 15 U.S.C. § 78u-5(c)(1)(B).

---

[14]    See also Slayton v. Am. Exp. Co., 604 F.3d 758, 773-77 (2d Cir. 2010) (affirming dismissal of Section 10(b) claim based on forward-looking statement when complaint does not adequately plead that the maker

**B.   Statements   Identifying   the   Factors   Driving Frutarom's Financial Performance**

Next,  plaintiffs  claim  that  certain  statements attributing  Frutarom's  overall  financial  performance  to factors like organic growth, acquisitions, and macroeconomic trends  triggered  defendants'  duty  to  disclose  the  alleged payments in Russia and Ukraine.  (See Am. Compl. ¶¶ 136, 180, 202, 204, 208.)

While  certain  statements  attributing  a  company's financial  success  to  legitimate  sources  may  be  actionable when  they  omit  that  improper  or  illegal  business  practices materially  contributed  to  that  success,  see  In re FBR Inc. Sec.  Litig.,  544  F.  Supp.  2d  346,  357  (S.D.N.Y.  2008), omissions  in  this  context  are  only  actionable  when  the  factors discussed  in  the  statements  are  specific  and  share  at  least a  reasonably  close  connection  to  the  omitted  conduct,  see Schiro,  396  F.  Supp.  3d  at  297  &  n.4  ("Cases  in  which  courts have  found  a  duty  to  disclose  involved  far  more  specific statements than the ones at issue here.") (listing cases); In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 403 (S.D.N.Y.

---

of the statement had "actual knowledge" of the statement's falsity); In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom. Nadoff v. Duane Reade, Inc., 107 F. App'x 250 (2d Cir. 2004) (summary order) ("A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws.") (citation omitted).

2016) ("[T]he critical consideration . . . is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading.") (citation and internal quotation marks omitted).   A review of the cases in this District analyzing when these types of statements are and are not actionable is instructive.

For example, statements in In re Par Pharmaceutical, Inc. Securities Litigation were actionable because the defendant, a pharmaceutical company, attributed its success to competitive advantages in obtaining speedy FDA approvals of its products yet omitted that it obtained those approvals through bribes.   733 F. Supp. 668, 675-78 (S.D.N.Y. 1990). Likewise, in In re VEON Ltd. Securities Litigation, representations by a telecommunications company that its growth in Uzbekistan was due to legitimate means like marketing, macroeconomic factors, and product quality were actionable because defendants concealed that the business the company generated in Uzbekistan was made possible through bribes.   No. 15 Civ. 8672 (ALC), 2017 WL 4162342, at *6-7 (S.D.N.Y. Sept. 19, 2017).[15]

_____

[15]   Other examples include In re Braskem S.A. Securities Litigation, where statements by a petrochemical company touting its ability to purchase raw materials at favorable prices were actionable because it failed to also reveal that the favorable pricing was secured through bribes, 246 F. Supp. 3d 731, 758-60 (S.D.N.Y. 2017), and

In contrast to these cases are those in which a company's statements about its financial performance were too generalized to require it to disclose bribes affecting only a portion of its operations.  For example, in Schiro, a building-materials company that operated in over 50 countries represented that its overall financial success was due to strengthening its footprint with expansion projects, its solid asset base, and its unique portfolio of business solutions, but did not reveal a bribery scheme in Columbia. 396 F. Supp. 3d at 296-97 & n.4.  There, the court found that these general statements about financial success were not actionable because they merely identified "broad trends and corporate strengths" that were too non-specific to trigger a duty to disclose.  Id.  Similarly, in Sanofi, statements made by a multinational pharmaceutical company claiming that its diabetes group was a "growth platform" for the company but omitting that an illegal marketing and kickback scheme drove its sales of diabetes products were not actionable because the statements did not "plausibly attribute the growing sales of diabetes products to pharmacies implicated in the alleged

---

DoubleLine Capital LP v. Odebrecht Financial, Ltd., in which statements by a construction and engineering conglomerate explaining that it was able to procure competitive bids in Brazil and Venezuela due to its engineering capabilities, management, and eligibility for government funding were actionable because they omitted that the company won many of its bids in those two countries through illegal bribes, 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018).

illegal kickback scheme" and thus omission of the kickback scheme was not "sufficiently connected to defendants' existing disclosures to make those public statements misleading." 155 F. Supp. 3d at 404 (citation omitted).

Here, the challenged statements attributing the overall financial performance of Frutarom to factors like organic growth and acquisitions fall far closer to the latter line of cases than the former. For a company with myriad revenue streams that sells products all over the globe, these types of statements are far too generalized and attenuated to implicate defendants' duty to disclose specific payments made by Frutarom to customers in Russia and Ukraine.[16]

### C.  Statements About Internal Controls Over Financial Reporting

Plaintiffs next challenge representations about the effectiveness of Frutarom's and IFF's internal controls over financial reporting and related audits. (See Am. Compl. ¶¶ 125-29, 131-34, 142-43, 166-67, 173-76, 194-98, 201.) Even though there are no allegations that defendants issued

---

[16]    While statements by Fibig and O'Leary attributing Frutarom's poor performance after the merger to "some weakness in parts of our Russia business" and "pressures" from the "Savory business primarily in PTI [(a Frutarom subsidiary)] in Russia" (Am. Compl. ¶¶ 202, 204) are more specific and share a more immediate connection with Frutarom's operations in Russia and Ukraine, these statements are not actionable because, as discussed below, plaintiffs do not sufficiently establish the materiality of the statements or the scienter of the IFF Defendants in making the statements.

inaccurate financial statements, plaintiffs claim that representations about the effectiveness of internal controls on financial reporting are misleading because those controls were overseen by individuals involved in the payment scheme because the payment scheme continued notwithstanding those controls.

Plaintiffs paint with far too broad a brush. The statements at issue exclusively concern the effectiveness of controls over <u>financial reporting</u>. The Amended Complaint does not allege that defendants failed to implement those controls or even that the controls were ineffective. That Frutarom carried out allegedly improper payments has nothing to do with controls over financial reporting. Accordingly, the statements vouching for the effectiveness of the internal controls and audits over <u>financial reporting</u> are not actionable, notwithstanding the payment scheme in Russia and Ukraine.[17] <u>See, e.g.</u>, <u>PetroChina</u>, 120 F. Supp. 3d at 359-60 ("Even if PetroChina officials were engaging in bribery, the [complaint] does not make any allegations that would imply

---

[17]   Plaintiffs also argue that they have stated a viable claim based on these representations because IFF and Frutarom's Israeli complaint against Yehudai alleges that Yehudai caused Frutarom to falsely report that its internal controls were effective. (Opp. at 19.) That defendants levied those allegations in a lawsuit brought under foreign law after an extensive internal investigation does not relieve plaintiffs of their burden to plead the basis of their U.S. securities law claim premised on these statements with particularity, which they fail to do here.

that the Company had flawed internal controls over financial reporting").

### D.   Statements About Frutarom's Management

The next variation on the theme of plaintiffs attempting to manufacture a connection between generalized representations and Frutarom's payments in Russia and Ukraine concerns statements describing the professional accomplishments of Yehudai, Granot, Anatot, and Gill in the context of announcing their bonuses. (Am. Compl. ¶¶ 157-60, 168-71.)   In particular, these statements detailed the individuals' roles at Frutarom, discussed Frutarom's financial performance under their leadership, and stated that they made substantial contributions to the merger efforts with IFF.[18]  According to plaintiffs, these statements were

---

[18]     (See, e.g., Am. Compl. ¶ 157 ("Mr. Yehudai has been employed by the Company since 1986 and began serving as president and chief executive officer of the Company in 1996.  During the past three decades, the Company, under Mr. Yehudai's management, has undergone a journey of accelerated growth in profits during which it has increased its income from approximately US$ 10 million in 1990 to an expected amount of more than US$ 1.6 billion in 2018, with significant ongoing growth in profit and profitability . . . based on the successful implementation of a strategy combining internal growth in profits at a rate double the growth of the markets in which the Company operates together with strategic acquisitions. . . .  In addition, Mr. Yehudai has been involved in the formulation of the terms of the Merger . . . ."); id. ¶ 159 ("Mr. Alon Shmuel Granot has been employed at the Company since 2001 and serves as executive vice president and chief financial officer of the Company.  By virtue of his role, he is responsible for the financial arrangements of the Company.  His role involves a great deal of broad responsibility over financing and management of the Company's funds, risk management, information systems, due diligence activities, mergers and acquisitions as well as many other matters. . . .  [He has] been and will be involved in many tasks involved with the Merger and overseeing the process both before the completion of the Merger and thereafter.").)

misleading because they praised defendants' managerial records while omitting that the same executives were involved in carrying out (or at least failed to prevent) Frutarom's payments to customers in Russia and Ukraine. (See id.)

We begin by noting that these statements about the roles these individuals occupied at Frutarom, the years they were employed, and Frutarom's financial performance during those years are fundamentally true recitations of historical fact, and plaintiffs do not contend otherwise. Moreover, the statements do not even remotely come close to implicating Frutarom's specific operations in Russia and Ukraine.

Plaintiffs' reliance on these statements to argue that they triggered a duty to disclose the alleged payment schemes in Russia and Ukraine amounts to little more than grasping at straws. To find that these representations are actionable would bend the duty of disclosure doctrine to such a degree that it would effectively create liability for any statement about an executive's contributions if that executive was also involved in corporate misconduct regardless of the contents of the disclosure. The federal securities laws impose a far more exacting standard to state a claim for material

misstatements and omissions.  Thus, these statements are not actionable.[19]

### E.   Statements About Anti-Bribery Compliance

The following category of challenged representations concerns Frutarom's certification in the merger agreement that it is in compliance with various anti-bribery laws, which IFF published in its June 2018 Form S-4 Registration Statement:

> Since December 31, 2015, [Frutarom] and its Subsidiaries have been and are in compliance with (i) all applicable Laws.
>
> . . .
>
> [S]ince December 31, 2014, none of [Frutarom], its [s]ubsidiaries, any of its or their directors or officers, nor, to the [k]nowledge of [Frutarom], any other employees, agents or other [p]ersons while acting for or on behalf of [Frutarom] or any of its [s]ubsidiaries, has violated the FCPA, the U.K. Bribery Act 2010, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any other applicable [l]aw relating to anti-corruption or anti-bribery (collectively, the "Anti-Corruption Laws").

---

[19]      Likewise, IFF's CEO Fibig's statement that it was his view that Frutarom executives were "nice guys" (Am. Compl. ¶¶ 206-07) shares no connection whatsoever with the payment scheme in Russia and Ukraine, and therefore cannot be the basis for liability under Section 10(b) for failing to disclose that payment scheme.  Using this statement as the premise for a securities fraud claim is borderline comical.

(Am. Compl. ¶¶ 144-47.)[20]

As thoroughly discussed above, claims based on these statements fail as a matter of law because plaintiffs have not explained how Frutarom's conduct violated any applicable law, let alone the laws identified in the challenged statements. See Schiro, 438 F. Supp. 3d at 198-200; Das, 332 F. Supp. 3d at 802-05; Menaldi, 164 F. Supp. 3d at 578-79; In re Axis Capital Holdings, 456 F. Supp. 2d at 585-86.

### F.   Statements Certifying the Accuracy of Other Statements

The final category of challenged statements involves certifications signed by IFF, Frutarom, and various individual defendants that the disclosures contained no misstatements or omissions of material fact and that they complied with applicable securities laws. (See Am. Compl. ¶¶ 130, 132, 148-53, 172, 174, 196-98, 201.) As plaintiffs have not pled any other actionable misrepresentations that would render these certifications themselves false, these statements are likewise not actionable. See Chapman v. Mueller Water Prod., Inc., 466 F. Supp. 3d 382, 410 (S.D.N.Y. 2020) ("Having failed to plead that [defendants made] any misstatements or omissions, . . . there is no basis for

---

[20]     Plaintiffs similarly challenge a statement published on Frutarom's website during the Class Period that Frutarom "does not give . . . bribes or other improper advantages . . . for business or financial gain." (Am. Compl. ¶¶ 184-85.)

Plaintiffs to challenge the statements of [defendant's] CEO and CFO that, in their opinions, [defendant's disclosures] did not contain any misstatements or omissions.") (citations omitted).

### G.   The Materiality of the Challenged Statements

Each of the challenged statements above are separately not actionable because the Amended Complaint fails to adequately plead that they were sufficiently material to a reasonable investor.

Assessing materiality is a "fact-specific" inquiry that probes "the significance the reasonable investor would place on the withheld or misrepresented information," and hinges on whether "there is a substantial likelihood that a reasonable shareholder would consider [the omission] important in deciding how to [act]." Basic, 485 U.S. at 231-32, 240 (citations omitted). Thus, for an alleged omission like kickback payments to customers to be material, there must "be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231-32 (citation omitted).

While dismissing a securities fraud complaint for failure to plead materiality is reserved for situations in which omissions would "obviously" be unimportant to a

reasonable investor, IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC, 783 F.3d 383, 390 (2d Cir. 2015) (citation omitted), dismissal is appropriate when a holistic review of relevant quantitative and qualitative factors demonstrates that the alleged omissions are not sufficiently material, see Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 491 (2d Cir. 2011).

### 1.   Quantitative Materiality Factors

We begin by analyzing quantitative materiality factors, guided by the Second Circuit-endorsed analysis outlined by SEC Staff Accounting Bulletin, No. 99 ("SAB No. 99"), 64 Fed. Reg. 45150 (Aug. 19, 1999). Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011) (noting that several Second Circuit cases have approved of SAB No. 99 as providing "relevant guidance regarding the proper assessment of materiality") (citations omitted).

Under SAB No. 99 and Second Circuit case law assessing quantitative materiality, omissions that implicate less than 5% of the company's business are presumptively immaterial. See Hutchison, 647 F.3d at 485, 487-89; SAB No. 99 at 45151-52 (noting that a helpful "rule of thumb" is that a "misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly

egregious    circumstances,    such    as    self-dealing    or
misappropriation by senior management").

Here, though plaintiffs fail to adequately plead with
particularity that any sales were affected by the alleged
customer payments during the Class Period, the payment scheme
would not clear the 5% presumptive immateriality threshold
even if the Court extrapolated their impact based on the
allegations of pre-2015 misconduct.    In reaching this
conclusion, the Court accepts the following assumptions
alleged in the Amended Complaint:

> (1) that the payments affected sales to approximately
> 35 to 45 of Frutarom's customers, representing between
> 30% to 50% of Frutarom's sales in Russia and Ukraine
> (Am. Compl. ¶ 68);
>
> (2) that Frutarom's sales in Ukraine "represented
> roughly 30% of Frutarom Russia sales" (id. ¶ 53),
> which the Court assumes to mean that Frutarom's
> combined sales in Russia and Ukraine is 1.3 times the
> sales attributed to Frutarom Russia;[21]
>
> (3) that Frutarom's sales in Russia constituted around
> 31% of Frutarom's total Emerging Markets sales (id.
> ¶ 69); and
>
> (4)   that   Frutarom's   Emerging   Markets   sales
> represented up to 45% of Frutarom's overall sales
> (id.).

---

[21]    This is a generous assumption, as the allegation that
Frutarom's sales in Ukraine "represented roughly 30% of Frutarom Russia
sales" most reasonably implies that Frutarom Russia's sales encompass
both sales in Ukraine and Russia, with Russia accounting for 70% of those
sales and Ukraine the remaining 30%.   However, given that the Court at
this stage must construe the Amended Complaint in the light most favorable
to plaintiffs, the Court will treat the combined sales in Ukraine and
Russia as the equivalent of 1.3 times Frutarom Russia's sales.

Applying these assumptions, at most, the affected sales represented between 5.44% and 9.07% of Frutarom's overall revenues.[22]  Plaintiffs, though, are not a class of Frutarom investors.  They are IFF shareholders.  Thus, plaintiffs' relevant investment interest in Frutarom's sales in Russia and Ukraine is tied to how those sales would add to IFF and Frutarom's combined bottom line in the context of a merger.  Accordingly, the appropriate denominator to assess the quantitative impact of the affected sales is IFF and Frutarom's combined revenue during the Class Period.[23]

---

[22]    If sales in Russia made up 31% of Frutarom's Emerging Markets sales, which in turn made up 45% of Frutarom's overall sales, that means that sales in Russia constitute 13.95% of Frutarom's overall sales.  If sales in Ukraine represent an additional 30% on top of those sales, then Russian and Ukrainian sales combine to represent 18.13% of Frutarom's overall sales.  If the kickback payments affected between 30% and 50% of those sales, then they implicate between 5.44% and 9.07% of Frutarom's overall sales.

[23]    In Hutchison, the Second Circuit explained that it may make sense to measure quantitative materiality against only a portion of a company's business in situations when a "product[]line, or division or segment of a company's business, has independent significance for investors," such as when that portion of the company is its "original niche, its iconic or eponymous business, critical to its reputation, or most promising for growth or as an engine of revenue," like a "flagship segment."  647 F.3d at 488 (citations omitted).  Conversely, when a line of business is not of "distinct interest to investors other than as another component of [a company's] book of business," then assessing materiality against the company's entire portfolio is appropriate.  Id. Here, while plaintiffs frame the quantitative analysis in terms of affected sales as a percentage of Frutarom's sales or even Frutarom's Emerging Market sales, those are illogical denominators.  As a class of IFF investors, plaintiffs never had an independent investment interest in Frutarom's sales in Russia and Ukraine beyond their ability to add to IFF and Frutarom's combined bottom line post-merger.  It is therefore inappropriate for Frutarom's sales, or a portion thereof, to serve as the denominator for the quantitative materiality analysis.

Frutarom's sales during the Class Period represented no more than 29.6% of IFF and Frutarom's combined sales.[24] Accordingly, the quantitative impact of the kickback scheme represented at most between 1.6% and 2.7% of IFF and Frutarom's combined bottom line, or about $82 million to $137 million.   It should also be recalled that IFF's internal investigation concluded that less than 1% of sales were affected by the payments.   Of course, all of these calculations fall comfortably below the 5% threshold to be presumptively immaterial for investors in a $5.1 billion company.

## 2.   Qualitative Materiality Factors

A statement that is presumptively immaterial because of its quantitative impact can still be actionable based on particularly egregious qualitative factors.  See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 203-05 (2d Cir. 2009) (similarly endorsing the approach outlined in SAB No. 99 for the qualitative materiality analysis); SAB No. 99 at 45151-52 (suggesting

---

[24]    IFF, Annual Report (Form 10-K) at 86, 106 (Feb. 26, 2019) (Ex. 7 to Decl. of Thomas S. Kessler (ECF No. 99-7) (for 2018, IFF and Frutarom's combined annual sales were $5,135,906,000, of which $359,560,000 is attributable to Frutarom post-merger and $1,158,367,000 pre-merger, representing a grand total of 29.6% of the combined IFF and Frutarom sales in 2018); IFF, Annual Report (Form 10-K) at 101 (March 3, 2020)(for 2019, IFF had sales of $5,140,084,000 with $1,485,448,000 attributable to Frutarom, or 28.9%).

that omissions that fall below the 5% quantitative threshold are not actionable in the "absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management").

Here, plaintiffs argue that these statements are qualitatively material because investors place emphasis on managerial integrity, because IFF and Frutarom sued Yehudai in Israel, and because IFF's stock price dropped after IFF disclosed that Frutarom made improper payments to customers in Russia and Ukraine. These factors are not egregious or sufficiently compelling to overcome the presumptive quantitative immateriality of the challenged omissions.

With respect to managerial integrity, the Amended Complaint goes into detail about alleged corruption at Frutarom's executive level before the merger. Plaintiffs, though, never had an ownership interest in Frutarom separate from it being a wholly owned subsidiary following a merger with IFF. Thus, the relevant managerial integrity IFF investors would be most interested in when making investment decisions is that of IFF, the company in which they invested.[25]

---

[25]     And, to the extent that plaintiffs are challenging the managerial integrity of IFF, it should be emphasized that this is the same management that decided to conduct the internal investigation into Frutarom's business practices in Russia and Ukraine and then publicly reveal the conclusions of that investigation, which was the impetus that launched this very case.

The only Frutarom defendant who ascended to an executive role at IFF following the merger was Anatot, who is the only Frutarom defendant that plaintiffs concede was not directly involved in approving of or carrying out the kickback scheme in Russia and Ukraine.[26]  (See Am. Compl. ¶¶ 32-36.)  The remaining Frutarom individual defendants never served at the IFF management level, as they were never promoted beyond the level of "consultants" or direct reports to IFF management. (See id.)  Given that none of the individuals who were allegedly responsible for the kickback scheme ever occupied a managerial role at IFF, plaintiffs fail to show why the challenged omissions would call into doubt the managerial integrity of IFF, the company in which they are shareholders. See Berks Cty. Employees' Ret. Fund v. First Am. Corp., 734 F. Supp. 2d 533, 539 (S.D.N.Y. 2010) (finding statements immaterial when plaintiff "has adduced no evidence that the alleged fraud implicated the integrity of defendants' management").[27]

---

[26]     In their opposition brief, Plaintiffs state that Anatot "may not have himself participated in the bribery scheme."  (Opp. at 35.)

[27]     It is undisputed that some of the alleged bad actors remained in some capacity at IFF's wholly owned subsidiary after the merger. Plaintiffs, though, do not convincingly explain in the Amended Complaint why the managerial integrity of a single wholly owned subsidiary at a major multinational conglomerate would be a material investment factor for a reasonable investor.  Moreover, plaintiffs do not cite a single case in which a court found that potential managerial integrity at the subsidiary level overcame a presumption of immateriality based on the quantitative analysis.

Next, plaintiffs attempt to plead materiality by implying that IFF and Frutarom themselves believe that the misrepresentations were material because they brought a lawsuit against Yehudai in Israel to recoup his bonus payment. Such allegations are no substitute for well-pled facts establishing materiality for Section 10(b) claims and, in any event, cannot meet plaintiffs' pleading burden in this U.S. federal securities fraud lawsuit, as discussed above.

Plaintiffs' final argument is that "[m]ateriality can also be evidenced by a drop in the stock price." (Opp. at 30.) The Second Circuit and SAB No. 99, however, caution that "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material." Hutchison, 647 F.3d at 490 (quoting SAB No. 99 at 45,152). As the statements are presumptively immaterial from a quantitative standpoint and given that plaintiffs have not identified any other convincing qualitative factors supporting materiality, the drop in stock price alone is insufficient.

*          *          *

As the alleged payments affected well less than 5% of IFF and Frutarom's combined bottom line and there are no compelling qualitative factors that weigh heavily in favor of

materiality, plaintiffs fail to adequately plead that these challenged misstatements and omissions would be sufficiently material to a reasonable investor in IFF.

**III. Whether Plaintiffs Adequately Plead Scienter Against the IFF Defendants and Statutory Standing Against the Frutarom Defendants**

Wholly independent from the issues of whether the Amended Complaint adequately pleads that illegal payments occurred in the class period and that defendants made actionable misstatements of material fact that were contemporaneously misleading, there are two additional issues that merit discussion. The first is plaintiffs' failure to plead a strong inference of scienter for the statements attributable to the IFF Defendants. The second is plaintiffs' lack of standing under Section 10(b) of the Exchange Act to challenge statements made by the Frutarom Defendants about Frutarom.

**A.   IFF Defendants' Scienter**

Plaintiffs weave together little more than vague factual allegations, hearsay, and insinuations to produce a peculiar theory of the IFF defendants' scienter.

Plaintiffs suggest that IFF knew before the merger that Frutarom was engaged in a major bribery and kickback scheme in Russia and Ukraine and nevertheless decided to forge ahead with the largest acquisition in its history. In the process,

plaintiffs further contend that IFF——aided by seasoned transactional counsel at Cleary Gottlieb Steen & Hamilton LLP——rushed the due diligence of Frutarom because IFF already knew about (or wished to willfully ignore) this misconduct. Plaintiffs submit that IFF then proceeded to knowingly make several misstatements with the intent to deceive its shareholders over the course of nearly a year. And, according to plaintiffs, despite already knowing about Frutarom's illegal activities and making these misrepresentations, IFF nevertheless decided to orchestrate a massive internal investigation to uncover details of Frutarom's illicit business practices so that IFF could publicly acknowledge wrongdoing for the first time ten months later to both the public and the U.S. Department of Justice.

That theory is incredible in every sense of the word. Moreover, nothing in the Amended Complaint approaches a compelling case for this implausible series of events.

To sufficiently plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"——i.e., the intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2)(A); Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).

Plaintiffs can establish this strong inference of scienter by alleging facts demonstrating: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198 (citation omitted). And, for corporate defendants, plaintiffs can plead scienter through establishing "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Jackson, 960 F.3d at 98 (citation omitted).

Ultimately, to survive dismissal under this heightened pleading standard, the allegations in the complaint viewed holistically must present an inference of scienter that "a reasonable person would deem [to be] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (citation omitted).

### 1. Motive and Opportunity

To plead a strong inference of scienter as a result of a defendant's motive and opportunity, a complaint can demonstrate motive by "pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures," and opportunity by "alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." Emps.' Ret. Sys. of Gov't of

the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015) (citation omitted).

The Amended Complaint fails at the first prong, motive. To establish scienter, a complaint may not rest on "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation." ECA, 553 F.3d at 198 (citation omitted).  Instead, the motive must be sufficiently personal and particularized to the individual making the statements, such as a "corporate insider[] . . . mak[ing] a misrepresentation in order to sell [his] own shares at a profit."  Id. (citation omitted).

Here, the Amended Complaint alleges that the IFF Defendants were motivated to complete the merger to expand IFF's footprint in Emerging Markets.  (See Am. Compl. ¶¶ 5, 7.)  An assertion that a corporation and its executives were looking for lucrative avenues to expand its business is precisely the type of generalized motive shared by all profit-oriented businesses that courts in this Circuit have routinely rejected as insufficient to plead a strong inference of scienter.  See, e.g., In re Barclays Liquidity Cross & High Frequency Trading Litig., 390 F. Supp. 3d 432, 451 (S.D.N.Y. 2019) ("[A]llegations of a generalized motive that could be imputed to any for-profit endeavor would fall

short of establishing the motive and opportunity [as a] basis for an inference of scienter.") (citations and internal quotation marks omitted).

**2.   Conscious Misbehavior or Recklessness**

Where a plaintiff does not adequately plead motive, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." ECA, 553 F.3d at 198-99 (citation omitted).

To plead a compelling inference of scienter through strong circumstantial evidence of conscious misbehavior or recklessness, a complaint must set forth particularized factual allegations demonstrating that the defendant acted either deliberately or with "a state of mind approximating actual intent, and not merely a heightened form of negligence." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (citation and internal quotation marks omitted). To plead conscious misbehavior, plaintiffs must establish a defendant's actual knowledge. See id. at 308. To allege recklessness, plaintiffs must show that a defendant's conduct was, "at the least," so "highly unreasonable" that it constituted "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (citation omitted).

### a. Allegations that IFF Knew of Frutarom's Payments Before the Merger

We start with plaintiffs' assertion that the IFF defendants had actual knowledge of Frutarom's payments in Russia and Ukraine before the merger. These allegations come from two sources.

The first is an allegation that CW-1 heard from Frutarom Russia's CFO, Buriy, that Buriy had heard from Rosenthal that IFF knew about the payments in 2018 before the merger and that IFF asked Frutarom to sign an attestation to not pay bribes. (Am. Compl. ¶ 110). This triple hearsay statement relayed to plaintiffs through a confidential witness who does not have direct personal knowledge of the state of mind of any IFF Defendant is inherently unreliable, and the Court does not credit it to establish the IFF Defendants' scienter. See Altimeo Asset Mgmt., 2020 WL 4734989, at *11.

The second is a news article that quotes an anonymous source who said that IFF knew before the merger about an "under the radar payment system" that supposedly did not involve "bribes or illegal commissions" (Am. Compl. ¶ 109 (citing Ganon & Abramson, IFF Submits Frutarom Findings to U.S. Department of Justice, supra)). As explained above, this article quite obviously does not meet plaintiffs' burden

to establish that the IFF Defendants knew of bribes and illegal commissions paid by Frutarom.

>    **b.    Generalized Allegations That a Company Experienced Success Selling Products in Russia and Ukraine.**

As plaintiffs have not established actual knowledge, we turn to whether the Amended Complaint sufficiently pleads the conscious recklessness of the IFF defendants through strong circumstantial evidence.

The first theory of conscious recklessness offered by plaintiffs relies on so-called "red flags."  For ignorance of supposed "red flags" to rise to the level necessary to demonstrate conscious recklessness under the PSLRA's "rigorous" pleading standards, the warning signs "must [have] be[en] particularized, specific, and together, egregious" to alert defendants to the precise misconduct that was occurring.  Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 344 (S.D.N.Y. 2013).

Here, the supposed "red flag" identified by plaintiffs is that the IFF Defendants knew that Frutarom sold products in Russia and Ukraine. (See Am. Compl. ¶¶ 102-108.)  The general allegation that Frutarom found success in countries where there is reported corruption comes nowhere close to establishing that IFF Defendants were specifically put on notice that Frutarom was likely employing bribery and

kickback schemes in Frutarom and Russia.  See In re Key Energy
Servs., Inc. Sec. Litig., 166 F. Supp. 3d 822, 870 (S.D. Tex.
2016) ("Merely conducting business in . . . countries [known
for corruption] does not show knowledge of alleged [bribery]"
for purposes of pleading scienter under the PSLRA).

### c. Allegations That IFF's "Rushed" Diligence and "Should Have Known" Attributed to Sources Unfamiliar With IFF's Due Diligence of Frutarom

Plaintiffs' remaining theory of conscious recklessness
is that IFF failed to sufficiently conduct due diligence of
Frutarom before the merger and, if it had, it would have
uncovered obvious evidence of the payment schemes.  In
support, plaintiffs rely on (1) CW-3's assertion that he would
have expected IFF's due diligence of Frutarom to take close
to a year, and (2) CW-1's and CW-2's assumptions that it would
have been "easy" for IFF to discover the payment schemes based
on a review of financial documents and internal
correspondence.  (Am. Compl. ¶¶ 95-101, 111.)

At the outset, the Court notes that the theory that IFF
did not spend enough time conducting due diligence, which is
predicated on information provided by a confidential witness
with no firsthand knowledge, is more descriptive of
negligence than conscious recklessness.  In any event,

plaintiffs' allegations do not sufficiently allege that the IFF Defendants acted with the requisite state of mind.

First, while CW-3——a former member of IFF's executive compensation team——worked on some due diligence matters for IFF, he left IFF in 2018 and did not do any work on IFF's due diligence of Frutarom.  (Id. ¶ 96.)   CW-3 thus has no firsthand knowledge of the thoroughness of IFF's due diligence of Frutarom or what the company did or did not discover in the process.  Without more, his speculation on how much time it might have taken IFF to conduct due diligence of Frutarom cannot substitute for well-pled factual allegations establishing the level of gross departure from acceptable norms to show conscious recklessness.

Second, the allegations credited to CW-1 and CW-2 are even less helpful, as they could have no knowledge at all of IFF's diligence process.  Instead, they only had knowledge of Frutarom's documentation of the payments from four years before the merger.  Plaintiffs simply overreach by insinuating that the existence of documents from four years before the merger is enough to establish that IFF would have discovered those documents during due diligence and then immediately recognized that the documents establish the existence of illegal payment schemes.

Even putting those infirmities aside, this theory of scienter would still fail because "allegations that a defendant 'would have learned the truth' if it had performed sufficient due diligence have been repeatedly rejected as insufficient to allege [scienter]." McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105, 128 (S.D.N.Y. 2013) (citation omitted); see In re Advanced Battery Techs., Inc., 781 F.3d 638, 646 (2d Cir. 2015) ("[C]onditional allegations of a sort 'that [a defendant] would have learned the truth' about a company's fraud 'if [it] had performed the due diligence it promised' are generally insufficient to establish the requisite scienter for private securities fraud claims under the PSLRA's heightened pleading instructions.") (citation and internal quotation marks omitted).[28]

---

[28]    Plaintiffs also argue that they have established scienter under the "core operations" doctrine, which permits an inference that senior executives have knowledge of information concerning the core of their company's operations.  The majority of courts in this Circuit have found that the core operations doctrine is a supplementary, but not an independent, means to plead scienter.  See In re Barrick Gold Corp. Sec. Litig., 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) (listing cases).  Here, of course, plaintiffs do not have any other viable independent theories of scienter.  And, regardless, it is implausible to conclude that Frutarom's sales in two countries that represent a small portion of its overall sales are the "core operations" of IFF, a company that generated $5.1 billion in sales derived from nearly every country on Earth.  See id. ("Courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'") (citations omitted).

### 3. Competing Theories

Ultimately, even if the individual components of plaintiffs' scienter allegations were not riddled with legal and logical deficiencies, the Court would still need to holistically weigh plaintiffs' theory against plausible competing theories.

On the one hand is plaintiffs' curious theory, stitched together by tissue paper-thin factual allegations and conjecture, that IFF went ahead and completed a $7.1 billion acquisition of Frutarom despite knowing or willfully ignoring that Frutarom was engaged in a previously undisclosed illegal payment scheme, ordered Frutarom to stop the payments, sat on its knowledge of the payment scheme for months, made several supposed misrepresentations about Frutarom, hired a team of lawyers to conduct an expensive internal investigation to uncover that same scheme, and then suddenly decided ten months later that it would be prudent to disclose for the first time the previously secret scheme to both investors and the Department of Justice, knowing full well that it would almost certainly lead to this very lawsuit and possibly other legal ramifications.

On the other hand is the competing narrative offered by the IFF defendants that IFF did not know about Frutarom's payments before acquiring the company, that some potential

issues may have come to light while IFF integrated Frutarom
into its compliance systems, that IFF took the responsible
step of conducting an internal investigation to look into
those issues and determine whether there had been any actual
misconduct, that IFF ultimately confirmed midway through the
investigation that Frutarom had made "improper payments" in
Russia and Ukraine at some point in the past, and that IFF
promptly disclosed its interim findings about that misconduct
in August 2019 to both investors and the Department of
Justice.

Simply put, the theory offered by plaintiff does not
plausibly explain the series of actions taken by the IFF
Defendants.  See City of Monroe Employees' Ret. Sys. v.
Hartford Fin. Servs. Grp., Inc., No. 10 Civ. 2835 (NRB), 2011
WL 4357368, at *17 (S.D.N.Y. Sept. 19, 2011) (rejecting a
theory of scienter as "simply bizarre" and "illogical" when
plaintiffs suggested that defendants knew about a fraudulent
scheme, and then made several misrepresentations about the
scheme "only to reveal [the scheme] to the world a few months
later").  By comparison, the account of events offered by the
IFF Defendants is far more plausible, as it rationally
describes why they took each of the actions described above.

As plaintiffs fail to offer a cogent theory of scienter
that is "at least as compelling as any opposing inference one

could draw from the facts alleged," Tellabs, 551 U.S. at 324
(emphasis added), they fail to directly establish the
requisite culpable state of mind for the IFF Defendants.

### 4. Imputing Any Scienter of the Frutarom Defendants Post-Merger

Plaintiffs also attempt to impute the scienter of
Frutarom, Anatot, and Yehudai to IFF following the merger.

#### a. Frutarom

Proceeding from an assumption that the Amended Complaint
established Frutarom's scienter during the Class Period,
plaintiffs argue that the scienter of Frutarom, IFF's
subsidiary upon completion of the merger, can be imputed to
IFF.

Even under that scenario, the Amended Complaint does not
plead facts sufficient to extend Frutarom's scienter to IFF
or its executives. "[T]he mere existence of a parent-
subsidiary or affiliate relationship is not on its own
sufficient to impute the scienter of the subsidiary to the
parent or affiliate." Schiro, 396 F. Supp. 3d at 301-02
(citations omitted). Instead, to sufficiently plead scienter
under these circumstances, "plaintiffs must demonstrate that
the parent . . . possessed some degree of control over, or
awareness about, the fraud." Id. (citations and internal
quotation marks omitted).

There are no allegations that IFF directed any of the alleged payments.  If anything, the Amended Complaint implies that IFF took steps to ensure that Frutarom did not make any improper payments.  (See Am. Compl. ¶¶ 110, 203.)  And, as discussed above, the Amended Complaint does not adequately plead that IFF had knowledge of the payments at any relevant time.  Thus, Frutarom's scienter, even if adequately pled, cannot be imputed to the IFF defendants.

### b.   Anatot

Next, plaintiffs argue that, as a member of the "Executive Leadership team" at IFF, Anatot's scienter can be imputed to IFF.  Here, too, the Court will generously assume that plaintiffs sufficiently plead Anatot's scienter.

As recently articulated by the Second Circuit, when evaluating whether to impute the scienter of a specific employee to a corporation, "most courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." Jackson, 960 F.3d at 98 (citations omitted).

"Under this approach, the most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement."  Id. (citation and internal quotation marks

omitted).  Here, though, the Amended Complaint does not allege
that Anatot was the maker of any of the challenged statements
under Janus Capital Grp., Inc. v. First Derivative Traders
after the merger.  564 U.S. 135, 141-43 (2011) (A statement's
"maker" is "the person or entity with ultimate authority over
the statement, including its content and whether and how to
communicate it."); cf. Am. Compl. ¶¶ 182-209 (not attributing
any of the challenged statements to Anatot).[29]

Next, "[t]he scienter of the other officers or directors
who were involved in the dissemination of the fraud may also
be imputed to the corporation, even if they themselves were
not the actual speaker."  Jackson, 960 F.3d at 98 (citation
omitted).  Plaintiffs, however, concede that under the facts
alleged in the Amended Complaint, "Anatot may not have himself
participated in the bribery scheme."  (Opp. at 35.)

As the Amended Complaint does not put forth enough
"connective tissue" between the alleged statements and
Anatot, plaintiffs cannot establish that Anatot's scienter,

---

[29]    The allegation that Anatot "approved, reviewed, ratified,
[and] furnished information and language for inclusion" in certain
statements (e.g., Am. Compl. ¶ 204) is insufficient to make Anatot the
"maker" of about a half-dozen statements issued by IFF following the
merger that are expressly attributed to other individuals.  See
Gavin/Solmonese LLC v. D'Arnaud-Taylor, 639 F. App'x 664, 669 (2d Cir.
2016) (summary order) ("[A]llegations that the [statement] was drafted
with the approval and input of [an individual defendant] is not sufficient
to demonstrate the control essential to maker liability [for that
individual]."). Accordingly, plaintiffs cannot show that Anatot made any
of these statements with any intent to defraud that could be imputed to
IFF.

even if adequately pled, could be passed along to IFF for purposes of any of the challenged statements.  Jackson, 960 F.3d at 99.

### c.    Yehudai

The last argument plaintiffs offer is that Yehudai's scienter can be imputed to IFF.  As above, we will assume that the Amended Complaint sufficiently pleads Yehudai's scienter for purposes of this analysis.

Similar to Anatot, plaintiffs do not allege that Yehudai was the maker of any challenged statement issued by IFF after the October 2018 merger.  (Cf. Am. Compl. ¶¶ 182-209.)  Unlike Anatot, however, plaintiffs do allege that Yehudai was involved in the payment schemes (albeit without the requisite particularity after 2014).

To impute the scienter of an employee who was involved in or had knowledge of misconduct to his employer, the Court must analyze the employee's role in the organization.  While courts in this District "have not developed a bright-line rule to determine which employees' scienter may be imputed to a corporation, . . . 'management level' employees are, ordinarily, sufficiently senior to serve as proxies for the corporation's mental state."  Schiro, 396 F. Supp. 3d at 301 (citations and internal quotation marks omitted); see Thomas

v. Shiloh Indus., Inc., No. 15 Civ. 7449, 2017 WL 2937620, at
*3 & n.1 (S.D.N.Y. July 7, 2017) (collecting cases).

Regarding Yehudai's role vis-à-vis IFF, the Amended
Complaint simply alleges that Yehudai "remained a consultant"
or served as a "strategic advisor" for IFF after the merger.
(Am. Compl. ¶¶ 32, 92, 117.)   It is thus not clear in the
first instance that Yehudai was even an employee of the
organization whose scienter plaintiffs are trying to
establish.   This, of course, would be fatal to plaintiffs'
theory of scienter.

Moreover, even if Yehudai were an employee, nowhere in
the Amended Complaint do plaintiffs substantively explain
what role he had at IFF or connect that role to the challenged
statements disseminated by IFF.   See Thomas, 2018 WL 4500867,
at *3-4 (listing cases in which the managerial role of an
individual was sufficient to impute scienter); see also
Jackson, 960 F.3d at 98 (scienter cannot be imputed from
employee to company for alleged misstatement unless
plaintiffs plead "connective tissue between th[e] employee[]
and the alleged misstatements").   Without presenting the
Court with a descriptive title or any details about his role
at the company, the Court has no way of analyzing whether
Yehudai had a sufficiently senior and meaningful position at
IFF to impute his knowledge to the company.

**B.    Standing to Sue Based on Statements Made by the Frutarom Defendants**

Having found that plaintiffs have not adequately pled scienter as to the IFF Defendants, we now address the statements attributed to the Frutarom Defendants.  We find that, even assuming that plaintiffs adequately pled that the Frutarom defendants made actionable misrepresentations of material fact with the requisite state of mind, plaintiffs still fail to state a claim against the Frutarom defendants.  That is because plaintiffs lack statutory standing under Section 10(b) to bring claims against the Frutarom defendants for statements made about Frutarom.

Section 10(b)'s implied right of action does not allow any investor to sue any entity simply because that entity made misrepresentations that happened to affect the price of a security purchased or sold by the investor.  Rather, Section 10(b) "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 747, 754-55 (1975).  Since that proclamation, the Supreme Court has repeatedly cautioned courts not to expand the judicially created private right of action under Section 10(b) "beyond its present boundaries." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148,

165 (2008) (citations omitted); see Janus, 564 U.S. at 142 (Courts "must give narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.") (quoting Stoneridge, 552 U.S. at 167) (internal quotation marks omitted).

Our decision that plaintiffs, who have never purchased or sold Frutarom securities, lack standing to sue the Frutarom Defendants for statements relating to Frutarom is guided by the Second Circuit's decision in Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27 (2d Cir. 2004) ("Nortel"). In that decision, the Second Circuit addressed the issue of "whether an individual has standing to sue a company pursuant to Section 10(b) . . . for making a material misstatement when the individual purchased the security of a company other than the one that made the misstatement." Id. at 28.

In Nortel, shareholders of JDS Uniphase Corporation, a fiber optic component manufacturing company, sued Nortel, a global supplier of telecommunications services. JDS and Nortel entered into an asset purchase agreement under which JDS agreed to sell its laser business to Nortel in exchange for Nortel stock and Nortel's "promise of increased fiber optic component purchases" from JDS. Id. at 29. Shortly

after the preliminary agreement was publicly reported, Nortel
stated that it saw strong demand for its fiber optics products
and projected a 30% growth in revenue and earnings for that
year.  These representations led to an increase in the price
of JDS's stock.  Three days after the transaction closed,
Nortel announced that it was significantly cutting its prior
revenue and growth estimates and, as a result, JDS's share
price fell significantly.

The JDS shareholders argued that they had standing under
Section 10(b) to sue Nortel because they relied on Nortel's
alleged misrepresentations when purchasing JDS securities.
Applying the limiting principle announced in Blue Chip
Stamps, the Second Circuit rejected this argument and
emphasized that "instead of purchasing securities of the
entity that made the alleged misrepresentations, [plaintiffs]
purchased securities of a company that had a business
relationship with the misrepresenter."  Id. at 32.
Accordingly, the Second Circuit held that "[s]tockholders do
not have standing to sue under Section 10(b) and Rule 10b-5
when the company whose stock they purchased is negatively
impacted by the material misstatement of another company,
whose stock they do not purchase."  Id. at 34.[30]

---

[30]    In reaching this conclusion, the Nortel panel reasoned that
Section 10(b)'s and Rule 10b-5's language declaring unlawful certain types
of fraud "in connection with the purchase or sale of any security"

Plaintiffs offer several arguments to avoid application of Nortel, none of which convince the Court to depart from Nortel's binding precedent.

First, plaintiffs submit that the Second Circuit severely cabined Nortel's application in its opinion a few years later in In re NYSE Specialists Securities Litigation, 503 F.3d 89 (2d Cir. 2007) ("NYSE"). That opinion clarified that Nortel should not be read "mean that an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security," as such a reading would erroneously "place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers." Id. at 102 (emphasis added). This later clarification, of course, leaves undisturbed Nortel's holding that the plaintiffs lack standing to bring a lawsuit against Frutarom for self-referential statements made by a company in which plaintiffs never invested.

Second, plaintiffs argue that Nortel was overturned sub silentio by Stoneridge, 552 U.S. 148. Stoneridge, in reaffirming that Section 10(b) claims may not proceed against

---

indicates "that the regulations reach all types of securities, and not any affected company's securities." 369 F.3d at 32 (emphases in original) (citation omitted).

secondary actors on an aiding and abetting theory, offered the largely unremarkable observation that plaintiffs may sue a "secondary actor" if they can establish that the "conduct of [that] secondary actor . . . satisf[ies] each of the elements or preconditions for [primary] liability." Id. at 158. Given that one of the "preconditions" to establishing primary liability under Section 10(b)'s implied private right of action is being among "the class of plaintiffs . . . who have at least dealt in the security to which the . . . representation[] or omission relates," Blue Chip Stamps, 421 U.S. at 747, the Court does not read Stoneridge as overturning either the Blue Chip Stamps limiting principle or the Second Circuit's application of that principle in Nortel.

The Court's conclusion that Nortel's holding remains in effect after Stoneridge is further bolstered by the Second Circuit's subsequent decision in Harbinger Capital Partners LLC v. Deere & Co., 632 F. App'x 653 (2d Cir. 2015) (summary order), which applied the central holding from Nortel to find that plaintiffs lacked standing to bring a Section 10(b) action against defendants for statements made about companies whose securities plaintiffs never purchased or sold. Id. at 657. Plaintiffs entirely ignore Harbinger and fail to grapple with its impact on their argument.

Third, plaintiffs point the Court to a non-binding recent decision issued in the Eastern District of Virginia in which the court construed Nortel, NYSE, and Stoneridge as permitting shareholders of Altria, a tobacco company, to bring a lawsuit against JUUL, an electronic cigarette company, for statements JUUL made about its own marketing practices (which it carried out in part with Altria). Klein v. Altria Grp., Inc., No. 3:20 Civ. 75, 2021 WL 955992, at *9-10 (E.D. Va. Mar. 12, 2021). For the reasons explained above, the Court respectfully rejects Klein's application of these precedents. Critically, like plaintiffs, Klein failed to engage with the continuing vitality of Nortel following Stoneridge, as recognized in Harbinger. Moreover, whereas the Eastern District of Virginia court merely found JUUL's reliance on Nortel to be "unpersuasive," id. at *10, this Court must follow Nortel's precedent as binding authority.

Finally, plaintiffs urge the Court to depart from the result in Nortel because, according to plaintiffs, Nortel "explicitly recognized that a merger would present precisely the type of 'direct relationship' between the acquired and acquiring company that was missing in Nortel." (Opp. at 74 (quoting two words from Nortel, 369 F.3d at 29).) Plaintiffs egregiously misconstrue the relevant passage from Nortel. While the Nortel panel mused in dicta that "a potential merger

might require a different outcome," as it could "create[] a far more significant relationship between two companies than does the sale of a business unit," the panel ultimately determined that this situation presented "a question that we leave for another day and about which we express no opinion . . . ." 369 F.3d at 34 (emphases added).

Critically, plaintiffs do not cite a single case——and the Court is not aware of any case——in the 16-plus years since Nortel in which a court in this Circuit has sustained a Section 10(b) lawsuit by plaintiffs against a company whose stock they never purchased, sold, or had some other type of a direct investment interest in for misrepresentations the company made about itself.

Instead, the Exchange Act cases in the merger context have been limited to lawsuits against an acquiring company brought by shareholders of the target company whose shares were convertible into stock of the acquiring company. See Semerenko v. Cendant Corp., 223 F.3d 165, 169 (3d Cir. 2000); Griggs v. Pace Am. Grp., Inc., 170 F.3d 877, 878-80 (9th Cir. 1999).[31] As the Nortel dicta suggested in analyzing the Third

---

[31] Two other out-of-Circuit cases cited by plaintiffs are of little persuasive value in resolving this issue because they either never analyzed statutory standing, see Hering v. Rite Aid Corp., 331 F. Supp. 3d 412 (M.D. Pa. 2018), or applied a "flexible" approach to interpreting the scope of private actions under Section 10(b), see Braun v. N. Ohio Bank, 430 F. Supp. 367, 378 (N.D. Ohio 1977), an approach that has since been cabined by the Supreme Court's more restrictive treatment of the

Circuit's decision Cendant, it is this type of contingent shareholder status premised on plaintiffs' understanding that their stock would be exchanged for the acquiring company's stock that might present a sufficiently direct link that could give rise to standing in the merger context. See Nortel, 369 F.3d at 33-34. That rationale is also consistent with cases that have recognized the standing of owners of equity-linked derivative securities directly tied to the value of a company to sue that company for misrepresentations by virtue of that direct ownership interest. See Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956 (N.D. Cal. 2005); In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2004 WL 1435356 (S.D.N.Y. June 28, 2004).

Here, plaintiffs never purchased or sold Frutarom securities, never stood to be contingent direct shareholders in Frutarom (as opposed to IFF that became the sole shareholder), and never owned a derivative security linked to the ownership value of Frutarom. Accordingly, the Court heeds the Supreme Court's instructions to not expand Section 10(b)'s private right of action beyond its present boundaries and holds that plaintiffs lack standing to sue the Frutarom Defendants for statements they made about Frutarom, as

---

scope of Section 10(b)'s implied private right of action, see Stoneridge, 552 U.S. at 165.

plaintiffs fall outside the "class of plaintiffs . . . who have at least dealt in the security to which the . . . representation[] or omission relates." Blue Chip Stamps, 421 U.S. at 747; see Nortel, 369 F.3d at 34.[32]

## IV.  <u>Scheme Liability</u>

Plaintiffs argue that defendants violated Rule 10b-5(a) and (c)'s scheme liability provisions by "operating Frutarom's business in a way that resulted in the dissemination of misleading disclosures," such as disclosing financial results "derived from illicit business practices without disclosing the improper practices."  (Opp. at 53.)

While claims based on "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5," Lorenzo v. Sec. & Exch. Comm'n, 139 S. Ct. 1094, 1100 (2019), it follows that a complaint must still adequately plead the predicate misconduct——making a false statement or omission of material fact——to be actionable.  Here, as analyzed

---

[32]    That is not to say that IFF's shareholders are left entirely without remedy for Frutarom's alleged misrepresentations to IFF in the merger process.  IFF has every right to pursue direct legal action against the Frutarom executives who were responsible for these alleged misrepresentations, which is exactly what IFF is doing in the Israeli lawsuit against Yehudai.  And, as owners of the company, IFF's shareholders would stand to benefit from any damages IFF recovers as a result of these legal actions.

thoroughly above, the Amended Complaint does not. Consequently, plaintiffs' scheme liability claim fails.

## V.   **Control Person Liability**

Plaintiffs claim that the individual defendants can be held responsible under Section 20(a) of the Exchange Act for control person liability.   To state a claim under Section 20(a), plaintiffs must in the first instance plead a "primary violation" of the Exchange Act by the controlled person. ATSI Commc'ns, 493 F.3d at 108 (citation omitted).   As plaintiffs have not stated a claim under Section 10(b) for primary liability, no claim lies against the individual defendants for Section 20(a) control person liability.   Id.

## VI.   **Israeli Law**

Plaintiffs bring claims under the Israeli Securities Law of 1968 and urge the Court to exercise supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a). Under Section 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3).   Thus, "where all the federal claims have been dismissed at a relatively early stage, the district court should decline to exercise supplemental jurisdiction over pendent [non-federal] claims."   Astra Media Grp., LLC v.

Clear Channel Taxi Media, LLC, 414 F. App'x 334, 337 (2d Cir. 2011) (summary order); Licci v. Lebanese Canadian Bank, SAL, 659 F. App'x 13, 16 (2d Cir. 2016) (summary order) ("[T]he District Court did not abuse its discretion in refusing to exercise supplemental jurisdiction over the Israeli state law claims in light of its dismissal of all of the Plaintiffs' federal law claims.") (citations omitted).

Having dismissed all of plaintiffs' U.S. federal securities law claims, the Court declines to exercise supplemental jurisdiction over their Israeli law claims, which are dismissed without prejudice to allow plaintiffs to pursue any potential claims they may have under Israeli law in the appropriate forum.[33]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions to dismiss.  Plaintiffs' Section 10(b) and Section 20(a) claims are dismissed with prejudice for failure to state

---

[33]    Having dismissed plaintiffs' claims for the reasons set forth above, the Court does not reach the parties' arguments on loss causation, forum non conveniens, or personal jurisdiction.  See ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013) ("Although we traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues.  In cases involving multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, [a court may] proceed[] directly to the merits on a motion to dismiss.") (citations and internal quotation marks omitted).

a claim.  The Court dismisses plaintiffs' Israeli securities law claims because it declines to exercise supplemental jurisdiction over such claims.

The Clerk of Court is respectfully directed to terminate the motions currently pending at ECF Nos. 94, 95 and 103 and to close the case.

**SO ORDERED.**


Dated:     New York, New York
           March 30, 2021

_____
        NAOMI REICE BUCHWALD
     UNITED STATES DISTRICT JUDGE